# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

IN RE: AD HOC ADVISORY COMMITTEE
ON LEGAL FEES

MS-1-83-56

FILED
KENNETH J. MURPHY
CLERK

Nov 16  8 29 AM '83

U.S. ... COURT
S... ... OF OHIO
... NATI

## ORDER

This matter is before the Court in accordance with its Order of March 8, 1983, creating an Ad Hoc Committee of Cincinnati attorneys to study and report on the prevailing attorney fees charged in Cincinnati in 1983. The Committee has issued its Report. A copy of such Report is attached to this Order as Exhibit A.

The Clerk of Courts is directed to file such Report and to make it available either for inspection or for copying by all persons interested.

Such Report shall be deemed to be an inquiry into prevailing fees only. It may not be assumed to establish attorney fees in the Southern District of Ohio nor to constitute either a "fee guide" or an endorsement by the Court of the rates reported by this Committee.

It is intended for informational purposes only.

IT IS SO ORDERED.

Carl B. Rubin, Chief Judge
United States District Court

S. Arthur Spiegel,
United States District Judge

David S. Porter,
United States District Judge

Timothy S. Hogan,
United States District Judge

## ATTORNEYS' FEES IN CLASS
## ACTION LITIGATION

Few subjects in recent years have sparked as much
interest and controversy as the topic of court appointed
attorneys' fees in complex and class litigation. The last decade
has seen an unparalleled growth in the class action suit and with
this trend, a concern for the manner in which attorneys working on
various types of litigation are paid. Since the Third Circuit
decision in 1973, <u>Lindy Brothers v. American Radiator and Standard
Sanitary Corp.</u>, 487 F.2d 161, a consensus has emerged from the
circuits as to the way fees should be calculated when attorneys
rely on the courts to award fees. This general agreement at the
circuit level however, has not yielded consistent results in the
trial courts. Fee awards are essentially factual determinations
and while appellate courts have laid down general guidelines, they
have left trial court judges a great deal of discretion to tailor
the fee to specific situations. The result is that across the
nation, there is still a great deal of variation in the way fees
are calculated and awarded from court to court.

This report will review the historical development of
class action fee awards and will discuss the general law and
policies surrounding those awards at present. Separate sections
will present current Sixth Circuit law on the subject and the fee

award process in bankruptcy proceedings.  This report is
accompanied with recommendations for the fee award process.  These
recommendations are drawn from recent appellate opinions,
Professor Arthur Miller of Harvard Law School's report to the
Federal Judicial Center on attorneys' fees in class actions, and
successful trial court procedures that have been reported.  The
recommendations are necessarily general, recognizing that the
trial court judge must balance the need for uniformity and
fairness in the fee-setting process with the individual facts of
the case before the court.

# I. General Review of the Law Concerning Attorneys' Fees Awards.

### A. The Trial Court's authority to grant or review attorney's fees.

In the United States, attorney's fees have traditionally been a matter decided between attorney and client. The two parties entered into an agreement as to how and how much the attorney would be paid, without the supervision of any outside person or body. In litigation, each party assumed its own legal expenses. This "no-fee" rule (the American rule)1/ has been criticized because it fails to make an injured party completely whole. A party seeking damages recovers the amount of his/her loss, from which the attorney must be paid. See, A. Miller, Attorneys' Fees in Class Actions (Federal Judicial Center 1980) p.12.

One of the few exceptions to the "no-fee" rule recognized by the courts was the common-fund recovery.2/ Where the work of any attorney for the client resulted in the creation of a fund for the recovery of others, the Supreme Court in 1881 held that the first client should not bear the entire expense of the creation of that fund. Trustees v. Greenough, 105 U.S. 527 (1881). The

---

1/ In the United Kingdom, the losing party bears the legal expenses of both sides.

2/ For a more complete discussion of common-fund exceptions for fees See, Berger, Court Awarded Attorneys' Fees: What is "Reasonable?" 126. U.Pa.L.Rev. 281 (1977).

litigation expenses should be paid out of the fund as a whole, since all parties share equally in the benefit of the fund. To allow the first party to bear all the expense would unjustly enrich those who would receive payments from the fund without sharing the burden. Id. at 532.

The Court extended the unjust enrichment doctrine in Central Railroad and Banking Company of Georgia v. Pettus, 113 U.S. 116 (1885). There the Court found that attorneys had an independent claim to reasonable compensation from a fund that their efforts had created, regardless of obligations owed to them by their clients. The work of the attorneys created benefits for a group under no contractual obligation to pay. To allow the attorneys to go uncompensated gives the group windfall benefits. The Court held that the court's control of the creation of the fund gave it the authority to prevent recipients of the fund from collecting benefits without bearing the costs.3/

From the common fund exception, the court extended the unjust enrichment rationale and awarded attorney's fees where there was a non-monetary benefit conferred upon beneficiaries.

---

3/ As Professor Berger points out (126 U.Pa.L.Rev. at 297-299), this is not really unjust enrichment. Unjust enrichment occurs when the creator of benefits is not reimbursed for expenses. In Central Railroad, the attorneys were paid by their client, but the Court taxed additional fees against the benefit fund, giving the attorneys additional fees above and beyond the value of their time, as measured by their initial agreement with their client.

-4-

Where a plaintiff was successful in vindicating a right that
created similar rights for others, the entire group ought to bear
the legal expenses.  See, Sprague v. Ticonic National Bank, 307
U.S. 161 (1939).  Where no monetary relief at all was sought in a
stockholders derivative action, the court assessed fees against
the defendant corporation, finding that all the shareholders, and
thus the corporation itself, were the beneficiaries of the
litigation, so all should bear the burden of the cost of the legal
activity.  Mills v. Electric Auto-Lite Company, 396 U.S. 375
(1970).

The extension of the unjust enrichment rationale came to
an abrupt halt in 1975 in Alyeska Pipeline Service Company v.
Wilderness Society, 421 U.S. 240.  Up to that point, whenever the
trial court found that the plaintiff's action had created benefits
for a larger group, the court could find unjust enrichment and
assess fees against all the beneficiaries.  It was thought that
this fee-shifting arrangement encouraged litigation that was
oriented for the social good by insuring that those who brought
actions benefitting large groups of people would not be saddled
with enormous legal fees.  See, Newman v. Piggie Park Enterprises,
Inc., 390 U.S. 400 (1968).  In Alyeska, the court held that a
trial court could not pick and choose which actions it thought
conferred a benefit, but must defer to Congress, which established
by statute which social litigation would be allowed

-5-

attorneys' fees. 421 U.S., at 269. Thus, outside direct Congressional authority for an attorneys' fee award or a clear common-fund created by the litigation, courts were not at liberty to grant fees to attorneys.

Congressional reaction to the Alyeska decision was swift, and by the next year the Civil Rights Attorneys' Fee Award Act of 1976, 42 U.S.C.A. §1988 (West Supp. 1978), had been passed. The Act allowed for the award of "reasonable attorney fees to the prevailing party". Exactly what that phrase means has been the subject of much litigation itself and will be discussed later in the memorandum. In addition, similar attorney's fee provisions were included in a number of other areas of legislation, including copyright, federal securities, and antitrust. See, Berger, Court Awarded Attorneys' Fees: What is "Reasonable?", 126 U. Pa. L. Rev. at n. 104. The rationale behind these statutory grants is much like the "private attorney general" theory that the Supreme Court espoused in Newman v. Piggie Park, supra. at p. 4. Since the government cannot be everywhere at once, some of the responsibility for the enforcement of individual rights must be borne by private citizens. In acting to enforce those rights, individuals ought not to be personally liable for the expense of enforcement. By granting attorneys' fees to successful plaintiffs in social litigation, the primary impediment to a private litigant is removed. Moreover, if the defendant is the party responsible for paying the plaintiff's fees, there is an additional incentive

-6-

for the defendant's voluntary full compliance with the law. Berger, at 309.

The common-fund and statutory provisions allow courts to award fees to attorneys in particular kinds of actions. Normally, courts do not have the authority to review fee-arrangements between parties. There is an exception, however, for class action litigation. F.R. Civ.P.23(e) requires that the court act as a guardian for unnamed members of the class and protect their interests in the litigation. If the plaintiff and defendant have worked out a settlement which includes the payment of plaintiff's legal fees, the court under Rule 23(e) must review that term of the settlement, along with all others, for fairness to the class as a whole. Foster v. Boise-Cascade, 420 F.Supp. 674 (S.D.Tex. 1976), aff'd, 577 F.2d 335 (5th Cir. 1977).

There are two underlying rationales for the court review of settlements including attorneys' fees. The first is that the court has a responsibility to protect not only the class, but the institution of class action litigation. To approve a settlement which is fair to the class but also includes a large attorneys' fee over and above the class award only serves to further the public perception of litigation as primarily feeding lawyers and not acting in the public interest. Keeping attorneys' fees reasonable helps to prevent class actions from falling into disfavor and limits the erosion of the incentive for private citizens to pursue litigation. Id., at 677.

-7-

The second rationale for court review of settlements which include attorneys' fees is more practical. When a defendant decides to settle, it looks at the total cost of the settlement agreement, both the class award and the fees. The defendant is not really concerned about the proportion of the award between counsel and client, just the total cost. Grunin v. International House of Pancakes, 513 F.2d 114 (8th Cir. 1975), cert. denied, 423 U.S. 864 (1975). This means that there is an inherent conflict of interest for the plaintiff's attorney in negotiating an "over and above" fee settlement with the defendant. Every dollar of the total amount that the attorney apportions to the fee is one less dollar to the class. Without some sort of protection for the class members, the total fee award may rise to an excessive level. If the defendant is willing to pay a large settlement, the extra benefit of that amount may not go to the class members, but to the attorney representing the class. The court must take the responsibility for reviewing the entire settlement agreement in order to insure fairness to the class. See, Levin v. Mississippi River Corp., 377 F. Supp. 926 (S.D.N.Y. 1974).

B. Methods of Calculating Attorneys' Fees: The Lodestar Approach.

While the authority for a trial court to award or review attorneys' fees has been relatively clear for a number of years, the method of calculating the amount of those fees has been the

source of some controversy. Until the early 1970's, while courts listed a variety of factors that were to be considered in making awards 4/, the most important element upon which fee awards were based was the amount of the actual recovery for the class. Courts routinely awarded a percentage of the total recovery to the attorneys, varying the actual percentage with the court's subjective evaluation of the attorney and the manner in which he/she handled the case.

The percentage of recovery method has been criticized from all sides. The principle objection has centered on the size of the award. An award of one-third of the recovery (a typical contingent fee amount) in a large class suit may be millions of dollars. Beyond the initial amount of time and effort on the part of the attorney, additional members in the class increase the size of the fund without increasing the amount of work for the attorney. For this reason, there is a concern that percentage award encourages attorneys to "pad" the class with additional members to increase the total recovery. Other criticisms have included the concern that percentage of recovery awards compel attorneys to seek monetary damages when equitable forms of relief might be more appropriate. The percentage award also encourages

---

4/ The influential opinion in In re Osofsky, 50 F.2d 925 (S.D.N.Y. 1931) listed the following factors: time spent on the case, quality required by the case, quality demonstrated by the attorney, amount involved in the litigation, the result or real benefit, and the reputation of the attorney.

attorneys to seek out litigation that requires a minimum of effort
to secure recovery, rather than more risky litigation which may
involve considerable expenditures of time and effort without
certain vindication. This "easy" litigation often arises in the
wake of government investigations. Attorneys file suit after
wrong-doing is discovered by governmental bodies and hope to
secure large settlements with a minimum of independent effort.5/
See, Miller at pp. 25-26.

The percentage of recovery method was first rejected in
the Third Circuit in <u>Lindy Brothers v. American Radiator and
Standard Sanitary Corp.</u> 487 F.2d 161 (1973)(<u>Lindy</u> I). The court
held that attorneys' fees in class actions were to be calculated
in the following manner. Each attorney involved was to submit the
number of hours worked, along with a description of how the time
was spent. The court was to multiply the number of hours by a
reasonable billing rate, which would vary for each attorney,
taking into account the attorney's qualifications and reputation.
Once this base figure, known as the lodestar, was obtained, only

_____

5/ The percentage of recovery method is not without its
defenders however. In a recent article in the <u>National Law
Journal</u>, two Chicago attorneys argued that time-rate calculations
are as prone to abuse, with time padding and overkill litigation
techniques, as the percentage method. The percentage method is
simple, encourages quick resolution, rewards good results, and
provides fairness to the class, because it represents the type of
contract that the individuals would have had with an attorney, had
they pursued the litigation separately, rather than as a class.
Solovy and Mendillo, "Calculating Class Action Awards: Is it Time
to Unload the Lodestar?", <u>National Law Journal</u>, May 2, 1983 at 20,
Col. 3.

then could the court vary the figure for the subjective factors of
risk and quality of representation. On rehearing, the Third
Circuit elaborated on the method, stating that hours spent on
matters of more concern to the individual client or the attorney,
and hence not principally benefitting the class, were to be
excluded from the initial lodestar calculation. For example, time
spent informing the client on the progress of the case was not
properly assignable to the class. The court specified that in
evaluating risk as an adjustment to the lodestar, the trial court
was to consider the effect of prior actions, probability of a
plaintiff's verdict, difficulties of proof, and evaluate the
financial risk to the attorneys in the litigation, in terms of
resources committed and delay in payment. The quality adjustment
factor ought to recognize exceptional performance, in part
measured by the percentage of the potential recovery the actual
recovery represents. Lindy II, 540 F.2d 102 (3rd Cir. 1976). See
also, Miller, at 26-33.

    The lodestar approach has been adopted by a number of
other circuits including the Second, City of Detroit v. Grinnell
Corp., 495 F.2d 448 (1976), the Sixth, Northcross v. Board of
Education of the Memphis Schools, 611 F.2d 624 (1979), and the
Eighth, Grinell v. International House of Pancakes, 513 F.2d 114
(1975), cert. denied 425 U.S. 864 (1975).

    Shortly after the Lindy I decision, the Fifth Circuit
decided the same problem with a slightly different approach

-11-

<u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (1974).
Instead of developing a formula for the calculation of fees, the
Court of Appeals listed twelve factors to be considered in making
fee awards.  They are:

    1)    Time and labor required.

    2)    Novelty and difficulty of the legal questions.

    3)    The skill required to perform the legal services
          properly.

    4)    Preclusion of other employment caused by the
          litigation.

    5)    The customary fee.

    6)    Whether there is a private fixed or contingent
          fee agreement.

    7)    Time limitations.

    8)    The amount involved and the recovery obtained.

    9)    The experience and ability of the attorney.

    10)   The undesirability of the case.

    11)   Nature and length of attorney's relationship
          with client.

    12)   Awards in similar cases.

The court held that all these factors were to be considered,
depending on their relevance to the case at hand.

      This list of factors was used extensively in the Fifth
Circuit and routinely cited by courts in other circuits until

1980, when the Court of Appeals recognized that four of the
factors, time spent, customary fee, amount involved and the
results obtained, and the experience and reputation of the
attorney, were by far the most important. The court held that
those factors must be considered and a fee calculated from them
before other factors were analyzed. Copper Liquor, v. Adolph
Coors Co., 624 F.2d 575 (1980). On rehearing, the Appeals Court
held further that, in general, the minimum fee ought to be no less
than the number of hours spent times a reasonable rate. Copper
Liquor III, 684 F.2d 1087 (1982). The result of this refinement
is that the Fifth Circuit has basically adopted a lodestar
approach, rather than the list of factors. Whether other
circuits, which followed the earlier Johnson approach, will
continue to do so or develop a more structured approach is
difficult to say 6/.

      C.  Application of the Lodestar Approach to Statutory
           Attorney's Fee Awards.

Under provisions like the Civil Rights Attorney Fee Award
Act, courts have the authority to award attorney's fees to the
prevailing party. How the court should determine the amount of
those fees was most recently clarified by the Supreme Court in

---

6/ The difficulty of trying to generalize or predict how the
various circuits adopt fee standards is well illustrated in
Professor Miller's survey of the circuits on this question in
1980. See, Miller, at 74-184.

Hensley v. Eckerhart, 51 U.S.L.W. 4552 (1983). The statute allows prevailing parties to recover reasonable attorneys' fees from the defendant.

The term "prevailing party" is generally considered to be a prevailing plaintiff although attorneys' fees have been awarded to a defendant where the lawsuit brought was frivolous or intended as harrassment. Christiansburg Garment Co. v. EEOC, 434 U.S. 412 (1978). A party is generally considered to be prevailing if it has succeeded on "any significant issue in the litigation which achieves some of the benefit the parties sought in bringing the lawsuit." Hensley, at 4554, citing, Nadeau v. Helgamoc, 581 F.2d 275 (1st Cir. 1978). In accord, Copeland v. Marshall, 641 F.2d 880 (D.C. Cir. 1980), Northcross v. Board of Education, 611 F.2d 624 (6th Cir. 1979). Whether a party prevailed is a threshold determination, bringing the party under the terms of the Act. The Act does not specify which hours will be compensated.

In Hensley, the court held that in evaluating the hours spent on the litigation by a party who prevailed on only some of the issues, the trial court must examine the relationship between the successful issues and those rejected. If the issues that failed were related in substance to the successful claims, hours expended on those issues are sufficiently related to the party's success so as to warrant compensation. "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a

-14-

sufficient reason for reducing a fee.  The result is what matters."  Id., at 4555.

If, on the other hand, the party has raised "distinctively different claims for relief based on different facts or legal theories" and only some of those claims are accepted by the court, the hours expended on those claims are not sufficiently related to the prevailing issues to warrant compensation.  An example would be a claim brought where the case law was in opposition to the theory behind the claim.  Jones v. Federated Department Stores, 527 F.Supp. 912 (S.D.Ohio. 1981).

The court held that the trial judge, after separating the claims according to their relationship to the party's success, must finally evaluate the extent of the party's success.  Where the party achieved the bulk of the relief it sought, time spent on individual claims not accepted should be compensated in recognition of the principle that full recovery should yield full compensation.  While those claims may be legally non-related, the pursuit of them may affect the plaintiff's success in other areas.  Attorneys who are successful in vindicating their client's rights, through whatever legal maneuvers, should be fully compensated.

Hensley deals specifically with which hours ought to be compensated in statutory fee awards and approves the lodestar approach.

-15-

> The most useful starting point for determining
> the amount of a reasonable fee is the number of
> hours reasonably expended on the litigation
> multiplied by a reasonable hourly rate. This
> calculation provides an objective basis on
> which to make an initial estimate on the
> value of a lawyer's services.

Id., at 4554. From the lodestar amount, the district court is

free to adjust the amount up or down in accordance with the

factors listed in the Johnson case. The court adds the cautionary

note that, as was recognized in Copeland v. Marshall, supra. at

890, many of the factors listed in Johnson are already

incorporated in an attorney's billing rate, Id., at n.9, and

adjustments based on those factors should be made prudently7/.

Also, in accord with Copeland, the district court should

make sure that hours included in the lodestar calculation which

would not be compensated if the attorney was billing a client, are

not compensated simply because the adversary is paying the bill.

Id., at 4555, citing Copeland at 891. Presumably, if an attorney

does not normally bill time spent preparing clients' bills, those

hours should not be taxed against the defendant.

Another concern under statutory fee awards is the

relationship of those awards to contingent fee contracts. Even in

situations where statutory attorneys' fees may be awarded,

---

7/ "A quality adjustment is appropriate only when the
representation is unusually good or bad, taking into account the
level of skill normally expected of an attorney commanding the
hourly rate used to compute the lodestar." Copeland, at 893,
(emphasis in the original).

attorneys and clients may have signed contingent fee contracts at the outset of their relationship. Where a contract exists and the attorney petitions for fees under the statute, the amount that counsel receives from the statutory award should be offset against the amount required by the contract. <u>Wheatley v. Ford</u>, 679 F.2d 1037 (2nd Cir. 1982). The existence of a contingent fee contract does not bar the attorney from seeking fees under the statute, and the court in awarding fees should not consider the amount that the contract would yield to be the ceiling on the statutory award. <u>Strama v. Peterson</u>, 561 F. Supp. 997 (N.D. Ill. 1981). This is particularly true in civil rights cases where monetary recovery might be quite small. Under the statute, the attorney is entitled to fees, calculated by the standard employed within that circuit, regardless of the existence of a prior contract. The attorney may not collect twice, both the full amount from the statute and the contract, but is entitled to at least the amount calculated under the statute.

Where statutory fees are available, but counsel chooses to receive fees under the contingent fee contract, the trial court under its supervisory powers, may interfere with the contract. Attorneys' fee statutes in areas like antitrust were designed to insure not just that attorneys pursuing important litigation would be compensated fairly, but that they would not be overcompensated. The concern under the antitrust fee award

-17-

statute was that a plaintiff might have his or her treble damages unduly diminished by payment of fees on a contingent contract. Perkins v. Standard Oil, 474 F. 2d 549 (9th Cir. 1973), cert. denied 412 U.S. 940 (1973).  The court has two separate sources of authority to interfere with the contingent fee in those situations:  the power to award a reasonable fee under the statute and the power to overturn an unreasonable contingency fee under its supervisory powers.  The contingency fee can only be upset if it steps beyond the outerbounds of reasonableness, and courts should be reluctant to intrude on the contractual agreement between between attorney and client.  Farmington Dowel Products v. Forster Manufacturing Company, 421 F.2d 61 (1st Cir. 1970).  The contract should be evaluated by its reasonableness at the time it was made, the risk involved in the litigation, and the plaintiff's sophistication.  International Travel Associates v. Western Airlines, 623 F. 2d 1255 (8th Cir. 1980).  If the court finds that the contingent fee does exceed an outer limit of reasonableness (in an antitrust case, the general guideline is that the fee should not be larger than the untrebled amount), it may then upset the contract and award fees as the standards of the statute will allow.  Id., at 1260.

There are two other issues involved in calculating fees under statutory authority that are not generally present in other types of litigation.  The first is that civil rights and Title VII litigation is frequently directed at governmental bodies.

-18-

Attorneys' fees assessed against such defendants will eventually come from tax revenues. Some courts have been reluctant to award full lodestar fees in those cases. This concern was rejected by the Appeals Court in Copeland and by the Third Circuit in Rodriquez v. Taylor, 569 F.2d 123; cert. denied, 436 U.S. 413 (1978).

> The fact that the City of Philadelphia's tax revenues must pay the fee award does not warrant special standards for public and private employers. The reasonable value of an attorney's time does not depend on who his or her adversary is.

Id., at 1244, n. 32. 8/.

The second issue present in statutory awards cases is that frequently the relief sought is not monetary, but equitable. Courts have been reluctant to award large attorney's fees in cases with nominal or no monetary damages. This reluctance is misplaced; the rationale behind these statutes is to assure that this type of litigation is pursued, and not just in cases that will yield large recoveries. The Sixth Circuit specifically held in Kinney v. Rothchild, 678 F.2d 658 (1982), that the lodestar approach, awarding reasonable fees based on the amount of time expended, was to be used even when it resulted in an attorney's fee much larger than the original damages.

---

8/ Judge Wilkey in his dissent to Copeland points out that the punitive effect of attorney's fee awards is not felt by government agencies, as it is in the private sector. The attorney fees are taken from the general treasury, not the department responsible for the injury, and persons responsible for the violation are insulated from the deterrent effect that attorney's fees are supposed to have.

Summarizing then, under statutory attorney's fee awards, attorneys for prevailing parties are to be awarded reasonable fees, based on the lodestar approach. Hours to be used in calculating the lodestar should include all hours spent on successful claims and claims related thereto. Only hours clearly irrelevant to successful claims are to be excluded, as well as hours not normally billed to the client. Once the lodestar has been calculated, it may be adjusted for extraordinary factors; but the court should keep in mind that some contingency and quality factors may be accounted for already in the hourly billing rate used in calculating the lodestar.

D. Calculation of Attorneys' Fees in Common-Fund Cases

While there appears to be general agreement on the use of the lodestar approach in theory as the method of calculating attorneys' fees, in application, there is a great deal of variation at the trial court level in how the lodestar approach is used. In part, this variation is a reflection of the factual nature of attorney's fee awards and their relationship to the particulars of a given case. In part, the variation stems from the wide discretion of trial courts in making fee assessments. In Lindy I, the Third Circuit established that attorney's fee awards would be reviewed only for abuse of discretion. Other circuits have generally followed this standard.

In using the lodestar calculation, it is not enough to say that the number of hours spent will be multiplied by a

reasonable hourly rate and then any necessary adjustments made. Adjustments can be made at a variety of points, different rates used for different tasks, different multipliers used for different jobs, etc. What follows are examples of three different techniques used by different courts in calculating attorney's fees.9/.

　　　1.　In re Equity Funding Corporation of American Securities Litigation, 438 F. Supp 1303 (C.D. Cal 1977). This case was an extensive securities fraud class action, involving many attorneys. The calculation of the lodestar was done in the following manner.

　　　a.　Time. The court divided all time records from all attorneys into five classes: pre-consolidation, consolidated litigation, settlement negotiation, settlement administration, fee petition. Duplicative hours were allowed before consolidation; afterwards, only tasks assigned to attorneys by virtue of the lead counsel arrangement were compensated.

　　　b.　Rates. The court established from the attorneys' own records the billing rates to be applied. Three different rates were recognized: partner, associate, paralegal. The same rate was applied to all tasks performed by an attorney at that level.

---

9/　These cases were selected for illustrative purposes because the opinions gave careful explanations of the way in which the fees were calculated, a virtue not generally found in attorneys' fee award cases.

The court used the historical rate (rate charged at the time services were performed).

     c. _Adjustments_. The court relied on the multiplier to correct possible inequities created by the lodestar, as well as to compensate for the risk of the litigation and the quality of the work. The court recited the factors listed in _Lindy II_ as determinative of the size of the multiplier. It analyzed the burden of proof that the plaintiffs bore in light of the facts, the risks in developing the case, including the hours worked without compensation and out of pocket expenses, and the delay in the receipt of payment. Balancing these factors, the court established three multipliers. The highest multiplier (3) went to plaintiffs' lead counsel, the next to partners in other firms (2), and the smallest to associates in other firms (1.5). The multiplier was applied to all hours exclusive of settlement administration and paralegal hours.

     d. _Conclusion_. In this case, the court relied on the multiplier to solve all possible inequities in the fee systems. While hours expended by attorneys were carefully evaluated, the rates applied to those hours were summarily accepted by the court. The actual figures selected by the court as multipliers were unexplained, although the rationale of differentiating the multipliers used on the basis of risk and responsibility was quite clear.

<div align="center">-22-</div>

2.   <u>In re Folding Carton Antitrust Litigation,</u> 84 F.R.D.
245 (N.D. Ill. 1979).  In this exceptionally large antitrust case,
the court appointed a committee to evaluate and determine the fee
awards to the plaintiffs.  The committee consisted of two members
of the lead counsel committee and an attorney from outside the
litigation entirely.  The committee reviewed all fee petitions and
reported to the court, which adopted the report in its entirety.

a.   <u>Time</u>.  Early in the case, the court had established
the requirement of high quality time records.  Hours not
sufficiently documented were excluded.  Duplicated hours were
excluded from each attorney's time as was general "read & review"
time unless the attorney had specific responsibility for that area
or client.  (Time was allowed for review of plaintiff's newsletter
and pre-trial material).  Hours spent on individual clients, fee
petitions and time summaries, and extensive filing time were also
deducted.  Finally, the committee evaluated the reasonableness of
hours spent on a particular task in light of the committee's own
experience and reduced hours claimed, if they were excessive.

b.   <u>Rate</u>.  The committee established the rate to be the
standard fees charged by attorneys of various levels of experience
in the city of the litigation, Chicago.  While the attorneys came
from all over the country and consequently a variety of fee rates
were claimed, the committee selected the locality of the
litigation as the best compromise.  The highest rate was given to
attorneys on the executive committee, a lesser amount to other

-23-

partners, and a smaller range of rates to associates. The same rate was charged to all time logged by a particular attorney.

c. <u>Adjustments</u>. Because this litigation was resolved fairly quickly, the committee felt that inflation and interest were best accounted for by using present rates, rather than historical rates, corrected for both inflation and the time value of money. To reward the attorneys for the excellent quality of the litigation, the committee determined that a multiplier was appropriate. To determine the appropriate multiplier, the committee used an economist to calculate a figure which would represent the additional amount of money needed by an attorney to provide sufficient incentive to take on litigation with this kind of risk. <u>See</u> Appendix A for the methodology and calculations utilized in this technique.

d. <u>Conclusions</u>. The committee system worked well in carefully establishing the lodestar, balancing accurate and careful accounting of time factors with the need for some simplicity in setting the fee rates. The use of an expert to calculate a multiplier was novel (and apparently unduplicated in other cases). A multiplier does seem appropriate in this case on its facts, since the plaintiffs were able to recover 118% of the relief originally sought.

3. <u>Copper Liquor, Inc. v. Adolph Coors Co.</u>, 624 F.2d 575 (5th Cir. 1980). This small antitrust case came before the Fifth Circuit three times before final resolution. While technically

-24-

not a common fund case, it clearly expresses the fee award procedure. In the final opinion, the Circuit Court approved the following lodestar calculation.

a. <u>Time</u>. The Court of Appeals held that only time clearly reflected in contemporaneous time records could be compensated. Duplicitous time would be excluded. Time spent on appeals and unsuccessful issues would be compensated so long as related to success on the merits.

b. <u>Rates</u>. The court accepted attorney affidavits as to customary rates. These rates were to reflect as many of the Johnson factors as possible, including the attorney's reputation and experience and the attorney's assessment of risk involved in the litigation.

c. <u>Adjustments</u>. The Court found that an accurately calculated lodestar should adequately compensate attorneys for their employment. Attorneys should be paid at an appropriate rate for justified hours. The fee calculated in this manner should not be reduced without a clearly articulable reason, nor should it be arbitrarily increased.

d. <u>Conclusion</u>. This type of calculation puts a great deal of faith in the lodestar calculation and is most in line with the most recent cases on statutory attorney fees. The emphasis here is on accurately calculating the lodestar and allowing the billing rate to absorb some of the contingent factors sometimes attributed to the multiplier. Because this was a small case,

there was little need to break down into categories the hours spent. Had that been necessary, and the billing rate varied to reflect the various risks and quality of representation, this approach would probably be the most desirable.

As evidenced by the variety in these three cases alone, it is clear that the range of techniques for calculating attorneys' fees to be paid from a fund is broad. The trial court is at liberty to use a variety of aids to help it make fee decisions, as well as latitude in deciding the fee itself. It is very common in large litigation today to appoint lead counsel or lead counsel committee, which helps to eliminate duplicated time. At the time the lead counsel is appointed, some courts have also established a standardized billing procedure, so as to accurately keep track of time as it is accumulated. In some cases, a magistrate has been appointed at that point to oversee the entire process of time and fee assessment, and the court has relied on the magistrate's final report for the fee award. See, e.g. White v. Crowell, 434 F. Supp.1119 (W.D. Tenn. 1977).

Another useful technique employed by some courts is the appointment of a monitor for the class at the time of fee awards. This approach is particularly critical when the fee comes out of a fund created by the defendant. At that point, the adversary system breaks down. Since the defendant has already paid its money into the fund, it has little concern as to whom the monies go. There is a clear conflict of interest between the interests

of the class and their attorneys in such a situation; the larger the attorneys' share, the smaller the actual recovery by class members. By appointing a monitor for the class, the court can rely on the adversary system for an investigation of the accuracy and reasonableness of the fees. In Miller v. Mackay International, Inc., 70 F.R.D. 533 (S.D. Fla. 1976), the court appointed a monitor to represent the class in a dispute with the class attorneys as to the composition of the fee, when cash and securities of unclear value were in the settlement fund. In appointing monitors, the court should be careful not to add an additional burden on the resources of the fund, as the monitor will also be paid from the fund. Miller, at 342.

Finally, some commentators have expressed concern over the strict use of the lodestar calculation in common fund cases, without regard for the size of the fund itself. Mr. Herbert Newberg, a recognized expert in class action litigation, testified in the Beverly Hills Fire litigation (December 18, 1981, pp. 21-31) that the lodestar calculated without adjustment might unfairly diminish the fund for the class, since attorneys' fees come directly from that recovery. He argued that the lodestar should be calculated and then compared to the fund. If the lodestar is disproportionately large as compared to the fund, the amount given to the attorneys should be reduced. As the size of the fund increases, the lodestar can be taken at its face value for the attorneys' award. When the size of the fund is

sufficiently large that it can withstand the use of multipliers and larger hourly rates, the court may increase the size of the award, keeping the total fee in proportion to the fund. Mr. Newberg also stated that as the size of the fund increases above the "break-even" point (that is where the lodestar is equal to approximately 30% - 40% of the fund), the ratio of the fee award to the total fund should decrease. He argued that above a certain point, it takes less marginal effort for attorneys to increase the size of the fund and that, therefore, the percentage of the fund given to them should decline. Without giving specific numbers, he stated that a declining sliding scale of attorneys' fees seemed to be the most appropriate in cases with large fund recoveries. In the Beverly Hills case, for example, the total fund was approximately 25 million dollars. Mr. Newberg testified that in a fund of that size, no more than twenty percent of the total fund should be designated for the attorneys, about five million dollars.

What Newberg proposed is not a return to the percentage of recovery system, but a sensitivity on the part of the trial judge to the proportion of any fund created that is given to the attorneys. Since the fund is immediately depleted by the fee award, the actual recovery to the plaintiffs is instantly reduced. Theoretically, the lodestar in a difficult case that yielded a small fund could consume the entire recovery. The trial court cannot be slavish to the use of the lodestar, but must use sound discretion in the award of an appropriate fee.

-28-

E.  Attorneys' Fees in Mass Tort Class Actions.

While not unknown, most tort litigation is not conducted through a class action.  For a while, it was thought that F. R. Civ. P. Rule 23 precluded the use of class actions for tort claims:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class acton because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting individuals in different ways.  In these circumstances an action nominally conducted as a class action would degenerate in practice into multiple lawsuits separately tried.  F.R. Civ. P. Rule 23, Advisory Committee note.

In a normal products liability suit, for example, too many separate issues of causation, contributory negligence, and other affirmative defenses, interfere with the purpose of class litigation.  Without a significant number of common facts between plaintiffs, a class action is not an efficient litigation technique and may unnecessarily foreclose plaintiffs from pursuing their case in the manner in which they would prefer.

There are tort claims which do lend themselves to class actions, however.  The most common is the sudden accident or mass disaster situation.  These accidents must be the kind in which there is common causality to the injuries and few, if any, affirmative defenses.  In re Federal Skywalk Cases, 680 F.2d 1175 (8th Cir. 1982), cert. denied 103 U.S. 542 (1982) (J. Heaney, dissenting).  Not all issues can be tried in the same forum in a

-29-

tort class action. Negligence and proximate cause are issues that can appropriately be determined for all class members, but questions of individual exposure and damages must be severed for individual trials. See, Hernandez v. Motor Vehicle Skyward, 61 F.R.D. 558 (S.D. Fla. 1974), aff'd 507 F.2d 1278 (5th Cir. 1975). The necessity of severance of issues would appear to be the major objection to tort class actions, but severance is not uncommon in non-tort actions routinely certified as a class. For example, in securities fraud cases, the issue of misrepresentation may be tried as a class, but individual reliance must be shown in individual trials. Id. at n. 7. The most important element for class certification of a tort action is a clearly common set of facts to the plaintiff class.

Even if there are uniform issues between the plaintiffs in tort actions, the most common technique for streamlining the litigation is not the class action, but consolidation of cases for pretrial discovery and motions as recommended by the Manual for Complex Litigation, §2814.07. For the purpose of judicial efficiency, a primary reason for any class action, pre-trial consolidation may be the best technique as it protects the rights of individual plaintiffs more completely than a class action necessarily can and increases the court's efficiency at the same time.

A court utilizes the class action, however, where there is concern that the ability of a particular plaintiff to be compensated by a defendant whose liability has been shown may

depend upon the number of previous plaintiffs.  Federal Rule of
Civil Procedure 23(b)(1)(B) provides in part that

> An action may be maintained as a class action if
> ... the prosecution of separate actions by or
> against individual members of the class would
> create a risk of ... adjudications with respect to
> individual members of the class which would as a
> practical matter be dispositive of the interests
> of the other members not parties to the
> adjudications or substantially impair or impede
> their ability to protect their interests.

Where the defendant's total potential liability exceeds the assets
available, the court may wish to certify a class under
23(b)(1)(B), so that all victims may receive some compensation and
not just those who are first to trial.  Coburn v. 4-R Corporation,
77 F.R.D. 43 (E.D. Ky. 1977)  In the Coburn case, the Beverly
Hills Fire class certification, the limited assets of the
corporation and the limited amount of insurance available as well
as the number and severity of the injuries, almost certainly
indicated that there would be insufficient or no recovery for all
but the first few plaintiffs.  The trial court found that the
limited assets available for compensatory damages created a
situation in which the interests of the first plaintiffs would be
dispositive of the interests of all others, as all monies for
damages would be dissipated.  This situation fell within the
parameters of 23(b)(1)(B) and was appropriate for a tort class
action.

A recent Eighth Circuit case, however, would seem to
limit the tort class action under 23(b)(1)(B) to situations where

-31-

compensatory damages may be limited by defendant's assets.  In re
Federal Skywalk Cases, 680 F.2d 1175 (1982).  There, the circuit
court decertified a class of plaintiffs injured in the Hyatt
Regency skywalk accident in Kansas City.  The lower court had
instituted a mandatory class action because there was limited
potential recovery of punitive damages.  Under Missouri law, it
appeared that punitive damages could be assessed only once against
a defendant.  The court saw a potential race to the courthouse and
thought that all plaintiffs should share in the recovery of
punitive damages.  The circuit court rejected this analysis,
holding that a mandatory class action violated the Anti-Injunction
Act, 28 U.S.C. §2283, because it foreclosed plaintiffs' ability to
pursue punitive damages in state court or in settlement.  Punitive
damages were not sufficiently central to the need for a class
action to warrant the foreclosure of other actions by the class.

Even if the nature of the tort claim is appropriate for a
class action, it is not clear that the court should award attorney
fees.  Other types of class actions need judicial interference
into the fees of the attorneys because the nature of the
litigation is such that attorneys undertaking the litigation might
not be adequately compensated for their efforts.  This is
particularly true under statutory awards of fees, where but for
the statute, the attorney might not receive any compensation.  In
other types of common-fund class actions, substantial numbers of
plaintiffs have no representation at all and are merely riding the

-32-

coattails of others who have sought counsel. The doctrine of unjust enrichment allows the court to distribute the cost of counsel among all those who recover.

Neither of these situations is generally true in tort litigation. Generally, when a defendant is found liable in a tort claim, substantial damages are awarded. Counsel can be compensated adequately under a contingency fee contract. Moreover, plaintiffs in tort actions are likely to be represented by counsel, so that the coattail plaintiff problem is not as likely to occur. Because tort claims are normally not certified as a class, the bulk of the plaintiffs are likely not only to have previously engaged counsel but also to have signed contingency fee agreements with their attorneys. The results of the litigation may be such that the most sensible approach to the attorneys' fees is to allow the contingency contract agreements to stand and have each attorney responsible for collecting his or her own fees.

In cases where the class is instituted because of potential limited recovery by plaintiffs, the court may well wish to override any contingent contracts and award fees from the fund. This may be necessary because of and is justified by the court's role in protecting class members. Where compensatory damages are limited, the court should be certain that attorneys are not receiving a disproportionate share of a diminished recovery.

-33-

Should the court decide to award fees in a tort class action, it has the authority both to award the fees from the fund, under the common-fund rationale discussed supra. and to override any contingency fee contract.

> Where an attorney recovers a fund in a suit under a contract with a client providing that he shall be compensated only out of the fund he creates, the court having jurisdiction of the subject matter of the suit has the power to fix the attorney's compensation and direct its payment out of the fund.

Krause v. Rhodes, 640 F.2d 214, 217 (6th Cir. 1981) citing Garrett v. Mcree, 201 F.2d 250, 253 (10th Cir. 1953). The court should review the agreement particularly if the contract between attorney and client was negotiated long before there was any indication that a class would be formed or that recovery might be limited.

Where the contingent fee contract is to be satisfied from settlement funds in a class action, the court must review the agreement for fees and insure that class members are adequately protected. Dunn v. H. K. Porter, 602 F.2d 1105 (3rd Cir. 1979). An agreement which is fair on its face, and would have been at the time it was signed, may prove to be unreasonable in light of the results of the litigation.

Where contingent fee contracts exist, courts have in general been reluctant to interfere with them unless there are extenuating circumstances, requiring the court's protection. Contingent fee contracts have been overturned where the plaintiffs

-34-

have been found to be unable to protect their own interests in the contract negotiations. Rosquist v. Soo Line Railroad, 692 F.2d 107 (7th Cir. 1982). Groups that have been identified as potentially unable to protect themselves in fee contracts are minor children, Hoffert v. General Motors Corp., 656 F.2d 161 (5th Cir. 1981), Donnarumma v. Barracuda Tanker Corp. 79 F.R.D. 455 (C.D. Ca. 1978), seamen (under the protection of admiralty law), Schlesinger v. Teitelbaum, 475 F.2d 137 (3rd Cir. 1973), and members of the class who may have had little or no contact with the attorney in class action litigation, Dunn v. Porter, supra.

In the case of a tort class action, it is not so much the type of plaintiff which would provide the rationale for non-enforcement of the contingency fee contract, but the factual situation which makes the class action feasible in the first place. Generally, the most compelling reason for a tort class action is limited recovery available from the defendant. A contingent fee arrangement of one-third the eventual recovery might seem fair at the outset of the litigation, but if the recovery has already been diminished by the defendant's lack of assets, the size of that fee may appear excessive in relation to the small amount recovered for the class. On the other hand, a contingent fee may appear excessive in relation to the number of hours spent by the attorney in cases where recovery is very large. In determining whether the fee is reasonable in such cases, the court should investigate various contingent fee arrangements used by attorneys in similar situations just as it

-35-

develops facts regarding normal hourly billing rates in computing the lodestar.  The court may find, for example, that contingent fees in potentially very large recovery situations often are scaled from 50% down to 5% depending upon the eventual recovery less expenses.  In othe situations, actual time spent may be factored into the equation.  The court should be guided more by those facts than by the subjective criteria of whether the fees "appear fair."

The measure of reasonableness in evaluating contingent fee contracts, even in class action litigation, is not to be construed as the lodestar figure, however.  "[T]he determination of reasonableness requires examination of factors beyond the four corners of the contingent fee contract, but comparison with Lindy is not one of them."  Dunn, supra. at 1111.  The fact that a contingent fee contract may yield much more than a lodestar determination is not sufficient to find the contract unreasonable.  Rather, the best measure of reasonableness in evaluating the fee is to measure it against the class's total recovery and to investigate contingent fee arrangements used by other attorneys in similar litigation.

If the court decides to override a contingent fee arrangement, it must then decide how to award fees.  At that point, the mass tort litigation would resemble the common fund, non-statutory type of fee situation.  The court should apply the relevant standard for fee awards in other common-fund cases in that circuit.  The court should not just reduce the amount of the

percentage of recovery, but rather, engage in the kind of detailed analysis that is required to award fees in other areas of litigation. In <u>Allen v. United States</u>, 606 F.2d 432 (4th Cir. 1979), the court held that once the contingent fee contract was not enforced, the court would not award a lower percentage but rather evaluate the fee in accordance with the <u>Johnson</u> factors, the standard in the Fourth Circuit. "A court abuses its discretion if it allows a fee without carefully considering the factors relevant to fair compensation." <u>Id</u>., at 435. The use of a lodestar approach is only sensible in this situation: If the concern is that the actual fee derived from a contingency contract is unreasonable and arbitrary, it only makes sense to use a calculated and reasoned award.

The other major question in awarding fees in a mass tort class action is which attorneys are to be compensated. Unlike shareholders' derivative suits, which are usually conceived of as class actions, mass tort cases tend to evolve into class actions. This means there may be several layers of attorneys involved: the initial attorneys consulted by plaintiffs, the plaintiffs' lead counsel committee, and expert attorneys brought in to assist with the litigation. All of those attorneys have varying roles and contribute in different ways to the litigation, and the court must decide how each set of attorneys will be paid. There are three possible approaches.

1. The court may choose to override all the contingent fee contracts and award fees on some scale of involvement. This was the approach taken by the court in the Beverly Hills Fire

litigaton. Attorneys initially consulted by plaintiffs were awarded a flat percentage fee. Lead counsel's fee was determined in accordance with a <u>Northcross</u>-type lodestar, with appropriate increases for the efforts of attorneys on the lead counsel committee most responsible for the successful settlement of the litigation..

This type of approach seems most fair and reasonable when the class is certified relatively early in the litigation and the bulk of the work is conducted by lead counsel for the benefit of the class.

2. Where all attorneys representing plaintiffs are involved in the development of the case and lead counsel are more important as coordinators than as chief litigators, the court may allow the contingent fee contracts to stand and enforce a modest percentage contribution by all counsel to lead counsel. This was the approach taken by the court in <u>Vincent v. Hughes Air West</u>, 557 F.2d 759 (9th Cir. 1977), a non-class action case. This approach is relevant to class situations where certification of the class comes relatively late and individual attorneys employed by plaintiffs are more than just referral attorneys.

3. A third possible approach is for the court to overturn the contingent fee contracts and require each plaintiff to contribute a fixed percentage of their recovery to an escrow account. Attorneys then may petition the court for awards from the escrow account, based on their time and rate calculations. This approach, used in <u>In re Air Crash Disaster at Florida</u>

-38-

__Everglades__, 549 F.2d 1006 (5th Cir. 1977), is similar to the first approach but may be preferable if actual settlements to individual plaintiffs are made separately. This situation might occur where the class action determined questions of liability, but severed the damage awards for individual plaintiffs.

## Summary

There is considerable latitude present in the way in which fee awards are calculated in class action litigation. Given the trend in statutory fee award cases, the best policy in the future would appear to be a careful calculation of the lodestar amount and less reliance on multipliers to correct inequities. The court should utilize magistrates and monitors when the litigation grows to sufficient complexity that the additional expense will not burden the class fund resources. If the court elects to certify a class in a mass tort case, the court should evaluate carefully the continued validity of the contingent fee contract; and, should it decide to overturn those contracts, the court should use a lodestar method in calculating appropriate fees.

II.     The Law in the Sixth Circuit Regarding Attorneys' Fees in
        Class Actions

        The vast majority of cases involving court awarded attorneys'
fees in the Sixth Circuit have involved fees granted under
statutory authority.  The controlling opinion in this field is
Northcross v. Board of Education of Memphis City Schools, 611 F.2d
624 (1979), cert. denied, 447 U.S. 911 (1980).  The courts of the
circuit have consistently applied the standards of Northcross to
statutory fee awards and have used the analysis developed in that
opinion in common fund cases as well.  This section of the report
will review the Northcross opinion and then examine the cases
following from it.

        A.    The Northcross Opinion.

        This case arose after more than a decade of school
desegregation litigation in Memphis and concerned an award under
the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C.A.
§1988.  The court's initial determination was what the term
"prevailing" meant under the statute.  The court held that a party
will be held to be prevailing if he has vindicated important
rights.  Northcross, at p. 633.  The plaintiff need not win a jury
verdict; a favorable settlement or a consent decree will indicate
sufficient vindication.  Once a party has been held to be
prevailing, he is entitled to all reasonable fees.  This holding

-40-

is likely to be limited by the restrictions in <u>Hensley v.
Eckerhart</u>, <u>supra</u> at. pp.7-8, to only those claims reasonably
related to the successful claims. The court's practical rather
than formal standard of prevalence, however, is likely to be
upheld.

Once a party has met this threshold determination, placing him
within the statute, the court should consider the following
factors in calculating a reasonable fee:

1.   <u>Time</u>. The court should require affidavits of time spent
on the litigation to be submitted by all attorneys seeking
reimbursement. If the court excludes hours, it must indicate its
reasons for doing so. If there are many lawyers involved, the
court may deduct a small percentage (5-10%) from the total hours
expended to correct for duplication. If the court determines that
a particular task ought to have been performed by a less
experienced person, the court ought not to eliminate those hours,
but lower the rate of compensation awarded.

2.   <u>Rate</u>. The hourly rate used by the court should vary with
the type of service performed and the type of person (partner,
associate, paralegal) completing the task. The court should use
the fair market value of attorneys' services in the community in
establishing the rates employed in the lodestar calculation.

3.   <u>Adjustments</u>. Multipliers used in cases like <u>In re Equity
Funding</u> are not recognized under the Civil Rights statute. That
fact, however, does not limit an attorney to his or her normal
hourly rate. The court can adjust the hourly rate to reflect risk

-41-

factors or high quality representation, but these adjustments must be applied only to time affected by the particular factor. For example, it would be appropriate to increase the hourly fee because of the contingent risk for time spent on the litigation portion of a case, but not for hours devoted to settlement administration. All adjustments should take place in the hourly rate charged. The lodestar figure itself is not to be multiplied by a general factor.

The Northcross position is in accord with the cases approved by the Supreme Court in Hensley, Copeland v. Marshall, 641 F.2d 880 (D.C. Cir. 1980) and National Association of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319 (D.C. Cir. 1982). Those cases all indicate the trend toward careful time/rate analysis and away from arbitrary multipliers tacked on to awards.

B.   Cases Following From Northcross.

The holding of Northcross has been strictly adhered to in this circuit and is unlikely to be upset as the prevailing standard in both statutory fee cases as well as common fund cases. The Court of Appeals has consistently remanded cases where fees were determined in any other manner. In Rose v. National Cash Register Corp., 703 F.2d 225 (6th Cir. 1983), the trial court had awarded one-third of the damages to counsel without consideration for time spent or rates to be applied. The Circuit court held that approach to be an abuse of discretion and remanded the issue of

-42-

attorneys' fees for consideration under the <u>Northcross</u> standards.
Similarly, the court remanded the question of attorneys' fees in
<u>Horace v. City of Pontiac</u>, 624 F.2d 765 (6th Cir. 1980) where the
trial court had arbitrarily reduced the fee requested, The Circuit
court stated:

> The <u>Northcross</u> opinion specifically permits the
> District Judge to eliminate duplicative hours
> billed and it also set standards for
> determining a reasonable rate based on the
> experience of the attorneys involved and fee
> levels customarily charged in the jurisdiction
> where the case was tried.  <u>Northcross</u> does not
> forbid the reduction of an excessive fee
> claim.  It does provide a standard for making
> that determination.

<u>Id</u>., at 770.  As long as a court does evaluate time spent by
attorneys, establishes a reasonable rate for services rendered and
explains any variation in the award granted from the lodestar
amount, the award will not be overturned, except for abuse of
discretion by the trial court.  <u>Stewart v. Rhodes</u>, 656 F.2d 1216
(6th Cir. 1981).

The <u>Northcross</u> standard has been applied to other fee awards
granted under statutory authority in this circuit.  <u>Northcross</u> was
extended to be controlling over Title VII cases in <u>Croushorn v.
Board of Trustees of the University of Tennessee</u>, 518 F. Supp. 9
(M.D. Tenn. 1980).  <u>Northcross</u> has also been applied as the
standard in antitrust fee awards.  In <u>Cantor v. Detroit Edison
Company</u>, 86 F.R.D. 752 (E.D. Mich. 1980), the settlement involved
only equitable relief.  Attorney fees were authorized under the

statute and were calculated under the <u>Northcross</u> standard even
though the utility would be paying the fee, which would probably
be passed on to consumers.  Where fees have been awarded, they
have been calculated in accordance with the principles of
<u>Northcross</u>.

The <u>Northcross</u> analysis has been held to be controlling even
where the result of the time/rate analysis is a fee much larger
than actual damages awarded to the plaintiff.  <u>See</u>, <u>Kinney v.</u>
<u>Rothschild</u>, 678 F.2d 658 (6th Cir. 1982).  The purpose of the
civil rights statute is to compensate attorneys for their efforts
in establishing individual rights.  The amount of fair
compensation does not vary with the amount awarded to the
plaintiff.  It is independent of the plaintiff's damages.

The independence of the attorney's fee was further established
in <u>Price v. Pelka</u> 690 F.2d 96 (6th Cir. 1982).  There, the
plaintiff had perjured herself, but the perjury was not relevant
to the merits of the civil rights violation.  The Sixth Circuit
held that the plaintiff's damages might be reduced, but where the
attorney was innocent of any wrongdoing, the fee would stand.
Likewise, fees awarded under other statutes will be calculated by
<u>Northcross</u> standards and allowed even if they exceed the damage
award.  The court allowed properly calculated fees that were
larger than awarded damages under the Fair Credit Reporting Act in
<u>Bryant v. TRW, Inc.</u>, 689 F.2d 72 (6th Cir. 1982).  Taken together,
these cases firmly establish that the calculation of attorneys'

-44-

fees is to be a separate and distinct process from and unrelated to the calculation of the plaintiff's recovery.

The impact of the Northcross analysis has been felt in this circuit even where it does not strictly apply. Social Security law provides for attorneys' fees to be awarded by the Court of not more than twenty-five percent of back benefits. 42 U.S.C. §406(b). There is no requirement of "reasonable fees" under this act as under the Civil Rights or Title VII statutes. Nevertheless, in evaluating the fee to be awarded, courts within this circuit have evaluated the time spent by the attorney and the rate charged and have treated the statutory figure as a ceiling, not a mandatory award. See, Lewis v. Secretary of Health and Human Services, No. 82-5295, slip op. at 3 (6th Cir. May 13, 1983); Bell v. Heckler, Civil Action C-2-81-537 (S.D. Ohio June 22, 1983).

The Northcross analysis has also been utilized in non-statutory fee awards, at least as far as the calculation of the lodestar figure and reliance on time/rate analysis to make an initial fee determination. In the Beverly Hills Fire Litigation, the settlements awarded to the class were collected into a common fund, from which fee awards to counsel were made. The court made an initial calculation of time and rates used for fees and then varied the amount upward to compensate the attorneys for their excellent work. The court noted that while Northcross provided guidance in calculating a lodestar, it was too restrictive to be applied per se to common fund cases. "Essentially, Northcross involved a determination of the lodestar rate only. A

consideration of factors or multipliers was prohibited since, as the Court observed 42 U.S.C. §1988 does not so provide." In re Beverly Hills Fire Litigation, No. 77-79 (S.D. Ohio, February 24, 1982)(joint order awarding attorney fees and expenses). The court did not arbitrarily select a multiplier however, but relied on expert testimony of Mr. Herbert Newberg, an authority on class action litigation, Mr. Griffin Bell, a former U.S. Attorney General, and the investigation of the class representative. The combination of the lodestar calculation and the careful consideration of factors that deserve extra compensation is certainly within the spirit of Northcross, if not the letter. It is also in accord with the trend in other circuits to utilize the careful analysis developed under statutory authority in common fund cases. See, e.g. Copper Liquor III, supra. at 24-25.

Flexible use of the Northcross analysis, typified by Judge Rubin's approach in the Beverly Hills case, was approved by the Circuit court in Louisville Black Police Officers Organization v. City of Louisville, 700 F.2d 268 (6th Cir. 1983). The court affirmed the use of the Northcross lodestar but emphasized that the lodestar was not an inflexible calculation but was to be tempered with judicial discretion. As long as the trial court developed an adequate record and considered the lodestar amount, the use of judicial discretion was approved.

The specific holdings of the Louisville Black Police Officers case illustrate the range of considerations properly within the trial court's discretion and permissible under Northcross. The

-46-

trial court in that case calculated the number of compensable hours, eliminating excessive time and duplication, multiplied by a reasonable rate and then increased that product by one-third, to reward the attorneys for excellent work.  The circuit court approved the court's decision against the contention that the Northcross method was an absolute rule to be followed.  The circuit court specifically held that the trial court should consider inflation in its calculation, but it need not to do so by using historical rates.  The court can account for changes in the value of money more generally by an adjustment at the end of the fee calculation process.

Likewise, the trial court has considerable discretion in selecting the rate at which counsel will be compensated.  While Northcross used the rate prevalent in the community in which the lawsuit was brought, it is not a requirement that the court use that rate.  Where out of town counsel are involved, the court may wish to look to their local rates.  Where non-private counsel are involved, the court is not bound to use local rates.

> District courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases ... Northcross and Horace offered the local market approach as an acceptable approach to determining rates of compensation.  However, we reiterate today that the district courts retain their discretion in such matters constrained only to achieve the goal enunciated in Northcross: "to make an award of fees which is 'adequate to attract competent counsel, but which do not produce windfalls to attorneys'".

-47-

<u>Louisville Black Police Officers</u>, at 278.

The impact of the <u>Louisville</u> opinion is to emphasize that <u>Northcross</u> provides a method of calculating fees and insures that an adequate record on the fee issue will be created. The trial court is free to exercise its discretion to compensate counsel fairly, using all the information at its disposal and tailoring the fee to the particular facts and circumstances of the case.

Besides emphasizing the trial court's discretion, recent Sixth Circuit cases have anticipated the Supreme Court's holding in <u>Hensley v. Eckerhart</u>, <u>supra</u>, that parties can be compensated only for work done which actually leads to vindication of the claim. In <u>Othen v. Ann Arbor School Board</u>, 699 F.2d 309 (6th Cir. 1983), the court held that the lawsuit must be causally related to the securing of relief. A plaintiff who voluntarily dismisses a suit in pretrial proceedings has a difficult burden to show that the institution of litigation was sufficient to trigger relief. Without that proof, attorneys for the plaintiff have not shown enough to entitle them to fees. Likewise, in <u>Buian v. Baughard</u>, 687 F.2d 859 (6th Cir. 1982), the court refused to allow fees for a wholly unsuccessful appeal. The standard of "prevailing" must be determined at each level, trial and appeal. This comparison of success on the merits with the time spent is in accord with the <u>Hensley</u> approach most recently approved by the Supreme Court.

Summarizing, <u>Northcross</u> has become firmly established as the standard for the award of attorneys' fees in the Sixth Circuit, and the recent Supreme Court cases would seem to support the Sixth

-48-

Circuit's interpretation.  The <u>Northcross</u> analysis combined the most sensible development of the lodestar approach with reasonable flexibility for the trial court to evaluate the efforts made and the risks undertaken by the attorneys.  By eliminating the use of the automatic multiplier and relying on the trial court's discretion in tailoring the fee to the actual factors involved in the litigation, <u>Northcross</u> removes the greatest source of fee inflation and ties the award more closely to the actual effort expended by the attorney.

III. **Attorneys' Fees in Bankruptcy Proceedings**

Under the Bankruptcy Code, the court is empowered to award
fees to the trustee and to attorneys in the case. The standards
for determining those fees under the statute have been derived
from standards developed in class action litigation, discussed
previously in this report. This section will focus on those
standards as applied to bankruptcy actions and will present both
the general and specific requirements for compensation under the
Code.

A. General Standards for Compensation in Bankruptcy

In adopting the Bankruptcy Code in 1977, Congress emphasized
that attorney fees awarded in bankruptcy actions should be based
on actual work involved in the case, considering time spent, the
rate normally charged, and the benefits conferred through the
attorneys' efforts. "The compensation is to be reasonable for
actual necessary services rendered, based on the time, the nature,
the extent, and the value of the services rendered, and on the
cost of comparable services other than in a case under the
bankruptcy code." House Report No. 95-595, 95th Cong., 1st Sess.
(1977) 329.

This time/rate standard was in contrast to the "spirit of
economy" test developed in In re Owl Drug, 16 F. Supp. 139 (D.
Nev. 1936) and which had been followed by a number of courts prior

-50-

to the adoption of the code.  See, In re Yale Express System, Inc., 366 F. Supp. 1376 (S.D.N.Y. 1973).  That test had focused on minimizing fees to attorneys so as to maximize recovery for creditors.  The result of this standard of frugality was that bankruptcy specialists were at the low end of the pay scale for attorneys and there was a general fear that only less well qualified attorneys were attracted to the field.  The economy standard reached its most extreme position in the case In re Beverly Crest Convalescent Hospital, Inc., 548 F.2d 817 (9th Cir. 1976, as amended 1977).  The court in that case arbitrarily limited the maximum fee to be awarded to attorneys in bankruptcy actions to the amount of a district court judge's salary.  The House Report, cited supra., which was adopted by the whole Congress, specifically overruled Beverly Crest to allow for consideration of time and rates to determine fees.

Remnants of the economy test persist in the bankruptcy area, however.  The Senate Report on the bankruptcy code legislation, which was not adopted by the whole Congress, spoke of the need to balance the fair compensation to attorneys, "generous enough to encourage lawyers and others to render the necessary and exacting services that bankruptcy cases often require", with the need for "moderation in the interest of the estate".  Senate Report No. 95-989, 95th Cong., 2d Sess. (1978) at 40.  The Senate Report went on to state that compensation for attorneys in the private sector was a reference point for the court but not controlling.  While not adopted by Congress, the Senate Report has been cited as

-51-

authority for limiting fees in bankruptcy proceedings to rates
less than those charged for other, non-bankruptcy matters. See,
In re Vaniman International, Inc., 24 B.R. 207 (E.D.N.Y. 1982).
This position seems to be in contrast with the House Report. In
order to assure good and effective representation in bankruptcy
matters, the court ought to compensate in accordance with the
rates charged in other matters. Just as in common-fund class
action cases, the court cannot ignore the size of the estate in
awarding fees. See, In the matter of Hamilton Hardware, 11 B.R.
362 (Bankr. E.D. Mich. 1981). No one suggests that all the money
present should be awarded to the attorneys if their time/rate
calculation would warrant that amount. But the size of the estate
should not be the controlling factor. The House Report makes
clear that the value of the services of attorneys in bankruptcy
cases should be on par with all other services performed by
attorneys.

B. Statutory Requirements for Attorney Compensation.

Before any attorneys may be eligible for court awarded fees in
bankruptcy proceedings, 11 U.S.C. §§ 327 and 328 of the Bankruptcy
Code require that they must be authorized by the court. Court
authorization is also required for any other professional who
seeks court awarded fees, including accountants, appraisers and
auctioneers. The general rule has been that any professional who
acts without court authorization will not be compensated by the

-52-

court.  See, In re WFDR, Inc. 22 B.R. 266 (Bankr. N.D.Ga. 1982),
In re Thibodeau, 20 B.R. 107 (Bankr. D.Me. 1982).  However, there
have been cases where individuals not previously appointed by the
court have been allowed fees.  If counsel has provided significant
services with benefits to the estate, and there appears to be some
justifiable or minor reason for not seeking prior court
appointment, some courts have allowed an appointment order along
with the award of fees.  In re King Electric Co., Inc., 19 B.R.
660 (E.D.Va. 1982).

     In addition to court appointment, the code requires attorneys
seeking compensation to disclose to the court any fee arrangements
previously made between attorney and client.  11 U.S.C. §329.
Moreover, the code does not allow attorneys to share court-awarded
fees with firms not before the court.  Failure to disclose a
fee-sharing arrangement is grounds for non-allowance of fees.  In
re Codesco, 15 B.R. 351 (Bankr. S.D.N.Y. 1981).  If there are
services performed by counsel who are not entitled to be
compensated from the estate, nothing in the code prevents the
attorney from billing the client for those services.  In re Brady,
7 C.B.C.2d 243 (Bankr. N.D. Ohio 1982).

     Before awarding fees, 11 U.S.C. §330(a) requires that notice
and a hearing be held.  At that hearing, individuals seeking fees
must submit adequate fee petitions, detailing number of hours
spent, descriptions of tasks performed and requests for particular
rates of compensation.  Matter of First Colonial Corp. of America,
544 F.2d 1291 (5th Cir. 1977).  In the Sixth Circuit, In the

Matter of Liberal Market, Inc., 24 B.R. 653 (Bankr. S.D. Ohio
1982) specified the standards upon which fee petitions would be
evaluated.  Since 11 U.S.C. 330(a) allows for all reasonable
necessary services to be compensated, the court needs an accurate
and complete description of the time spent to determine whether
that time was necessary legal time.  Hours spent on business
matters were not legal services and, hence, not compensable under
the code.  Fee petitions must also be scrutinized for the
reasonableness of the time spent.  Just as in class action fee
petitions, the court may discount hours spent which seem excessive
or duplicative, relying on the court's experience and comparisons
of hours spent on similar tasks in other areas of the law.

Liberal Market also provides some guidance on the manner in
which the court should set the rate at which reasonable, necessary
time will be compensated.  Generally in bankruptcy matters, the
prevailing local rate for comparable services should be used.  The
court recognized that in a specialized field like bankruptcy, the
"local" area upon which fees are based may be a wider geographic
area than just the immediate community of the court.  The court
should look at the rates charged by bankruptcy specialists
regularly appearing before the court and use that rate as the
"local" or prevailing rate for compensation.

C. Specific Standards for Compensation in Bankruptcy Proceedings.

In determining fees in bankruptcy matters, the Bankruptcy court is required to follow the methods established within that circuit for any judicially determined fee. In the Sixth Circuit, that method was presented in the Northcross case, discussed supra., which required the trial court to carefully evaluate time spent by attorneys and apply appropriate rates to those hours to adequately compensate attorneys. As the Louisville Black Police Officers Association case made clear, the court has considerable discretion in its evaluation of time and services. So long as the trial court makes an adequate record of its evaluation, its decision will be overturned only for abuse of discretion.

There are special considerations in applying the Northcross standards to bankruptcy proceedings. In evaluating time, the court should eliminate excessive time, but it should also recognize that skilled and experienced bankruptcy specialists may be able to dispose of a case quickly. Their ability to be efficient should not be penalized in the fee award evaluation process. In re International Coins and Currency, Inc., 26 B.R. 256 (Bankr. D. Vt. 1982).

The court should also evaluate time spent and the nature of the services provided, to determine if the time was really necessary. Where a debtor was hopelessly insolvent, time spent on reorganization was not to be compensated. In re Sutherland, 14

-55-

B.R. 55 (Bankr. D. Vt. 1981). Likewise, where the legal services performed related to the bankruptcy, but were not necessary to the bankruptcy (in this case, a divorce), time so spent could not be compensated by the court. In the Matter of Swartout, 20 B.R. 102 (Bankr. S.D. Ohio 1982). Where an attorney is both the trustee and the attorney, time records must be kept so as to determine which hours are related to his or her duties as trustee, and in consequence are compensible under the statutorily defined rates of §326, and which hours are properly classified as professional services. In re Crutcher Transfer line, Inc., 20 B.R. 205 (Bankr. W.D.Ky. 1982), in accord., In re Red Cross hospital Assoc., Inc., 18 B.R. 593 (W.D.Ky. 1982). Where the court is unsure of how time is to be compensated, or whether it is compensible at all, the attorneys' work product should be available for court scrutiny. In the Matter of Olen, 15 B.R. 750 (Bankr. E.D.Mich. 1982).

When setting rates in bankruptcy cases, the court should recognize that a certain amount of time spent is clerical and administrative. Time so spent should not be eliminated but should be compensated at a lower rate. In the Matter of Nu-Process Industries, Inc. 13 B.R. 136 (E.D.Mich. 1981). This is in accord with Northcross, which approves the setting of different rates for different services.

As to the general rate, the court should apply the local rate, recognizing as in Liberal Market that "local" for purposes of bankruptcy proceedings may involve a wider geographic area than other, more common types of litigation. The court may rely on

-56-

surveys of local rates for guidance on appropriate fees. In the Matter of Swartout, 20 B.R. 102 (Bankr. S.D. Ohio 1982). If out-of-town counsel are involved and seek higher than local rates, the court should evaluate the services provided. If local counsel was available to perform comparable work, local rates should be applied. In re Sutherland, 14 B.R. 55 (Bankr. D. Vt. 1981).

While Northcross disallowed the use of bonuses or multipliers under the Civil Rights Attorneys Fees Act, no such barrier exists under the Bankruptcy Code. Where the results obtained are excellent, the court may, in its discretion, augment the award to attorneys beyond the time/rate lodestar. In re Penn-Dixie Industries, 18 B.R. 834 (Bankr. S.D.N.Y. 1982). Following the Northcross guidelines, however, rather than tacking a bonus on to the final time/rate product, the court might prefer to assess a higher hourly rate for the time expended.

Just as in fee awards in other areas, Bankruptcy Courts are free to override contingency fee contracts should they exist and should the terms appear improvident in light of the final results of the bankruptcy action. In re Warrior Drilling and Engineering Co., INc. 9 B.R. 841 (Bankr. N.D.Ala. 1981).

Finally, 11 U.S.C. §331 authorizes the court to provide interim fees to counsel if the situation so warrants. In doing so, the court should award those fees based on clearly necessary hours and at local rates. Decisions as to higher rates and hours

-57-

which may be compensible should wait until the final results of the bankruptcy proceedings are apparent. In the Matter of Pennsylvania Tire and Rubber Company of Mississippi, Inc. 19 B.R. 125 (Bankr. N.D. Ohio 1981).

Summarizing, as in other areas relying on judicially determined attorneys' fees, bankruptcy matters require the court's careful scrutiny of time records and discretion in setting fees. The Code's requirement that services performed be "necessary" allows the court to disallow hours that would be compensible in other fields. The bankruptcy court has more leeway in setting fees than other statutory award cases, since the court may award premiums to counsel with an excellent performance. However, the restrictions that apply to courts in awarding fees in cases of limited recovery also apply to bankruptcy courts, as the nature of the proceeding is such as to almost insure that there will be a limited amount of money from which to pay fees. The court should carefully calculate the lodestar, evaluating the hours that are truly necessary and setting appropriate rates. The amount of the estate should be considered, but only after the lodestar has been determined.

-58-

Appendix

274    84 FEDERAL RULES DECISIONS

APPENDIX—Continued
EXHIBIT NO. 4
THE UNIVERSITY OF CHICAGO
DEPARTMENT OF ECONOMICS
1126 East 59th Street
Chicago, Illinois 60637

September 6, 1979

TO: Fee Committee of Folding Carton
Anti-Trust Litigation

FROM: Robert E. Lucas, Jr.

I have been asked by the committee to advise on the setting of legal fees in the Folding Carton Anti-trust Litigation. I will first outline the general economic principles which bear on the setting of fee schedules, next apply these principles to a simple illustrative example, and finally discuss some elements which would be involved in a more refined analysis. The main emphasis will be on the *incentive effects* of different methods of setting fees.

At the time an anti-trust suit is undertaken there are, from the clients' point of view, two quite different sources of uncertainty. First, since it is impossible to know in advance the nature of the evidence to be discovered, the final settlement cannot be predicted even *given* the quality of the legal services rendered. Second, the client is uncertain as to what quality of legal effort will be applied to the case, *given* the nature of the evidence. Notice that there is no practical way for the client to separate these two sources of uncertainty even after the fact: a disappointing settlement may be due either to weaker-than-expected evidence or to mediocre legal work. The client has no way of knowing, and the question is nearly as difficult for some one with legal expertise.

These considerations suggest two quite different principles for establishing fees. First, fees must be high enough *on average* so that cases worth pursuing (from clients' viewpoint) are worth undertaking by legal firms with the competence to do so. Second, fees must vary with the size of the settlement in such a way that the responsible firms have the incentive to obtain the

best possible settlement, given the nature of the case. It is clear that if the generally accepted schedule of fees should "flatten out" above some given settlement size, no firm would have any financial incentive to work toward any larger settlement, however strong be the facts of the case.

These two principles are not sufficient in themselves to determine the "shape" of the appropriate fee schedule, but in conjunction with other information, they are very helpful. An example will illustrate this.

Consider a hypothetical case which will cost $C$ to carry to completion, and which has four possible settlement possibilities 0, $S_{min}$, $S_{ave}$ and $S_{max}$, increasing in size. Think of 0 as arising when the case comes to nothing, $S_{min}$ as arising when the case is weak but successful and competently handled, $S_{ave}$ as an "average" settlement arising either from a strong case competently handled or a weak one exceptionally well handled, and $S_{max}$ as requiring both a strong case and exceptional handling. Treat all outcomes as equally likely, before the case is undertaken, so that each occurs .25 of the time. The way the case is treated will then depend on the fees 0, $F_{min}$, $F_{ave}$, $F_{max}$ which are expected to correspond to each of these outcomes.

For the three cases in which there is a positive settlement, consider schedules relating fees to settlements in a linear way:

$$F = a + bS$$

so that the problem involves selecting the constants $a$ and $b$. It seems reasonable that if $S_{min}$ is the outcome, the fee should at least cover direct cost, or that

$$F_{min} = a + bS_{min} = C$$

or that $a = C - b(S_{ave} - S_{min})$

Then $F_{ave} = C + b(S_{ave} - S_{min})$

and $F_{max} = C + b(S_{max} - S_{min})$

That is, the fees in the two "good" outcomes are set at cost $C$ plus a premium for above minimal settlements, $S - S_{min}$.

From: In Re Folding Carton
Anti-Trust Litigation,
84 F.R.D. 245 (N.D.Ill. 1979)

APPENDIX—Continued
EXHIBIT NO. 4—Continued

Second, the expected return from undertaking the case must be enough to cover costs. This implies

$$\frac{1}{4}[F_{min} + F_{ave} + F_{max}] = C$$

If, as assumed above, $F_{min}$ is set at C, this conditional is equivalent to

$$\frac{1}{2}(F_{ave} + F_{max}) = \frac{3}{2}C.$$

That is, the average fee for the two "good" outcomes must equal 1.5 times cost. A second expression for this quantity is obtained by averaging the two expressions for $F_{ave}$ and $F_{max}$ above:

$$\frac{1}{2}(F_{ave} + F_{max}) =$$

$$C + b[\frac{1}{2}(S_{ave} + S_{max}) - S_{min}]$$

Combining gives:

$$b = \frac{C}{S_{ave} + S_{max} - 2S_{min}}$$

This example may be made more concrete through the use of some (not wholly) hypothetical numbers. Take C to be equal to $9.9 million. (This is a relatively hard estimate of the actual cost incurred in the Folding Carton Case, which will be discussed in more detail below.) Take $S_{min}$ to be $30 million: a settlement actually offered by defendants, and hence an estimate of what might be regarded as a minimal settlement, warranting a minimal fee. Take $S_{max}$ to be $200 million: the settlement actually obtained. Finally, let $S_{ave}$ be $80 million: a rather open guess as to what might have been arrived at with good, but not outstanding counsel. With these specifics, the formulas arrived at above yield a schedule of

$$F = 8.55 + (.045)S.$$

Table 1 gives the fee implied by this formula for various possible settlement values.

Table 1

| Settlement ($ millions) | Fee ($ Millions) |
|---|---|
| 30 | 9.9 |
| 80 | 12.1 |
| 130 | 14.4 |
| 200 | 17.6 |

The table is based on a hypothetical "model" which attempts to capture in a rough way the possible outcomes of the Folding Carton litigation as they might reasonably have appeared when the case was undertaken and when it was underway. Changes in assumptions would, of course, alter the outcome of these calculations. (See Appendix A for some alternative calculations.) Nevertheless, the incentives described in Table 1 seem to be near to the minimal required to motivate law firms to undertake promising anti-trust cases and to develop them as skillfully as possible, once undertaken. The fee of $9.9 m. for the minimal settlement covers direct costs and no more, leaving $20.2 m. for the clients. For every dollar obtained above 30 m. this schedule assigns 4.5¢ in fees and 95.5¢ to clients.

The matter of estimating direct cost has been postponed to this point, and requires attention. Over a period of 40 months, $7 m. was expended. Since these costs were incurred prior to the award of fee, they must be cumulated at compound interest to the time of fee award in order to put costs and returns in comparable units. Once an appropriate interest rate (a measure of the return which these expenditures would have enjoyed had they not been expended for purposes of this case) is selected, this calculation is routine. I have employed an annual rate of 20%, so that direct cost, as of the date of the fee award, are $7 m. × 1.42 = $9.9 m. This rate reflects, certainly not excessively, the risky character of the investment involved in committing funds to an enterprise with so open an outcome. (See Appendix B for fee schedules under alternate interest rates.)

This analysis has required a number of simplifications or abstractions from the complexities of the Folding Carton case. Much of the hypothetical nature of the argument used is, however, inherent in the character of the problem. The essence of establishing fees in an individual case is the effect this will have on *incentives* in future, roughly comparable cases. Estimation of

276      84 FEDERAL RULES DECISIONS

APPENDIX—Continued

EXHIBIT NO. 4—Continued

this effect necessarily involves not simply measuring what has already happened (direct costs) but also trying to estimate the way in which the fees arrived at in the present case will motivate legal activities in future cases (incentive effects).

There are several aspects of this analysis which could stand refinement. I have treated the case as though it involved a *certain* cost commitment of $9.9 m. and a settlement which is *entirely* unknown until the very end of the process. In fact, of course, information on both costs and the likely settlement became known gradually throughout the process. Analytical methods exist for treating this sequential aspect of the problem with more care than I have employed. In my opinion, the use of these methods would most probably increase confidence in, but not materially alter, the conclusions arrived at above. Similar remarks apply to my use of a 20% interest rate: utilizing the vast literature on the relationship of risk and rate of return would surely sharpen this estimate. Finally, perhaps the most arbitrary element in the above was my assignment of probabilities to various possible outcomes. I have assumed that an informed person, at the outset of the case, would have taken either side of a 3–1 bet on the possibility of a $200 m. settlement. There is no method by which we can ever "know" whether this was the case, but it does not seem an extreme view to assume that these odds are not too long.

In summary, a fee of $17.6 m. in this case seems to me a reasonable and conservative estimate. It is based on costs which I have valued at $9.9 m., and which have already been tangibly incurred. More important, in my view, it is based on necessarily less precise estimates as to the effects of this fee determination on the incentives for anti-trust litigation to be undertaken and successfully pursued in the future.

### Appendix A

Table A–1 below, reproduces Table 1 under some alternative assumptions.

#### Table A-1. Alternative Schedules

| Settlement | Fee A | Fee B | Fee C |
|---|---|---|---|
| 30 | 9.9 | 9.9 | 6.9 |
| 80 | 14.5 | 11.8 | 11.9 |
| 130 | 19.2 | 12.6 | 16.8 |
| 200 | 25.7 | 14.5 | 23.8 |

Schedule A is constructed under the logic described above, but with assumed probabilities of .3 for settlements of 0, 30 and 80 and a probability of .1 only for 200. The incentive on this schedule (the value of b) is .093. Schedule B is constructed in the same way, but with probabilities of .1 for *both* outcomes 0 and 200, and .4 for 30 and 80. In the case, b = .027. In this case, however, it seems unlikely that a settlement of $30 m. would be regarded as adequate to justify a fee of full cost. Schedule C is constructed with the *same* probabilities as B, but with a fee for $30 set at $6.9 m., or 70% of costs. In this third case, b = .093.

### Appendix B

Table B–1 below, presents the analogues to the schedule in Table 1 in the text, under discount rates of 10%, 20% (as in Table 1) and 30%. The costs under these rates are $8.3 m., $9.9 m., and $12 m. respectively.

#### Table B-1

Fees for Interest Rate (annual percent) of

| Settlement | 10 | 20 | 30 |
|---|---|---|---|
| 30 | 8.3 | 9.9 | 12.0 |
| 80 | 10.2 | 12.2 | 14.8 |
| 130 | 12.1 | 14.4 | 17.5 |
| 200 | 14.8 | 17.6 | 21.4 |

### EXHIBIT NO. 5

RE: FOLDING CARTON ANTITRUST
LITIGATION—MDL 250

PLAINTIFFS' COMMITTEES AND
ASSIGNMENTS

July 12, 19██

NOTE: Listing of members of committees and subcommittees have been made in alphabetical order where possible.



lawyer referral services, and other related programs have been developed, and others will be developed, by the profession.[42] Every lawyer should support all proper efforts to meet this need for legal services.[43]

## DR 2-106 Fees for Legal Services.[87]

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.[88]

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.[89]

42 "Whereas the American Bar Association believes that ... persons requiring legal adviser be able to attain it, irrespective of ... ... lawyer referral ... "Resolved, that the Association approves and sponsors ... ... ... of ... plans and low-cost legal service methods for the purpose of ... benefit of legal advice ... " *Proceedings of the House of Delegates*, A.B.A. Rep. 103, 109-10 (1966).

43 "The defense of indigent citizens, without compensation, ... representing ... legal aid societies, not only with the approval, but with the encouragement ... or legal aid services are rendered out of sympathy or for other philanthropic reasons. There is nothing whatever in the Canons to prevent a lawyer ... should there be ..." *ABA Opinion* 148 (1935).

87 *See* ABA Canon 12.

88 The charging of a "clearly excessive fee" is a ground for discipline. State ex rel. Nebraska State Bar Ass'n v. Richards, 165 Neb. 80, 90, 84 N.W.2d 136, 143 (1957). "An attorney has the right to contract for any fee he chooses so long as it is not excessive (see Canon 12), and this Court is not concerned with the amount of such fees unless it excessive as to constitute a misappropriation of the client's funds (see Opinion 27)." *ABA Opinion* 120 (1946).

*Cf. ABA Opinions* 209 (1940), 190 (1939), and 27 (1930); and State ex rel. Lee v. Buchanan, 191 So. 2d 33 (Fla. 1966).

89 *Cf.* ABA Canon 13; *see generally* MacKinnon, Contingent Fees for Legal Services: A Report of the American Bar Foundation).

```
Code of Professional Respon-
sibility, Disciplinary Rule
2-106:  Fees for Legal Service
```



ECs 2-16 to 2-19, 2-21, 2-23 to 2-25
DR 2-106(A), (B)                                    CANON 2                          108

## RELATED PROVISIONS

*EC 2-16:*
  EC 2-26
  EC 8-3

*EC 2-17:*
  EC 1-1
  EC 2-1
  EC 7-1

*EC 2-19:*
  DR 2-110(C)(1)(f)

*EC 2-21:*
  DR 2-103(D)(4)
  EC 5-22
  DR 5-107(A)(1)
  DR 5-107(A)(2)

*EC 2-23:*
  DR 2-110(C)(1)(f)
  DR 4-101(C)(4)
  EC 5-7
  DR 5-103(A)(1)
  DR 9-102(A)(2)

*EC 2-24:*
  EC 2-16
  EC 8-3

*EC 2-25:*
  EC 1-1
  EC 2-26
  EC 8-3

*DR 2-106(A), (B)*
  EC 2-32
  DR 2-107(A)(3)
  DR 2-110(A)(3)
  EC 6-3

## COMMENT

### *DR 2-106 and Related EC's*

The substance of DR 2-106 is contained in section (A): "A lawyer
shall not enter into an agreement for, charge, or collect an illegal or

clearly excessive fee." (The corresponding Ethical Considerations suggest that the lawyer charge no more than a reasonable fee (EC 2-16, EC 2-17) and refer to the existence of a commendable tradition of giving "special consideration" in the fixing of the fees for services rendered to other lawyers or their immediate families (EC 2-18).) A lawyer of "ordinary prudence" would be able to recognize a "clearly excessive" fee (DR 2-106(B)); on reviewing the facts, he or she would be left with "a definite and firm conviction that the fee is in excess of a reasonable fee." "[R]easonable fee" is not defined, although DR 2-106(B) lists eight factors "to be considered as guides in determining the reasonableness of a fee." The implication appears to be that a consideration of the guides will lead a lawyer to formulate reasonable fees. The wording of the text, however, denies this: as presented, the guides are no more than factors to be taken into account in the setting of any fee, whether reasonable or clearly excessive. This conclusion is implicit in *Formal Opinion 329*, August 1972; the Committee declared that the Code of Professional Responsibility did not proscribe any reasonable application of the factors that were to be considered as guides in the setting of fees.

Judicial opinions that have relied on the Code offer no guidance for defining "excessive fee" or "clearly excessive" fee. Pre-Code decisions suggest that "excessive" may be equated with "unconscionable." To warrant discipline, a fee must be "so exorbitant and wholly disproportionate to the services performed as to shock the conscience." *Bushman v. State Bar*, 113 Cal. Rptr. 904, 522 P.2d (Cal. 1974), quoting from *In re Goldstone*, 214 Cal. 490, 498, 6 P.2d 513 (1931). If a client's earning capacity is only "moderate," the lawyer's fee for even a substantial amount of work involving considerable professional responsibility and attended by a successful outcome may be found to be "greatly excessive." *In re Loring*, 62 N.J. 336, 301 A.2d 721, 723 (1973). Generally, however, even a finding that a lawyer has charged an excessive fee does not, in itself, warrant disciplinary action. Other elements of wrongdoing (overreaching, appropriation of the client's funds under the guise of charging a fee, and so forth) have to be present. 1 Stuart M. Speiser, *Attorneys' Fees* § 1.37 (Rochester, N.Y.: Lawyers Co-operative Publishing Co., 1973). The relevancy, therefore, of the Code provisions is not altogether obvious. In fact, one commentator states:

Legally, the ethical rules proscribing excessive fees are redundant. The law at large fully covers the matter. A contract for a fee is, under general principles of law, a contract between a fiduciary and his protégé dependent. As such, it is unenforceable unless its terms are fair



to the client. Hence, the rules in the Code go no further than the law of contract and probably stop short of it.

Geoffrey C. Hazard, Jr., *Ethics in the Practice of Law* 99 (New Haven, Conn.: Yale University Press, 1978).

In some recent cases, however, the courts have found that a violation of the excessive-fee provisions of DR 2-106 was sufficient grounds for disciplinary action. In *Florida Bar v. Moriber,* 314 So. 2d 145 (Fla. 1975), a lawyer was disciplined for violating DR 2-106 by charging a fee of approximately $8,000 for handling an estate of approximately $24,000 in which the major asset ($23,000) passed to the client by operation of law, the lawyer's work being confined to writing a few letters, completing some forms, and making some telephone calls. In *Westchester County Bar Ass'n v. St. John,* 43 A.D.2d 218, 350 N.Y.S.2d 737 (1974), a lawyer charged a fee of $33,500 for approximately 20 hours of work in prosecuting a claim for accidental death benefits on a $100,000 insurance policy. In disciplining the lawyer under DR 2-106(A) and EC 2-17, the court also commented on the "circumstances" under which the fee was imposed. It may have been referring to the fact that the action was presented to the client as a collection matter; because of the terms of a bar association minimum-fee schedule, naming the work at hand a collection matter entitled the lawyer to the fee charged. In *In re Marine,* 82 Wis. 2d 602, 264 N.W.2d 285, 289 (Wis. 1978), the court expressly cited a lawyer's violation of DR 2-106(A) as one of three unrelated grounds for imposing discipline on him.

An exhaustive treatment of case law relating to fees is found in Stuart M. Speiser, *Attorneys' Fees,* 2 vols. (Rochester, N.Y.: Lawyers Co-operative Publishing Co., 1973). For a thorough review of the factors considered by courts in setting fees, see Samuel R. Berger, Court Awarded Attorneys' Fees: What Is "Reasonable"? 126 *U. Pa. L. Rev.* 281 (1977).

It has been a long-standing general policy of the Committee not to pass on the reasonableness of fees. This policy was first stated in *Formal Opinion 27,* May 5, 1930, in which the Committee declared that it was not its function to determine what a reasonable fee was in a given situation unless a lawyer "under the guise of charging a fee, has retained so much of the funds coming into his hands, as in the opinion of the Committee, amounts to misappropriation of funds." The Committee has not, in fact, issued any Opinions evaluating the size of particular fees or the application of the factors listed under DR 2-106(B) in determining the size of fees.

In some Opinions, however, the Committee has evaluated the propriety of charging fees for particular services, a matter that the Code

of Professional Responsibility is concerned with only to the extent that it states that it is improper to charge or collect an illegal fee (DR 2-106 (A)). The Committee, however, lacks the authority to deal with such questions as illegal fees, because its Rules of Procedure prohibit it to issue opinions on law (Rule 9). In *Informal Opinion 1389*, July 14, 1977, the Committee held that it was proper, regardless of the work involved, for a lawyer who had advised a client on a transaction that was largely "tax-motivated" to charge the client a fixed fee that would cover not only the planning of the transaction but also any necessary representation of the client later before the Internal Revenue Service and the Tax Court. In *Informal Opinion 1338*, August 19, 1975, the Committee considered the question of whether a lawyer/executor could be required by his law firm, which had acted as attorney for the executor and had received the maximum fee allowable by the court for such services, to turn over to the firm his fee for services as executor. The Committee held that unless the fee was clearly excessive when both amounts were "considered together," there was no impropriety involved in the law firm's requirement.

In *Informal Opinion 1351*, October 31, 1975, the Committee dealt with the question of whether lawyers representing injured individuals could charge their clients a contingent fee for recovering for the federal government from third-party tort-feasors the value of government medical care furnished to their clients. (Recovery would be effected under the terms of the medical care recovery act (42 U.S.C. Federal agencies are prohibited to pay fees to private 42 U.S.C. § 2106 (1976)), but the government would cooperate with the lawyers in obtaining records, witnesses, and so forth. Certain of the injured parties are not personally liable for reimbursing the government for medical care.) The Committee observed that a contingent fee was likely to be excessive "in some but perhaps not all instances" (*Informal Opinion 1351*, October 31, 1975) and that because of the presence of potentially differing interests, the lawyer had the problem of making clear to the client the nature of and basis for the fee. Also, the lawyer must determine that there are "compelling advantages to the individual clients that are so great that it is not unfair or inequitable for the private client to bear the Government's legal costs." In some instances, the government waives or reduces its claim in order to make it possible to obtain a larger recovery for the injured party. Again, it would be proper for lawyers to charge their clients a fee on the waived amount, provided that the arrangement was "understood by the client and reasonable in light of all the circumstances involved."



Case: 1:83-mc-00056-UNA Doc #: 1 Filed: 11/16/83 Page: 69 of 136 PAGEID #: 69

Regarding charges for certain services, the Committee ruled in *Informal Opinion 998*, August 26, 1967, that it was improper for a lawyer to charge a specific fee for "opening a new case folder." This case pertained to a lawyer who had charged a fee to a potential client who had come to his office and filled out a preliminary questionnaire in which he gave certain background information about himself. It would have been proper, however, for the lawyer to charge this cost against the retainer. In *Informal Opinion 1333*, May 29, 1975, the Committee held that charges for the work of lay employees could either be included in overhead charges or be shown separately on the fee bill.

Under both the old Canons (Canon 12 and 1: . EC 2-25, EC 8-3), lawyers are urged to provide the services free of charge in appropriate cases. In *Informal Opinion* , August 9, 1970, the Committee appears to say that a fee charged when a client is able to pay one; it stated that it w. for a military legal services office to provide its serv. — had been provided free of cost—to military personnel or those clients who were able to pay fees. (The Committee cited EC 2- also referred to the fact that free service would involve the expenditure of public funds.) Unless they were of such a nature that they could be handled only by a military legal services office, the legal matters of such persons should be referred to local lawyers. (See also *Informal Opinion 1339*, August 25, 1975, in which the Committee balances the necessity for lawyers to receive adequate compensation, as expressed in EC 2-17, with the encouragement of free representation or representations at reduced fees, as expressed in EC 2-24, EC 2-25, and EC 8-3.)

Charging reduced or fixed fees has also been viewed with disapproval. *Informal Opinion 1236*, August 24, 1972, dealt with the matter of a discount club that was offering the services of a lawyer member to its other members at a discount. The offer was held to be improper on the grounds that it violated DR 2-103(B) and DR 2-106(B) and was contrary to the provisions of EC 2-17. The Committee observed that it was improper for a lawyer to agree in advance to render services for fees that were less than those customarily charged in the neighborhood, because such arrangements would lead to the lawyer's either performing the services at a substantial loss or not taking the time required to perform them properly.

In *Informal Opinion 1237*, August 9, 1972, the Committee had "problems" with fee schedules set by the board of a labor union group legal services plan. In the Opinion, the Committee made no reference to fees that were smaller than the customary ones, but it cited EC 2-17 to emphasize the need for the lawyer to receive adequate compensation. The Opinion held that the fee schedules

"should be set with due regard for the requirements of DR 2-106(B)" and noted that "sufficient flexibility must be maintained to protect on the one hand the lawyer where the problem is of unanticipated complexity and, on the other hand, the client who is unable to pay the prescribed fee."

The view that inadequate fees will lead to inferior legal services goes back to the old Canons; in considering the propriety of a fixed-fee annual legal check-up (*Formal Opinion 307,* May 26, 1962), the Committee stated that a fixed fee would be improper; since it would be impossible to determine what a check-up might involve, a fixed fee could lead to a situation in which the fee would be "so inadequate that the services might be rendered in a slipshod manner." The Committee also stated, however, that it was proper for lawyer-referral plans to charge a fixed fee, because the lawyers who participated in such services did so as part of their service to the public and could therefore charge a very low set fee for a defined service that was of limited duration. But see *Informal Opinion 1389,* July 14, 1977, in which the Committee held proper a fixed fee that was related to services rendered only to the extent that it was based on the maximum amount of service that could be anticipated in a given situation.

### Retainer

In *Informal Opinion 993,* August 26, 1967, the Committee defined "retainer" as an "advance payment in connection with fees and not a payment considered to fees." In addition, it held that it was improper for a lawyer to require a client to agree to the lawyer's keeping the client's retainer under all circumstances and regardless of services performed. In *Informal Opinion 1389,* July 14, 1977, the Committee considered the propriety of a tax lawyer's setting a fixed fee which included not only the planning of the "tax-motivated" transaction in question but which "also cover[ed] representation of the client in the event the client's return was selected for audit, both before the Internal Revenue Service and in possible litigation before the Tax Court." It held that if the lawyer had obtained a retainer fee and his fee was charged on a time-expended basis, the lawyer should return to the client any funds left over from the retainer. (For other definitions of the term "retainer," see 1 Stuart M. Speiser, *Attorneys' Fees* § 1:1 (Rochester, N.Y.: Lawyers Co-operative Publishing Co., 1973)).

### Fees Set by Someone Other Than the Lawyer Performing the Service

At times, fees for legal services are set by someone other than the lawyer who provides the services. The Committee has viewed this



practice with uneasiness but has not declared it improper, because a lawyer has the right to contract for any fee so long as it is not clearly excessive (*Formal Opinion 190*, February 17, 1939). *Formal Opinion 190*, February 17, 1939, dealt with a situation in which clients or prospective clients stated what they were willing to pay for certain services. The Committee noted that such a practice was bad because it would induce some lawyers to perform legal work for inadequate compensation. In *Informal Opinion 1237*, August 9, 1972, the Committee considered whether it was proper for the board of the group-legal-services panel of a labor union to establish fee schedules for services to be rendered to its members. The Committee said that such a practice was not improper, but cautioned that it might have the undesirable effect of unduly restricting the lawyer or in other cases that of failing to allow for the member's inability to pay fixed amounts.

### Payment of Fee

Credit cards may be used to pay fees and interest may be charged on delinquent accounts provided the client agrees to the payment of interest before obtaining services (*Informal Opinion 338*, November 16, 1974).

### Unpaid Fees

According to *Formal Opinion 250*, June 26, 1943, a lawyer may reveal the confidences of a client if the disclosure is necessary in order to collect his or her just fee, but the lawyer must avoid any disclosure that is "not clearly necessary to obtaining or defending his rights" (see discussion on p. 183). In *Formal Opinion 209*, November 23, 1940, the Committee stated that the question of whether it was proper for a lawyer to assert a lien against a client's papers in order to secure his fee was a question of law, which the Committee would not attempt to decide. (For a discussion of remedies for recovery of fees, see 2 Stuart M. Speiser, *Attorneys' Fees* § 16 (Rochester, N.Y.: Lawyers Co-operative Publishing Co., 1973). See also DR 9-102(A)(2), concerning the lawyer's withdrawal of money that is due him or her from a clients' trust account.)

EC 2-23 states that controversies over fees should be resolved amicably and that suits against clients for fees are proper only when "necessary to prevent fraud or gross imposition by the client." One court has decided that EC 2-23 is not a rule of law that can be applied to bar a suit for a fee, even if the suit is unnecessary to prevent the fraud or gross imposition mentioned in EC 2-23. *Kizer v. Davis*, 369 N.E.2d 439 (Ind. Ct. App. 1977).

## CONTINGENT FEE ARRANGEMENTS

**EC 2-20** Contingent fee arrangements[30] in civil cases have long been commonly accepted in the United States in proceedings to enforce claims. The historical bases of their acceptance are that (1) they often, and in a variety of circumstances, provide the only practical means by which one having a claim against another can economically afford, finance, and obtain the services of a competent lawyer to prosecute his claim, and (2) a successful prosecution of the claim produces a *res* out of which the fee can be paid.[31] Although a lawyer generally should decline to accept employment on a contingent fee basis by one who is able to pay a reasonable fixed fee, it is not necessarily improper for a lawyer, where justified by the particular circumstances of a case, to enter into a contingent fee contract in a civil case with any client who, after being fully informed of all relevant factors, desires that arrangement. Because of the human relationships involved and the unique character of the proceedings, contingent fee arrangements in domestic relation cases are rarely justified. In administrative agency proceedings contingent fee contracts should be governed by the same consideration as in other civil cases. Public policy properly condemns contingent fee arrangements in criminal cases, largely on the ground that legal services in criminal cases do not produce a *res* with which to pay the fee.

[DR 2-106]

(C) A lawyer shall not enter into an arrangement for, charge, or collect a contingent fee for representing a defendant in a criminal case.[60]

### TEXTUAL AND HISTORICAL NOTES

EC II-20 of the October 1968 tentative draft read as follows:

Contingent fee arrangements in civil cases are justified because the litigation may provide the only means by which a layman can obtain

30. See ABA CANON 13, see also MACKINNON, CONTINGENT FEES FOR LEGAL SERVICES (1964) (A report of the American Bar Foundation).

"A contract for a reasonable contingent fee where sanctioned by law is permitted by Canon 13, but the client must remain responsible to the lawyer for expenses advanced by the latter. 'There is to be no barter of the privilege of prosecuting a cause for gain in exchange for the promise of the attorney to prosecute at his own expense.' (Cardozo, C. J. in Matter of Gilman, 251 N.Y. 265, 270-271)." ABA Opinion 246 (1942).

31. See Comment, Providing Legal Services for the Middle Class in Civil Matters: The Problem, the Duty and a Solution, 26 U PITT L. REV 811, 829 (1965).

60. "Contingent fees, whether in civil or criminal cases, are a special concern of the law. . . .

"In criminal cases, the rule is stricter because of the danger of corrupting justice. The second part of Section 542 of the Restatement [of Contracts] reads: 'A bargain to conduct a criminal case . . . in consideration of a promise of a fee contingent on success is illegal. . . .'" Peyton v. Margoum, 393 Pa. 86, 136 A.2d 885, 887 (1958).

"The third area of practice is which the use of the contingent fee is generally considered to be prohibited is the prosecution and defense of criminal cases. However, there are in few cases, and these are predominantly old, that it is doubtful that there can be said to be any current law on the subject . . . . In the absence of cases on the validity of contingent fees for defense attorneys it is necessary to rely on the consensus among commentators that such a fee is void as against public policy. The general practice itself makes unlikely the use of contingent fee contracts." MacKinnon, CONTINGENT FEES FOR LEGAL SERVICES 52 (1964) (A Report of the American Bar Foundation).



EC 2-20
DR 2-106(C)

CANON 2

10?

the services of a lawyer of his choice and may produce a recovery with
which to pay the fee. A contingent fee arrangement generally should
not be made with a client who is able to pay a reasonable fixed fee.
However, it is not improper for a lawyer to enter into a contingent fee
contract in advance with any client who, after being fully informed of
all circumstances, desires that arrangement. Public policy properly
condemns contingent fee arrangements in criminal cases.

The current text of EC 2-20 came into being through the following
changes. For the preliminary draft of January 1969, the first three
sentences of EC II-20 of the tentative draft were reworded and ex-
panded, and the material contained in the last half of the last
sentence of current EC 2-20, referring to *res*, was added. For the final
draft of July 1969, the statements that appear in the current text
referring to domestic relations cases and administrative proceedings
were added. The wording found in current DR 2-10° (C) (DR II-8 §c
in the tentative draft; DR 2-106(C) in the preliminary draft was not
changed during the drafting process.

## RELATED PROVISIONS

*EC 2-20:*
    EC 5-7
    DR 5-103(A)(2)

## COMMENT

Contingent fees, permitted in civil cases, are against public policy
and are prohibited in criminal cases, largely because criminal cases do
not produce a *res* with which to pay the lawyer's fee (EC 2-20). In
1964, the author of the standard study on contingent fees stated that
it was doubtful that there was any current law on the subject (F. B.
MacKinnon, *Contingent Fees for Legal Services* 52 (Chicago: Aldine
Publishing Co., 1964)). A fairly recent case, in which the court did
not refer to the Code, suggests that a conflict of interests between
client and lawyer may be one reason that contingent-fee contracts are
against public policy in criminal matters. In *U.S. ex rel. Simon v.
Murphy,* 349 F. Supp. 818 (E.D. Pa. 1972), the court found that a
"blatant" conflict of interest existed when counsel for the defendant
in a murder trial failed to inform the defendant in timely fashion of a
plea offer made by the prosecution. The lawyer had a contingent-fee
contract with the defendant which would have been valueless if the
client was not acquitted. A conflict of interest need not arise,
however. See *Schoonover v. State,* 218 Kan. 377, 543 P.2d 881
(1975). One court held that at least the spirit of DR 2-106(C) was

violated when, during a probation hearing, the court had the matter in question under advisement and counsel for a criminal defendant demanded an additional fee as a condition for his continuing appearance at the hearing (*State v. Hilton*, 217 Kan. 694, 538 P.2d 977 (1975)).

EC 2-20 states that "contingent fee arrangements in domestic relations cases are rarely justified." This Code provision has not been discussed or evaluated. For the law on this point, see 1 Stuart M. Speiser, *Attorneys' Fees* § 2:6 (Rochester, N.Y.: Lawyers Cooperative Publishing Co., 1973); Comment, Contingent Fee Contracts: Contract Related to Divorce Action Upheld, 56 *Minn. L. Rev.* 979–87 (1972).

*Informal Opinion 1317*, May 17, 1975, dealt with the question of whether it would be proper for lawyers to obtain insurance against the loss of compensation (fees and expenses) when litigation was unsuccessful in contingent-fee cases. Citing EC 2-20 and EC 2-21, the Committee observed that while such a practice would not necessarily violate any Disciplinary Rules, it would not "encourage" it. Such a practice, the Committee also suggested, might involve the acquisition of financial interest in litigation and the insurance might have a bearing on the reasonableness of the contingent fee charged by the lawyer (EC 5-2; EC 5-7; EC 5-8). (See also discussion on p. 103.)

## DIVISION OF FEES AMONG LAWYERS

**EC 2-22** Without the consent of his client, a lawyer should not associate in a particular matter another lawyer outside his firm. A fee may properly be divided between lawyers[33] properly associated if the division is in proportion to the services performed and the responsibility assumed by each lawyer[34] and if the total fee is reasonable.

**DR 2-107** Division of Fees Among Lawyers.

(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his firm or law office, unless:

    (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.



33  "Only lawyers may share in ... a division of fees, but . . . it is not necessary that both lawyers be admitted to practice in the same state, so long as the division was based on the division of services or responsibility." *ABA Opinion* 316 (1967).
34  *See* ABA Canon 34
  "We adhere to our previous rulings that where a lawyer merely brings about the employment of another lawyer but renders no service and assumes no responsibility in the matter, a division of the latter's fee is improper (*Opinions 18 and 153*).
  "It is assumed that the bar, generally, understands what acts or conduct of a lawyer may constitute 'services' to a client within the intendment of Canon 12. Such acts or conduct constitute, if not always, involve 'responsibility' on the part of the lawyer, whether the word 'responsibility' be construed to denote the possible resultant legal or moral liability on the part of the lawyer to the client or to others, or the sense of deciding what should or should not be done in behalf of the client. The word 'responsibility' in Canon 12 must be construed in this broad sense and may apply to the selection and retainer of associate counsel as well as to other acts or conduct in the client's behalf." *ABA Opinion* 204 (1940).

COMPLEX LITIGATION 1.47

**(a) General Considerations** The great potential of the class action for speed and efficiency in the administration of justice is accompanied by an equally great potential of unreasonable charges for attorneys' fees and expenses and improper solicitation of legal representation. [155] The measures recommended in section 1.41 *supra*, and the suggested sample order in section 1.41-II, *infra*, are designed to prevent improper solicitation of funds and expenses and legal representation from potential and actual class members.

Those preventive measures mentioned in section 1.41 do not expressly deal with the court's retention of power to control the charges to class members for fees and expenses at the conclusion of the class action or thereafter.

In determining awards of attorneys' fees, the guiding principles should be to provide compensation sufficient to stimulate the motive for representation of classes and to ensure that the fees awarded are consistent with the benefits bestowed upon the class, insofar as the bestowing of those benefits can be shown to be the product of the lawyer's work. The numerous exacting standards that have been set down by the courts should be strictly applied to ensure that this aspect of the class action is not subjected to abuse.

**(b) Standards for Determining Attorneys' Fees in Class Actions**

**(1) Attorneys' Fees from a Settlement or Recovery Fund** [156] Precise standards for the determination of appropriate attorneys' fees have been enunciated in many recent cases. The keynote of the principles announced by the courts has been one of moderation: "For

---

[155] "Few subjects associated with the class action device have generated as much critical commentary in recent years as the matter of attorneys' fees. *See, e.g.,* Illinois v. Harper & Row Publishers, Inc., 55 F.R.D. 221 (N.D. Ill. 1972); 7A Wright & Miller, Federal Practice and Procedure § 1803 (Supp. 1979); Manual for Complex Litigation § 1.47 (1973 rev. ed.). Comment, *Attorneys' Fees in Individual and Class Action Antitrust Litigation*, 60 Calif. L. Rev. 1656 (1972); Handler, *The Shift from Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Annual Antitrust Review*, 71 Colum. L. Rev. 1, 9-10 (1971). As Judge Decker has wryly put it, the lucrative fees involved in recent class actions may evoke public acceptance of an Italian proverb, 'A lawsuit is a fruit tree planted in a lawyer's garden.' Illinois v. Harper & Row, 55 F.R.D. at 224." Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., 481 F.2d 1045, 1049-50 (2d Cir.), *cert. denied*, 414 U.S. 1092, 94 S. Ct. 722, 38 L. Ed. 2d 549 (1973). *See also* In re Armored Car Antitrust Litigation, 472 F. Supp. 1357 (N.D. Ga. 1979).

[156] *See* Manual for Complex Litigation, § 1.47 (1973 rev. ed.). Even if the settlement agreement provides for "reasonable attorneys' fees," the standards herein stated are applicable. *See* Grunin v. International House of Pancakes, 513 F.2d 114 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S. Ct. 134, 46 L. Ed. 2d 93 (1975); Merola v. Atlantic Richfield Co., 493 F.2d 292 (3d Cir. 1974) (*Merola I*) and 515 F.2d 165 (3d Cir. 1975) (*Merola II*).

69



**1.47**                                        SUGGESTED PROCEDURES

the sake of their own integrity . . . and the integrity of Rule 23, it
is important that the courts should avoid awarding 'windfall fees'
and that they should likewise avoid every appearance of having done
so." [157] The purpose of the fee award is said to be to "compensate
the attorney for the reasonable value of services benefiting the
. . . claimant." [158] The controlling standard is one of reasonableness
under the circumstances of the particular case. [159]

The key question in determining reasonableness is, what services
were actually provided by the attorney? This starting point was
articulated by Judge Seitz in *Lindy Bros. Builders v. American Radia-
tor & Standard Sanitary Corp. (Lindy I):*

> In detailing the standards that should guide the award of fees to
> attorneys successfully concluding class suits, by judgment or settle-
> ment, we must start from the purpose of the award: to compensate
> the attorney for the reasonable value of services benefiting the un-
> represented claimant. Before the value of the attorney's services can
> be determined, the district court must ascertain just what were those
> services. To this end the first inquiry of the court should be into the
> hours spent by the attorneys—how many hours were spent in what
> manner by which attorneys. [160]

The court must then determine a reasonable hourly rate for each
attorney for the specific types of work performed. Reference must be
made to each attorney's normal billing rates and to general standards
in the community in effect at the time. [161]

The resulting figure, based on time expended and reasonable hour-
ly rates, may then be adjusted to take other factors into account. In
*Lindy I,* the court said that the district court cannot properly fix
attorneys' fees merely by multiplying the hourly rate for each attor-
ney by the number of hours worked on the case:

> While the amount thus found to constitute reasonable compensation
> should be the lodestar of the court's fee determination, there are at

---

[157] City of Detroit v. Grinnell Corp., 495 F.2d 448, 469 (2d Cir. 1974).

[158] Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 487 F.2d 161,
167 (3d Cir. 1973) *(Lindy I). See also* Lindy Bros. Builders v. American Radiator & Standard
Sanitary Corp., 540 F.2d 102, 110 (3d Cir. 1976) *(Lindy II).*

[159] 7A Wright & Miller, Federal Practice and Procedure § 1803 (Supp. 1979).

[160] Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 487 F.2d at
167.

[161] *See* Jorstad v. IDS Realty Trust, No. 80-1289, slip op. (8th Cir. Mar. 10, 1981), holding
it to be an abuse of discretion to apply "national" standards.



70



COMPLEX LITIGATION

1.47

least two other factors that must be taken into account in computing the value of attorneys' services. The first of these is the contingent nature of success: this factor is of special significance where, as here, the attorney has no private agreement that guarantees payment even if no recovery is obtained. . . . The second additional factor the district court must consider is the extent, if any, to which the quality of an attorney's work mandates increasing or decreasing the amount to which the court has found the attorney reasonably entitled. [162]

It has been held that "more is needed than a mere listing of factors." [163] Consequently, the courts, analogizing the counsel fee to a recovery in quantum meruit, have set down certain mathematical steps for the district court to go through in computing attorneys' fees in class actions. Those steps were described initially (and perhaps most completely) in *Lindy I* as follows:

First step—The court must first determine "the hours spent by the attorneys—how many hours were spent in what manner by which attorneys. . . ." The court needs "some fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, *e.g.*, senior partners, junior partners, associates, . . ."

Second step—"After determining . . . the services performed by the attorneys, the district court must attempt to value those services" by reference to the lawyer's "normal billing rate," which may differ "for different activities."

Third step—The "reasonable hourly rate" derived from the second step "does not end the court's inquiry into the value of the attorney's services." It does provide, however, "the only reasonably objective basis for valuing an attorney's services." But "there are at least two other factors that must be taken into account in computing the value of attorneys' services. The first of these is the contingent nature of success; this factor is of special significance where, as here, the attorney has no private agreement that guarantees payment even if no recovery is obtained. [footnote omitted] . . . The second additional factor the district court must consider is the extent, if any, to which the quality of an attorney's work mandates increasing or decreasing the amount to which the court has found the attorney reasonably entitled. . . . [I]n increasing or decreasing an attorney's

_____

[162] Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 487 F.2d at 168.

[163] City of Detroit v. Grinnell Corp., 495 F.2d at 470.

71



**1.47**                                                   SUGGESTED PROCEDURES

compensation, the district judge should set forth as specifically as possible the facts that support his conclusion, . . ."

Fourth step—"After determining the total reasonable value of an attorney's services in securing recovery of a fund for the class, the district court must determine what portion of the amount arrived at should be paid by the unrepresented claimants. Absent extraordinary circumstances, the unrepresented claimants should pay for the attorneys' services in proportion to their benefit from them—that is, the unrepresented claimants should pay a percentage of the reasonable value of the attorneys' services to the class equal to their percentage of the class' recovery."

Similarly, the Second Circuit, in *City of Detroit v. Grinnell Corp.*, [164] adopted the same basic principle that "multiplying attorney's hours and typical hourly fees . . . is the only legitimate starting point for analysis," but added that "other, less objective factors can be introduced into the calculus":

> Perhaps the foremost of these factors is the attorney's "risk of litigation," i.e., the fact that, despite the most vigorous and competent of efforts, success is never guaranteed. The greater the probability of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee. [165]

Variations of this approach have been adopted in the Sixth, Seventh, Eighth, and District of Columbia Circuits. [166] Other courts have listed a variety of factors to be taken into account in making fee determinations. The Fifth Circuit, in *Johnson v. Georgia Highway Express, Inc.*, [167] listed twelve considerations:

1. The time and labor required
2. The novelty and difficulty of the questions
3. The skill requisite to perform the legal service properly
4. The preclusion of other employment caused by accepting the case
5. The customary fee
6. Whether the private fee agreement is fixed or contingent
7. Time limitations imposed by the client or the circumstances
8. The amount involved and the recovery obtained



[164] *Id.*
[165] *Id.* at 471.
[166] *See* A. Miller, Attorneys' Fees in Class Actions. (Fed. Judicial Center 1980).
[167] 488 F.2d 714 (5th Cir. 1974).



COMPLEX LITIGATION                                                    1.47

    9.  The experience and ability of the attorneys
  10.  The "undesirability" of the case
  11.  The nature and length of the attorney's professional relation-
       ship with the client
  12.  Awards in similar cases.

Courts in the First and Fourth Circuits have expressly adopted the
*Johnson* approach. [168]

Another set of factors has been listed in the Second Circuit cases,
*City of Philadelphia v. Chas. Pfizer & Co.* [169] and *Alpine Pharmacy,
Inc. v. Chas. Pfizer & Co.* [170]

The controlling standard and factors cannot be applied unless a
reliable record of the required information is developed through a
procedure guaranteeing an opportunity for the affected parties to be
heard.

In awarding fees in class actions, attention should be given to the
existence of fees paid or payable under private fee contracts to coun-
sel for the class and whether these fees should be deducted from
awards for representation of the class. [171]

Clearly, the trend in all circuits is toward initial emphasis on the
time expended on the case and each petitioning attorney's normal
hourly rates. Even those courts following a *Johnson* analysis tend
first to consider time and rate, then make adjustments to take into
account the remaining factors. Generally, the considerations in-
volved in making the quality and contingency adjustments under
*Grinnell* and *Lindy I* are the same as those listed by the *Johnson*
court. [172]

Because of the open-ended factors denominated "contingent na-
ture of success," "risk of litigation," or "quality of the attorney's
work," the widespread although not universal adoption of this meth-
od has not insured against abuses of the class action. As one com-
mentator recently noted, "the contingent nature of a fee and the
likelihood of success are among the risks that may justify fees exceed-

168 The *Johnson* factors have also been adopted by the Eight Circuit as applicable to
attorneys' fee awards under the Age Discrimination in Employment Act of 1967 *Cleverly v.
Western Elec. Co.*, 450 F. Supp. 507, 511-12 (W.D. Mo. 1978), *aff'd.* 594 F.2d 638 (8th Cir.
1979).

169 345 F. Supp. 454, 482-83 (S.D.N.Y. 1972).

170 481 F.2d 1045, 1050 (2d Cir. 1973).

171 *See* note 180, *infra.*

172 *See* A. Miller, *supra* note 166.



**1.47** SUGGESTED PROCEDURES

ing the lawyer's usual hourly rate." [173] It seems redundant and unnecessary, however, to increase the hourly rate geometrically because of the quality of representation and the difficulty of the issues, when those two factors have already been sufficiently addressed by the individual lawyer's normal hourly billing rate and the number of hours he spent in preparation. This is particularly so when there are vested contingent or regular fee contracts that either have provided the lawyer with some insurance against the "risk of litigation or will sufficiently reward him for those risks."

The current standards may therefore be said to be consistent with those initially expressed in an early case, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* [174] as follows:

1. Whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the government
2. The standing of counsel at the bar—both counsel receiving the award and opposing counsel
3. Time and labor spent
4. Magnitude and complexity of the litigation
5. Responsibility undertaken
6. The amount recovered
7. The knowledge the court has of conferences, arguments that were presented, and work shown by the record to have been done by attorneys for the plaintiff prior to trial
8. What it would be reasonable for counsel to charge a victorious plaintiff.

A desirable result was reached in *Liebman v. J.W. Petersen Coal & Oil Co.,* [175] in which Judge Will noted that the prior revision of

[173] 3 Class Act. Rep. 92 (1974).

[174] 245 F. Supp. 258 (M.D. Pa. 1965), *vacated on other grounds,* 377 F.2d 776 (3d Cir. 1967), *aff'd in part and rev'd in part,* 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968)

[175] 63 F.R.D. 684 (N.D. Ill. 1974). *See also* Pete v. UMW, 517 F.2d 1275 (D.C. Cir. 1975). Large attorneys' fees in class actions are a much-criticized aspect of class actions. *See, e.g.,* Oakland, *"Risk Factor" Is Cited in Setting Legal Fees,* Washington Post, May 28, 1975, at 2. Weinstein, *The Class Action Is Not Abusive,* N.Y.L.J., May 1-2, 1972; Philadelphia Inquirer, Feb. 1, 1972, at 1. The Supreme Court has recently indicated a restrictive attitude regarding attorneys' fees generally, holding that the "private attorney general" concept does not permit an award of attorneys' fees to one party from another if no statute explicitly provides for such an award or if courts have traditionally awarded attorneys' fees for bad faith or obduracy. *See* Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975). On the other hand, recent legislative provisions, such as 42 U.S.C. § 1988 (1979) permitting an award of attorneys' fees in civil rights actions for the prevailing party, indicate



COMPLEX LITIGATION                                                    1.47

the *Manual* imposed three additional factors:

> ". . . (1) that in seeking and accepting employment as counsel for a
> judicially determined class an element of public service is involved, (2)
> the representation of the class by counsel is not a result of private
> enterprise but results from provision of an opportunity to represent
> the class by a judicial determination; and (3) the policy of the law in
> class actions, including antitrust actions, is to provide a motive to
> private counsel to represent consumers and to enforce the laws." [176]

The court further refined the "quality" standard by stating that it
should be justified by "the complexity and novelty of the issues
presented, the quality of the work that the judge has been able to
observe and . . . the amount of recovery obtained." Accordingly, in
a case in which preparation was simplified by the availability of the
evidence from a prior, related criminal case that was likely to estab-
lish liability, counsel were compensated at the usual hourly rate
without any increase in that total. In reaching that conclusion, Judge
Will noted that "[t]he principal attacks on . . . [Rule 23] are largely
the result of conduct by counsel for plaintiffs in some cases who have
acted as though the rule was adopted for their benefit rather than for
the multitude of individuals comprising the class or classes whose
rights they were presumably vindicating. . . . It would be ironic
indeed if class actions and the opportunity which Rule 23 presents
to redress grievances which heretofore went unredressed were to be
restricted or eliminated as a result of the conduct of a very small
segment of the bar specializing in plaintiffs' representation." While
occasional arithmetic increases in attorneys' fees may reasonably be
made on the grounds of "contingency" or "quality," there is no
reason to escalate that amount merely to make it a "respectable"
portion of the total recovery. [177] The services devoted to representing
the class, rather than the amount recovered, should be the "lodestar"
of fee allowances. And "quality" should be specifically justified on
the basis of circumstances in the particular case, rather than by
simply referring to complex issues that the settlement avoided resolv-

---



otherwise. It has been held that, in cases brought under the Equal Employment Opportunity
Act, the provision in 42 U.S.C. § 2000e-5(k) for an award of "costs" includes attorneys' fees.
Van Hoomissen v. Xerox Corp., 503 F.2d 1131 (9th Cir. 1974). But, in many types of class
actions, attorneys' fees are simply apportioned from the settlement or recovery fund.

[176] 63 F.R.D. at 691.

[177] Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 382 F. Supp.
999, 1014 (E.D. Pa. 1974).



ing or to the academic records and reputations of the lawyers involved. [178]

Finally, in awarding counsel fees in class actions, the courts should further be mindful that "fees and costs of counsel may be assessed against the unclaimed portion of a class action judgment. . . . If a plaintiff class member is adjudicated to have an interest in a fund, he has benefited within the meaning of the common fund doctrine . . . and his share of the judgment may be received on request." [179]

**(2) Attorneys' Fees Under Contingent Fee Contracts**  The problem respecting contingent fee contracts in relation to class actions typically has been raised by counsel's applying for attorneys' fees from the class when that counsel has been employed by the representative parties under a contingent fee contract. The contingent fee contract is to be judged apart from attorneys' fees from the settlement or recovery fund and solely by the canon of reasonableness. [180] As is made clear by the previous subsection, the court is not governed by the contingent fee contract regarding the fee to be charged to the other members of the class, even though the contingent fee contract is otherwise reasonable and ethical in respect to the formal party or parties originally represented by that counsel. An important current question is whether the amounts due counsel under a contingent fee agreement can be subtracted from the amounts determined to be due him for class representation in accordance with the principles enunciated in the previous subsection. In *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp. (Lindy II)*, the United States Court of Appeals for the Third Circuit said that the district court "should not have mixed considera-

---

[178] *Id.* at 1017-23.

[179] Van Gemert v. Boeing Co., 590 F.2d 433, 435, 439 (2d Cir. 1978), *aff'd.* 441 U.S. 942, 99 S. Ct. 2158, 60 L. Ed. 2d 1043 (1980) ("Although the full value of the benefit to each absentee member cannot be determined until he presents his claim, a fee awarded against the entire judgment fund will shift the costs of litigation to each absentee in the exact proportion that the value of the claim bears to the total recovery.").

[180] In Dunn v. H.K. Porter Co., 602 F.2d 1105 (3d Cir. 1979), it was held that federal district courts have authority to set aside contingent fee contracts when they would yield unreasonable fees. Rejecting the argument of counsel that such contracts could be set aside only if unreasonable on their face, the court said that the following factors should be considered: (a) the manner in which the contract was entered, (b) the status and sophistication of the plaintiffs, (c) whether the source of the fee payment is a settlement fund or a tax against the defendants, (d) the size of the proposed award, and (e) whether the fee allowed is sufficient to encourage capable counsel to undertake similar litigation in the future.





**COMPLEX LITIGATION** 1.47

tions of the fee determined by equitable principles (the equitable fund award) with considerations of the fees dependent on private contracts.... Private arrangements individual members of the class may have with counsel are simply irrelevant." [181]

Certainly, when counsel has a private agreement for the value of his services with the class representative or other formal parties, his fee should not be enhanced by the "contingency" factor cited above. The same principle applies when his taking the "risk of the litigation" is satisfactorily rewarded by contingent fee contracts that have become vested.

**(3) Judicial Management**   The more information about the work of the attorneys and the economic realities of the litigation available to the court, the more likely it is that a fair, reasonable, and adequate attorneys' fee will be awarded. It is imperative that judges be aware of rates and fee practices in their communities and that counsel be required to keep precise records. A pretrial conference devoted to fee issues should be held early in the proceedings, at which the court's expectations and procedures regarding the fee determination process should be made clear to all parties involved. In *Liebman v. J.W. Petersen Coal & Oil Co.*, it is noted that the court's controlling the activities of counsel from the commencement of the action is one method by which the abuse of high and unnecessary attorneys' fees may be obviated: "The courts . . . have the ultimate power and responsibility to prevent abuse. One important step in this direction is for the court to supervise the conduct of class actions from their inception." [182]

The award of attorneys' fees should be based on actual time records, not on estimates or reconstructions. The trial judge therefore should direct counsel, by written order at the beginning of the action, to keep accurate time sheets broken down by work category. [183] It must be made clear in the order that the categorization of counsel activities should be sufficiently precise to make clear (a) exactly how much time was spent in each activity and (b) whether the activity itself was of benefit to the settlement or class recovery.

---

181 540 F.2d at 120. But the courts have not yet definitively answered the question of "whether [an attorney's] private clients can require that all or part of the fees recovered by the attorney be applied against the fees charged those clients." Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 487 F.2d at 169.

182 63 F.R.D. at 701.

183 *See* In re Armored Car Antitrust Litigation, 472 F. Supp. 1357, in which the court found the fee request exorbitant, despite early warnings to counsel.

77



**1.47** SUGGESTED PROCEDURES

The order should require that these contemporaneous time sheets be submitted to the court at frequent intervals. This will enable the court to monitor the reports periodically for insufficient record keeping, or for such problems as duplication of efforts, excessive hours, and double billing. [184]

Use of magistrates to deal with all fee matters should be considered in those districts where magistrates are available. In especially complex cases, a master might be appointed to report to the court periodically on factual issues relating to the records and relevant to the fee determination.

When absent class members may be adversely affected by one or more fee applications and are not adequately represented, the court may appoint a guardian ad litem to test the reasonableness of the fees sought by counsel for the class. [185]

In complex cases involving a number of different attorneys representing various subclasses or class members, the court should direct, at the beginning, that an organizational structure be agreed upon. [186] Normally the class counsel will be appointed lead counsel, and attorneys representing individual clients should be advised that only work benefiting the class will be compensated by the court. Other plans for division of responsibility might be considered, however.

In making determinations respecting attorneys' fees in complex actions, the court should also bear in mind that some courts have held that lead counsel may be paid from a fund contributed to by plaintiffs in consolidated cases whose claims have been settled since the appointment of lead counsel. Further, counsel who have not actively participated in pretrial activities may be required to contribute to the fund. [187]

**(4) Procedure for Processing Fee Applications** The logistics of the current standards for determining reasonable fees are substantial. Time sheets must be examined; evaluations made of whether work performed was necessary or duplicative; determinations made of (a) the quality of the work performed, (b) whether there was an efficient use of legal and paralegal personnel, (c) the difficulty of discovery and other preliminary and pretrial matters including threshold legal

---

[184] A sample of such an order is contained in § 1.47-11, *infra.*

[185] Miller v. Mackey Int'l, Inc., 70 F.R.D. 533 (S.D. Fla. 1976). *See also* Haas v. Pittsburgh Nat'l Bank, 77 F.R.D. 382 (W.D. Pa. 1977).

[186] *See* §§ 1.90-1.93, *infra.*

[187] Vincent v. Hughes Air West, Inc., 557 F.2d 759 (9th Cir. 1977); In re Air Crash Disaster at Florida Everglades on December 29, 1972, 549 F.2d 1006 (5th Cir. 1977).





COMPLEX LITIGATION

1.47

questions, and (d) the normal or customary hourly rates of those performing the various services; as well as consideration given to other factors relevant to determining the number of hours necessarily devoted to the case, the reasonable hourly charges to be awarded, and the quality and contingency adjustments.

More than a few firms filing fee applications can be a substantial burden, involving so much time that the judge cannot effectively make the necessary analysis and calculations. If a magistrate or master has been previously designated to organize and receive periodic reports, a determination of reasonable fees may initially be made by the magistrate or master, subject to court approval. In some cases, the time involved may be too great a burden for the magistrate.

In *In re Folding Carton Antitrust Litigation* (MDL Docket No. 250), involving aggregate settlements of approximately $200 million, fifty-seven law firms that had performed legal services in varying degrees, under the leadership of the plaintiff class steering committee, filed fee applications totaling over $17 million. In anticipation of an impossible logistical burden, the court appointed a fee committee consisting of the lead and liaison counsel for the plaintiff class and a respected local attorney who had no prior connection with the case and was not an antitrust specialist (he was made chairman of the committee).

After consultation with the court, the committee sent a six-page letter to all plaintiffs' counsel of record, outlining the procedure and documentation that the committee contemplated and required. The committee worked extensively for three months, during which it was assisted by a major accounting firm and an academic economist. The committee held open hearings and private conferences with each of the firms requesting them. The report, which reduced the requested fees by approximately $4 million, was accepted by all fifty-seven firms without objection. No member of the committee participated in the determination of his own firm's fees. The cost of the entire operation was less than $100,000.

**(5) Standards for Processing Fee Applications**  Recent publications and decisions may be helpful to the trial judge in determining the general range of the attorneys' fee to be awarded in the particular type of case that has been tried or settled. The recent decision in *In re Armored Car Antitrust Litigation* [188] highlights some of the prob-

[188] 472 F. Supp. 1357. *See also* In re Equity Funding Corp. of America Sec. Litigation, 438 F. Supp. 1303 (C.D. Cal. 1977); Barnett v. Pritzker, 73 F.R.D. 430 (S.D.N.Y. 1977). In





**1.50**                                          SUGGESTED PROCEDURES

lems the judge may encounter in attempting to define the reasonable
range of fees. Further, the July/August and November/December
1978 issues of *Class Action Reports* contain very thorough analyses
of awards of attorneys' fees in types of antitrust [189] and securi-
ties [190] class actions, compared to the amount of recovery and the
time expended on the case. Other decisions may be of aid in other
types of cases. [191] In one case, a federal appeals court has held that,
when the claim for attorneys' fees is "outrageously excessive," denial
of any attorneys' fee at all "is an entirely appropriate means of
encouraging counsel to maintain adequate records and submit rea-
sonable, carefully calculated, and conscientiously measured claims
when seeking statutory counsel fees." [192]

### 1.50
### Scheduling of Requests for First Wave of Discovery

The main objective to be accomplished in the early stages of the
recommended program is the completion of a first wave of discovery,
to be followed in the later phases by a second wave of discovery on
the merits. [193] The first wave of discovery should be designed to
disclose as far as possible (a) the names and locations of witnesses
whose written interrogatories or depositions upon oral interrogato-
ries may be sought on the merits; (b) the existence, location, and
custodian(s) of documents and other physical evidence, the
production of which may be sought on the merits; and (c) informa-
tion concerning the transactions upon which the claims for relief are
based. Regarding document depositories, *see* § 2.50, *infra.* Because
a party may destroy valuable relevant information, documents, and
other materials before they can be discovered and used in processing
the action, the judge should consider entry of an order prohibiting
destruction of any relevant material. To avoid confusion and dispute,

---

re Penn Cent. Sec. Litigation, 416 F. Supp. 907 (E.D. Pa. 1976), *rev'd on other grounds,* 560
F.2d 1138 (3d Cir. 1977); Blank v. Talley Indus., Inc., 390 F. Supp. 1 (S.D.N.Y. 1975).

[189] 5 Class Act. Rep. 331-59 (1978).

[190] *Id.* at 470-526.

[191] *See, e.g.,* Lamphere v. Brown Univ., 610 F.2d 46 (1st Cir. 1979). Imprisoned Citizens
Union v. Shapp, 473 F. Supp. 1017, 1021 (E.D. Pa. 1979), applying the above principles in
awarding attorneys' fees under 42 U.S.C. § 1988, and significantly holding that, in making the
fee determination, "an evidentiary hearing is not required when the material facts are not in
dispute." *See also* Northcross v. Board of Educ. of Memphis City Schools, 611 F.2d 624 (6th
Cir. 1980), noting also the necessity for specific findings for review.

[192] Brown v. Stackler, 612 F.2d 1057 (7th Cir. 1980).

[193] *See also* § 6.20, *infra,* for coordination of discovery between civil and criminal actions.



**1.47**

### Sample Order Directing Counsel to Maintain Contemporary Records of Time Spent in Potential Class Action (Alternative 1)

The above-styled action has been filed as a potential class action in which the plaintiff seeks to act as the representative of a class of persons "so numerous that joinder of all members is impracticable," within the meaning of Federal Rule of Civil Procedure 23(a)(1) In order for counsel representing the plaintiff class to be awarded attorneys' fees as the class counsel, it is necessary that they maintain "contemporary time records, kept on a day-by-day basis" of the time spent by them in this action, Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 382 F. Supp. 999, 1011 (E.D. Pa. 1974), *aff'd in pertinent part*, 540 F.2d 102, 109 (3d Cir. 1976), with specific descriptions of the activities of each attorney for all of the time recorded. Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973). Reconstructions of expenditures of time are not a sufficient basis for an award of attorneys' fees. *Id.*

It is therefore

ORDERED that the attorneys seeking to represent the potential class in this action maintain contemporary, day-by-day records revealing specifically what activities were performed by each attorney and the time spent by him in each activity and that such records continue to be maintained after any class certification and until the conclusion of the action by class counsel.

It is further

ORDERED that the records being maintained by the attorneys in accordance with this order be produced at each pretrial conference held in this action for inspection by the court.

Dated this _____ day of _____, 19____.

_____
JUDGE



291



**1.47**

## Sample Order Directing Counsel to Maintain Contemporary Records of Time Spent in Potential Class Action (Alternative 2) [488]

The above-captioned action has been filed as a potential class action in which the plaintiff seeks to act as a representative of a class within the meaning of Federal Rule of Civil Procedure 23(a)(1). The court anticipates that if a class is certified and if there is a recovery by plaintiff, counsel for plaintiff will seek attorneys' fees and reimbursement of out-of-pocket expenses from that recovery.

The court hereby advises counsel for plaintiff that only work benefiting the class, if certified, will be compensated by the court. The court is particularly concerned that counsel avoid, inter alia, duplication of efforts, work performed by persons overqualified for a particular task, excessive hours for a particular task, and excessive costs.

In order to assist the court in determining what will constitute fair and reasonable attorneys' fees and out-of-pocket expenses, counsel for plaintiff shall fully comply with the following directions:

(1) Maintain original, contemporary, day-by-day records revealing specifically what activities were performed by each attorney, paralegal, and law clerk, and the exact time spent and costs incurred by each individual in each activity. Reconstructions or estimates of this information are not a sufficient basis for an award of attorneys' fees.

(2) File, under seal, with the clerk a copy of these original records covering three-month intervals, beginning _____. These records shall be filed on or before the tenth day following the end of each three-month interval.

(3) Maintain intact the original fee and cost records until further order of the court.

(4) File, under seal, with the clerk, on or before _____:

---

[488] This order is adapted, in part, from orders entered by Judge James M. Fitzgerald of the District of Alaska, sitting by designation in the Western District of Washington, in In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litigation, MDL Docket No. 249 (W.D. Wash.), Apr. 27, Feb. 2, & Jan. 6, 1978, and by Judge Malcolm M. Lucas in In re Equity Funding Corp. of America Sec. Litigation, 438 F. Supp. 1303, 1323 (C.D. Cal. 1977).

293





**1.47**                                                    **SAMPLE MATERIALS**

    (a)  complete copies of any written fee contract relating to this action and entered into with counsel's respective clients, or a recitation in full of any oral agreement regarding fees in the action entered into with counsel's respective clients;

    (b)  complete copies of any written fee arrangement, or a recitation in full of any oral agreement, by and between any counsel or group of counsel in this action; and

    (c)  complete copies of any written fee arrangement, or a recitation in full of any oral agreement, by and between any counsel and an expert in this action.

    (5) If counsel subsequently enter into any agreement mentioned in paragraph 4 above, a copy of the agreement shall be filed promptly, under seal, with the clerk.

    The court may require counsel, if appropriate, to file, under seal, with the clerk copies of all fee applications and/or time records in all other cases handled by counsel during the pendency of the above-captioned action. The court may, of course, enter additional orders regarding attorneys' fees and costs, if and when appropriate.

    All records filed with the court relating to attorneys' fees and costs may be reviewed by the court or its designate.

    Dated this _____ day of _____, 19____.

                                             **JUDGE**



**294**

## Bibliography

**Altman and Weil 1982 Survey of Law Firm Economics**

Samuel R. Berger, "Court Awarded Attorneys' Fees: What is 'Reasonable'?", <u>Univ. of Pa. Law Rev.</u>, Vol. 126:281

CANONS ON ETHICS, 57 ALR 3d 475

Daniel J. Cantor & Co., Inc., <u>1982 Economics Study of Private Law Firms</u>

John Leubsdorf, "The Contingency Factor in Attorney Fee Awards", 90 Yale L.J., pp. 473-513 (Jan. 1981)

MANUAL FOR COMPLEX LITIGATION, §1.47 (4th ed. 1977)

Arthur Miller, Attorneys's Fees in Class Actions, (Federal Judicial Center 1980)

3 H. Newburg, Class Actions §6935 (1977)

Salovy and Mendillo, "Calculating Class Action Awards: Is it Time to Unload the Lodestar?", <u>National Law Journal</u>, May 2, 1983 at 20, Col. 3

Rates Survey

# 1982

# ECONOMICS STUDY

# OF

# PRIVATE LAW FIRMS

**DANIEL J. CANTOR & COMPANY, INC.**

**Philadelphia – Chicago – San Francisco**

*Consultants to the Legal Profession*

Suburban Station Building
Philadelphia, Pennsylvania  19103

5

## QUANTITATIVE DEFINITIONS

**MEAN** .............. The sum of the parts divided by the number of parts. Synonymous with "average."

**MODE** .............. The number occurring most often.

**MEDIAN** ........... The middle number (or the average of the two middle numbers) in a list of descending values.  Not synonymous with "MEAN (average)."

**MIDDLE RANGE** ...... The numbers enclosed by the first and third quartiles.

**FIRST QUARTILE** .... The middle number in the lower half in a list of descending values.  Synonymous with "25th percentile."
Abbreviated Q1

**THIRD QUARTILE** .... The middle number in the upper half in a list of descending values.  Synonymous with "75th percentile."
Abbreviated Q3

**NINTH DECILE** ...... The number dividing the top 10% and the bottom 90% in a list of descending values.  Synonymous with "90th percentile."
Abbreviated D9

**EXAMPLE:**

```
                20
                16          = 9th Decile
                12          = 3rd Quartile  ]
   Mode = [     11                          }  Middle
          [     11          = Median (10)   }= Range
                 9                          }   7 - 12
                 8
                 7          = 1st Quartile  ]
                 6
                 5
   10)  ̄ ̄1̄0̄5̄ ̄  (10.5 = Mean
```

As calculated by the computer, exact figures are used for mean amounts. All other amounts are rounded as appropriate.

## LEGAL ASSISTANT FEE RATES

**Question:** What is the most common hourly fee rate for legal assistants?

Clerical positions, e.g., title clerks

| Category | # Replied | Dollars ($) Mean | Mode | Q1 | Median | Q3 | D9 |
|---|---|---|---|---|---|---|---|
| N AMERICA | 31 | 31 | 25 | 25 | 30 | 39 | 42 |
| REGION | | | | | | | |
| NY City | 1 | 40 | 40 | 40 | 40 | 40 | 40 |
| Chicago | 2 | 34 | - | 28 | 34 | 40 | 40 |
| New England | 9 | 30 | 30 | 24 | 30 | 35 | 38 |
| Mid-Atlantic | 4 | 33 | - | 28 | 33 | 38 | 38 |
| Southeast | 4 | 44 | 25 | 25 | 38 | 63 | 65 |
| South Cntrl | 1 | 20 | 20 | 20 | 20 | 20 | 20 |
| East Cntrl | 4 | 23 | 15 | 15 | 21 | 31 | 32 |
| West Cntrl | 1 | 40 | 40 | 40 | 40 | 40 | 40 |
| Southwest | 3 | 27 | 25 | 25 | 25 | 30 | 30 |
| Pacific Cst | 2 | 30 | - | 15 | 30 | 45 | 45 |
| CITY POP | | | | | | | |
| Und 100M | 4 | 24 | 25 | 20 | 25 | 28 | 28 |
| 100M1-500M | 6 | 26 | 20 | 20 | 24 | 30 | 34 |
| 500M1-1MM | 5 | 35 | - | 29 | 35 | 41 | 43 |
| 1MM1-2MM | 8 | 38 | 35 | 28 | 35 | 45 | 67 |
| 2MM1 & Over | 8 | 30 | 40 | 26 | 29 | 38 | 40 |
| LEGAL STAFF | | | | | | | |
| Und 11 Lyrs | 4 | [illegible] | [illegible] | 20 | 25 | 25 | 25 |
| 11-20 Lwyrs | 7 | [illegible] | [illegible] | 21 | 30 | 30 | 33 |
| 21-30 Lwyrs | 3 | [illegible] | [illegible] | 25 | 25 | 28 | 28 |
| 31-50 Lwyrs | 4 | 34 | 35 | 33 | 35 | 35 | 35 |
| 51-70 Lwyrs | 5 | 37 | - | 30 | 40 | 46 | 48 |
| 71 & More | 8 | 36 | 40 | 25 | 35 | 40 | 64 |

Nonclerical positions, e.g., investigators

| Category | # Replied | Dollars ($) Mean | Mode | Q1 | Median | Q3 | D9 |
|---|---|---|---|---|---|---|---|
| N AMERICA | 27 | 33 | 35 | 25 | 35 | 40 | 44 |
| NY City | 2 | 38 | - | 35 | 38 | 40 | 40 |
| Chicago | 3 | 32 | - | 25 | 32 | 40 | 40 |
| New England | 4 | 36 | - | 28 | 35 | 45 | 46 |
| Mid-Atlantic | 3 | 37 | - | 25 | 40 | 45 | 45 |
| Southeast | 3 | 35 | 35 | 35 | 35 | 35 | 35 |
| South Cntrl | 0 | | | | | | |
| East Cntrl | 4 | 29 | - | 20 | 20 | 38 | 39 |
| West Cntrl | 5 | 27 | 25 | 24 | 25 | 31 | 33 |
| Southwest | 1 | 30 | 30 | 30 | 30 | 30 | 30 |
| Pacific Cst | 2 | 38 | - | 35 | 38 | 40 | 40 |
| Und 100M | 7 | 30 | 25 | 25 | 30 | 35 | 36 |
| 100M1-500M | 5 | 31 | 25 | 25 | 25 | 35 | 40 |
| 500M1-1MM | 2 | 28 | - | 15 | 28 | 40 | 40 |
| 1MM1-2MM | 7 | 38 | 35 | 35 | 35 | 44 | 45 |
| 2MM1 & Over | 6 | 34 | 40 | 30 | 34 | 40 | 40 |
| Und 11 Lyrs | 6 | 28 | 25 | 25 | 25 | 35 | 35 |
| 11-20 Lwyrs | 7 | 30 | 25 | 25 | 30 | 35 | 38 |
| 21-30 Lwyrs | 1 | 40 | 40 | 40 | 40 | 40 | 40 |
| 31-50 Lwyrs | 5 | 31 | 30 | 29 | 30 | 34 | 36 |
| 51-70 Lwyrs | 2 | 38 | - | 35 | 38 | 40 | 40 |
| 71 & More | 6 | 40 | 40 | 35 | 40 | 45 | 47 |

Other professionals, e.g., accountants

| Category | # Replied | Dollars ($) Mean | Mode | Q1 | Median | Q3 | D9 |
|---|---|---|---|---|---|---|---|
| N AMERICA | 88 | 40 | 40 | 31 | 40 | 45 | 50 |
| NY City | 4 | 65 | 0 | 43 | 53 | 88 | 93 |
| Chicago | 1 | 45 | 45 | 45 | 45 | 45 | 45 |
| New England | 12 | 38 | 40 | 33 | 38 | 43 | 50 |
| Mid-Atlantic | 14 | 41 | 40 | 30 | 40 | 45 | 61 |
| Southeast | 7 | 35 | 35 | 35 | 35 | 39 | 40 |
| South Cntrl | 5 | 30 | 30 | 27 | 30 | 31 | 33 |
| East Cntrl | 17 | 36 | 35 | 30 | 35 | 42 | 45 |
| West Cntrl | 10 | 38 | 40 | 35 | 38 | 40 | 45 |
| Southwest | 8 | 48 | 40 | 40 | 40 | 55 | 74 |
| Pacific Cst | 10 | 39 | 30 | 30 | 38 | 45 | 50 |
| Und 100M | 11 | 33 | 30 | 26 | 30 | 37 | 48 |
| 100M1-500M | 15 | 36 | 40 | 30 | 35 | 40 | 45 |
| 500M1-1MM | 16 | 38 | 40 | 33 | 38 | 43 | 49 |
| 1MM1-2MM | 26 | 40 | 35 | 35 | 40 | 45 | 50 |
| 2MM1 & Over | 20 | 47 | 40 | 37 | 40 | 48 | 70 |
| Und 11 Lyrs | 17 | 40 | 40 | 30 | 37 | 46 | 60 |
| 11-20 Lwyrs | 21 | 39 | 30 | 30 | 35 | 40 | 54 |
| 21-30 Lwyrs | 11 | 38 | 40 | 35 | 40 | 44 | 45 |
| 31-50 Lwyrs | 15 | 39 | 35 | 35 | 35 | 44 | 50 |
| 51-70 Lwyrs | 9 | 35 | 35 | 30 | 35 | 40 | 40 |
| 71 & More | 15 | 45 | 45 | 40 | 45 | 49 | 50 |

# ASSOCIATE FEE RATES

Question: What is the most common hourly fee rate:

| Category | Associates under 2 years in practice: # Replies | Dollars ($) Mean | Mode | Q1 | Median | Q3 | D9 | Associates 2 to 4 years in practice: # Replies | Dollars ($) Mean | Mode | Q1 | Median | Q3 | D9 | Senior associates over 4 years in practice: # Replies | Dollars ($) Mean | Mode | Q1 | Median | Q3 | D9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N AMERICA | 110 | 59 | 50 | 50 | 60 | 65 | 70 | 113 | 69 | 70 | 60 | 70 | 75 | 85 | 102 | 80 | 85 | 70 | 80 | 90 | 100 |
| REGION | | | | | | | | | | | | | | | | | | | | | |
| NY City | 6 | 75 | 70 | 70 | 73 | 85 | 85 | 5 | 86 | - | 79 | 90 | 93 | 94 | 6 | 109 | 110 | 100 | 110 | 115 | 116 |
| Chicago | 5 | 58 | - | 54 | 60 | 62 | 63 | 6 | 64 | 60 | 60 | 63 | 70 | 73 | 6 | 73 | 70 | 65 | 70 | 80 | 86 |
| New England | 16 | 55 | 50 | 49 | 53 | 63 | 69 | 16 | 67 | 70 | 55 | 70 | 75 | 85 | 13 | 81 | 80 | 74 | 80 | 91 | 101 |
| Mid-Atlantic | 16 | 61 | 55 | 52 | 58 | 68 | 74 | 13 | 70 | 70 | 60 | 65 | 73 | 96 | 14 | 79 | 70 | 67 | 73 | 85 | 100 |
| Southeast | 10 | 58 | 55 | 50 | 58 | 65 | 70 | 10 | 65 | 60 | 55 | 60 | 80 | 83 | 10 | 72 | 60 | 60 | 72 | 85 | 95 |
| South Cntrl | 5 | 52 | 55 | 49 | 54 | 55 | 55 | 6 | 60 | 50 | 50 | 63 | 66 | 68 | 4 | 70 | - | 60 | 70 | 80 | 80 |
| East Cntrl | 18 | 57 | 60 | 51 | 59 | 60 | 68 | 22 | 65 | 70 | 60 | 65 | 70 | 76 | 20 | 76 | 75 | 65 | 75 | 89 | 95 |
| West Cntrl | 13 | 55 | 50 | 50 | 55 | 60 | 71 | 15 | 67 | 65 | 60 | 65 | 75 | 80 | 11 | 78 | 75 | 70 | 75 | 84 | 100 |
| Southwest | 8 | 60 | 60 | 55 | 60 | 65 | 68 | 8 | 75 | 75 | 73 | 75 | 78 | 83 | 9 | 88 | 85 | 84 | 85 | 89 | 106 |
| Pacific Cst | 13 | 65 | 65 | 64 | 65 | 70 | 77 | 12 | 78 | 75 | 68 | 75 | 90 | 96 | 9 | 88 | 100 | 74 | 90 | 100 | 109 |
| CITY POP | | | | | | | | | | | | | | | | | | | | | |
| Und 100M | 12 | 48 | 50 | 40 | 50 | 50 | 59 | 13 | 56 | 50 | 49 | 50 | 65 | 68 | 12 | 57 | 50 | 50 | 53 | 65 | 71 |
| 100M1-500M | 21 | 55 | 55 | 49 | 55 | 60 | 75 | 22 | 64 | 55 | 55 | 60 | 70 | 78 | 14 | 74 | 75 | 65 | 75 | 85 | 85 |
| 500M1-1MM | 17 | 57 | 50 | 50 | 55 | 65 | 65 | 19 | 67 | 65 | 61 | 66 | 74 | 78 | 16 | 79 | 80 | 70 | 80 | 85 | 89 |
| 1MM1-2MM | 32 | 61 | 60 | 57 | 60 | 68 | 70 | 31 | 72 | 75 | 66 | 75 | 79 | 85 | 32 | 84 | 85 | 73 | 85 | 93 | 100 |
| 2MM1 & Over | 28 | 66 | 65 | 55 | 65 | 70 | 85 | 28 | 75 | 70 | 62 | 73 | 85 | 95 | 28 | 91 | 100 | 75 | 93 | 103 | 113 |
| LEGAL STAFF | | | | | | | | | | | | | | | | | | | | | |
| Und 11 Lwyrs | 21 | 57 | 50 | 50 | 55 | 63 | 72 | 21 | 65 | 60 | 54 | 60 | 66 | 94 | 20 | 71 | 60 | 58 | 66 | 75 | 100 |
| 11-20 Lwyrs | 24 | 57 | 50 | 50 | 55 | 65 | 75 | 27 | 64 | 65 | 55 | 65 | 75 | 84 | 21 | 76 | 75 | 64 | 75 | 86 | 100 |
| 21-30 Lwyrs | 14 | 61 | 50 | 50 | 60 | 70 | 76 | 14 | 70 | 75 | 65 | 73 | 75 | 86 | 12 | 80 | 85 | 70 | 80 | 85 | 111 |
| 31-50 Lwyrs | 20 | 57 | 60 | 54 | 59 | 60 | 65 | 20 | 68 | 70 | 60 | 70 | 75 | 75 | 18 | 82 | 85 | 70 | 85 | 88 | 97 |
| 51-70 Lwyrs | 11 | 60 | 60 | 51 | 60 | 65 | 76 | 11 | 72 | 70 | 61 | 70 | 79 | 91 | 11 | 84 | 75 | 75 | 75 | 96 | 104 |
| 71 & More | 20 | 63 | 70 | 60 | 64 | 70 | 70 | 20 | 76 | 70 | 70 | 75 | 85 | 85 | 20 | 92 | 90 | 83 | 90 | 98 | 108 |

# PARTNER FEE RATES

**Question:  What is the most common hourly fee rate for:**

## Younger partners

| | # Replies | Mean | Mode | Q1 | Median | Q3 | D9 |
|---|---|---|---|---|---|---|---|
| | 107 | 69 | 100 | 70 | 90 | 105 | 120 |

## Intermediate partners

| | # Replies | Mean | Mode | Q1 | Median | Q3 | D9 |
|---|---|---|---|---|---|---|---|
| | 116 | 104 | 75 | 76 | 100 | 125 | 150 |

## Senior partners

| | # Replies | Mean | Mode | Q1 | Median | Q3 | D9 |
|---|---|---|---|---|---|---|---|
| | 127 | 120 | 100 | 90 | 115 | 149 | 175 |

AEW - 1982 STUDY GROUP

## EARNINGS

A total of 530 firms participated in this study. Usable income information was provided for 9,336 persons, including 3,105 associates, 4,803 partner/shareholders, 175 individuals designated counsel, 1,007 paralegal employees, and 236 legal administrators. A number of firms which provided other types of information for the study were unable (or unwilling) to furnish this detail.

A number of the respondents are professional corporations/associations. The owner-employees of such organizations may receive substantial benefits which are not reported as taxable earnings. In partnerships (and proprietorships), such benefits as pension fund contributions are attributable to each partner's income, and are deducted by the partner personally. Other deductible benefits, such as medical reimbursement and life insurance, are simply not available to partners and proprietors.

The survey, therefore, reports "cash income," the taxable earnings from the firm, and "total compensation," the aggregate of cash income and the following benefits: pension - profit sharing contributions (vested or unvested), medical benefits, group insurance benefits, employer's share of social security, workers' compensation and unemployment compensation, and dividends paid by a professional corporation. Not included are auto expense, excluding education expense and professional dues.

## DEFINITIONS

The heading PARTNER/SHAREHOLDER includes partners in partnerships, shareholders in professional corporations and associations and sole proprietors. The term ASSOCIATE is used in the traditional way. PARALEGAL assistants are distinguished from secretarial, clerical and administrative employees. LEGAL ADMINISTRATOR included office manager, but excludes senior secretaries and bookkeeper.

AVERAGE, as used herein, is the arithmetic mean.

LOWER QUARTILE is the 25th percentile, MEDIAN is the middle-most number in a series, UPPER QUARTILE is the 75th percentile and NINTH DECILE is the 90th percentile.

FIRMS indicates the number of law firms which reported within a category.

A distribution analysis shows the number of persons in each earning category, e.g. with earnings of $30,000 to $34,999, or with x to y hours.

No averages are shown for any category which does not have earnings information supplied by at least three firms.

One firm is to all of the firms who participated. Comments and suggestions with regard to future studies will be most welcome.

ii

SURVEY SUMMARY

TYPICAL HOURLY BILLING RATES

UNDER 2 YEARS OF LEGAL EXPERIENCE

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $40 | $40- $44 | $45- $49 | $50- $54 | $55- $59 | $60- $64 | $65- $69 | OVER $69 |
|---|---|---|---|---|---|---|---|---|---|
| 417 | 56 | 14 | 35 | 38 | 108 | 54 | 64 | 36 | 68 |

2 AND 3 YEARS OF LEGAL EXPERIENCE

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $55 | $55- $59 | $60- $64 | $65- $69 | $70- $74 | $75- $79 | OVER $79 |
|---|---|---|---|---|---|---|---|---|
| 422 | 65 | 82 | 55 | 77 | 53 | 34 | 62 | 59 |

4 AND 5 YEARS OF LEGAL EXPERIENCE

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $60 | $60- $69 | $70- $79 | $80- $89 | $90- $109 | $110- $124 | $125- $149 | OVER $149 |
|---|---|---|---|---|---|---|---|---|---|
| 430 | 74 | 55 | 106 | 117 | 75 | 61 | 12 | 4 | |

6 TO 10 YEARS OF LEGAL EXPERIENCE

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $60 | $60- $69 | $70- $79 | $80- $89 | $90- $109 | $110- $124 | $125- $149 | OVER $149 |
|---|---|---|---|---|---|---|---|---|---|
| 470 | 86 | 14 | 70 | 107 | 98 | 113 | 35 | 23 | 10 |

11 TO 20 YEARS OF LEGAL EXPERIENCE

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $60 | $60- $69 | $70- $79 | $80- $89 | $90- $109 | $110- $124 | $125- $149 | OVER $149 |
|---|---|---|---|---|---|---|---|---|---|
| 463 | 99 | 4 | 34 | 80 | 73 | 113 | 60 | 64 | 35 |

21 OR MORE YEARS OF LEGAL EXPERIENCE

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $60 | $60- $69 | $70- $79 | $80- $89 | $90- $109 | $110- $124 | $125- $149 | OVER $149 |
|---|---|---|---|---|---|---|---|---|---|
| 384 | 110 | 1 | 21 | 52 | 38 | 94 | 53 | 66 | 59 |

HOURLY BILLING RATES FOR PARALEGALS

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $20 | $20- $24 | $25- $29 | $30- $34 | $35- $39 | $40- $49 | OVER $49 |
|---|---|---|---|---|---|---|---|---|
| 392 | 34 | 9 | 19 | 63 | 92 | 91 | 94 | 24 |

HOURLY BILLING RATES FOR LAW CLERKS

| NO. OF FIRMS | AVERAGE RATE $ | UNDER $20 | $20- $24 | $25- $29 | $30- $34 | $35- $39 | $40- $49 | OVER $49 |
|---|---|---|---|---|---|---|---|---|
| 527 | 28 | 214 | 26 | 63 | 76 | 71 | 52 | 25 |

## TYPICAL HOURLY BILLING RATES BY REGION

### UNDER 2 YEARS OF LEGAL EXPERIENCE

| REGION | NO. OF FIRMS | AVERAGE RATE | NUMBER OF FIRMS REPORTING RATE OF— | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UNDER $40 | $40–$44 | $45–$49 | $50–$54 | $55–$59 | $60–$64 | $65–$69 | $70–$74 | $75–$79 | $80–$84 | $85–$89 | OVER $90 |
| WEST | 44 | 61 | | | 2 | | | | | | | | | |
| CALIFORNIA | 57 | 66 | | | | 10 | | | | | | | | |
| MIDWEST | 113 | 55 | 3 | 2 | | 2 | | | | | | | | |
| SOUTHWEST | 48 | 57 | 1 | | 21 | | | | | | | | | |
| SOUTH | 76 | 55 | 1 | | | 21 | | | | | | | | |
| NORTHEAST | 83 | 55 | 7 | | 11 | 21 | | | | | | | | |

### 2 AND 3 YEARS OF LEGAL EXPERIENCE

| REGION | NO. OF FIRMS | AVERAGE RATE | NUMBER OF FIRMS REPORTING RATE OF— | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UNDER $55 | $55–$59 | $60–$64 | $65–$69 | $70–$74 | $75–$79 | $80–$84 | $85–$89 | $90–$94 | $95–$99 | $100–$104 | OVER $105 |
| WEST | 45 | 73 | 1 | | 21 | | | | | | | | | |
| CALIFORNIA | 56 | 77 | | | 3 | | | | | | | | | |
| MIDWEST | 124 | 61 | 32 | | | | | | | | | | | |
| SOUTHWEST | 48 | 66 | 6 | 23 | | | | | | | | | | |
| SOUTH | 81 | 64 | 20 | 13 | | | | | | | | | | |
| NORTHEAST | 96 | 64 | 15 | 12 | | | | | | | | | | |

### 4 AND 5 YEARS OF LEGAL EXPERIENCE

| REGION | NO. OF FIRMS | AVERAGE RATE | NUMBER OF FIRMS REPORTING RATE OF— | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UNDER $60 | $60–$69 | $70–$79 | $80–$89 | $90–$99 | $100–$109 | $110–$119 | $120–$124 | OVER $125 |
| WEST | 44 | 84 | | | | | | | | | |
| CALIFORNIA | 55 | 70 | 17 | | | | | | | | |
| MIDWEST | 120 | 70 | | | | | | | | | |
| SOUTHWEST | 85 | 76 | 22 | | | | | | | | |
| SOUTH | 85 | 76 | 12 | | | | | | | | |
| NORTHEAST | 94 | 74 | | | | | | | | | |

NOTE:  THE AVERAGES IN THIS SECTION ARE THE AVERAGES OF FIRMS, WITHOUT CONSIDERATION OF THE NUMBER OF LAWYERS AT EACH RATE.

38



TYPICAL HOURLY BILLING RATES BY REGION

**6 TO 10 YEARS OF LEGAL EXPERIENCE**

|  |  |  | NUMBER OF FIRMS REPORTING RATE OF | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REGION | NO. OF FIRMS | AVERAGE RATE $ | UNDER $60 | $60-$69 | $70-$79 | $80-$89 | $90-$99 | $100-$109 | $110-$124 | $125-$149 | OVER $149 |
| WEST | 49 | 96 | 1 |  | 5 | 12 | 20 | 7 |  |  | 1 |
| CALIFORNIA | 39 | 107 |  | 1 |  | 7 | 12 | 3 | 3 |  |  |
| MIDWEST | 136 | 80 | 2 | 30 | 41 | 25 | 27 |  |  |  |  |
| SOUTHWEST | 58 | 87 | 2 | 4 | 13 | 18 | 12 | 6 | 2 |  | 1 |
| SOUTH | 91 | 77 | 6 | 22 | 18 | 26 | 11 |  |  |  |  |
| NORTHEAST | 105 | 87 | 5 | 13 | 25 | 21 | 21 | 10 | 4 | 4 | 3 |

**11 TO 20 YEARS OF LEGAL EXPERIENCE**

|  |  |  | NUMBER OF FIRMS REPORTING RATE OF | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REGION | NO. OF FIRMS | AVERAGE RATE $ | UNDER $60 | $60-$69 | $70-$79 | $80-$89 | $90-$99 | $100-$109 | $110-$124 | $125-$149 | OVER $149 |
| WEST | 50 | 106 |  | 1 | 4 | 5 | 17 | 10 | 3 |  | 5 |
| CALIFORNIA | 34 | 120 |  |  |  |  |  | 2 | 5 | 2 | 5 |
| MIDWEST | 140 | 93 | 2 | 14 | 25 | 24 | 31 | 23 | 14 | 2 | 1 |
| SOUTHWEST | 48 | 104 | 1 | 1 | 16 | 18 | 13 | 7 | 7 | 7 | 4 |
| SOUTH | 82 | 91 |  | 13 | 18 | 15 | 13 | 3 |  |  | 2 |
| NORTHEAST | 102 | 103 |  | 4 | 25 | 16 | 27 | 17 | 20 |  | 5 |

**21 OR MORE YEARS OF LEGAL EXPERIENCE**

|  |  |  | NUMBER OF FIRMS REPORTING RATE OF | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REGION | NO. OF FIRMS | AVERAGE RATE $ | UNDER $60 | $60-$69 | $70-$79 | $80-$89 | $90-$99 | $100-$109 | $110-$124 | $125-$149 | OVER $149 |
| WEST | 48 | 116 |  |  | 2 | 5 | 5 | 7 | 9 | 11 | 6 |
| CALIFORNIA | 24 | 136 |  |  |  |  |  |  |  | 3 | 10 |
| MIDWEST | 117 | 101 | 1 | 9 | 20 | 16 | 27 | 22 | 12 | 10 | 7 |
| SOUTHWEST | 42 | 113 |  | 8 | 19 | 5 | 11 | 3 | 3 | 10 | 8 |
| SOUTH | 75 | 97 |  | 4 | 7 | 6 | 23 | 13 | 13 | 14 | 7 |
| NORTHEAST | 86 | 118 |  |  |  |  | 10 |  |  |  | 21 |

30

# TYPICAL HOURLY BILLING RATES BY REGION

## HOURLY BILLING RATES FOR PARALEGALS

| REGION | NO. OF FIRMS | AVERAGE RATE | NUMBER OF FIRMS REPORTING RATE OF: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | UNDER $20 | $20–$24 | $25–$29 | $30–$34 | $35–$39 | $40–$49 | OVER $49 |
| WEST | 48 | 36 | | 1 | 3 | 16 | 17 | 10 | 5 |
| CALIFORNIA | 30 | 41 | 2 | 1 | 17 | 25 | 15 | 18 | 2 |
| MIDWEST | 411 | 34 | 1 | 6 | 26 | 211 | 23 | 55 | 2 |
| SOUTHWEST | 73 | 34 | 1 | | 22 | 11 | 11 | 7 | 5 |
| SOUTH | 80 | 33 | 3 | 4 | 23 | 16 | 84 | 2 | 4 |
| NORTHEAST | | | | | | | | | |

## HOURLY BILLING RATES FOR LAW CLERKS

| REGION | NO. OF FIRMS | AVERAGE RATE | NUMBER OF FIRMS REPORTING RATE OF: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | UNDER $20 | $20–$24 | $25–$29 | $30–$34 | $35–$39 | $40–$49 | OVER $49 |
| WEST | 54 | 25 | 10 | | 5 | 9 | 7 | 10 | 4 |
| CALIFORNIA | 42 | 23 | 17 | 1 | 5 | 21 | 21 | 17 | 2 |
| MIDWEST | 157 | 19 | 67 | 10 | 7 | 11 | 5 | 1 | 2 |
| SOUTHWEST | 56 | 21 | 22 | 1 | 5 | 6 | 5 | 4 | 4 |
| SOUTH | 103 | 21 | 44 | 1 | 17 | 16 | 5 | 6 | 4 |
| NORTHEAST | 115 | 28 | 46 | 3 | 17 | 22 | 2 | 4 | 4 |



# TYPICAL HOURLY BILLING RATES BY SIZE OF FIRM

## UNDER 2 YEARS OF LEGAL EXPERIENCE

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE | UNDER $40 | $40- $44 | $45- $49 | $50- $54 | $55- $59 | $60- $64 | $65- $69 | $70- $74 | $75- $79 | $80- $84 | OVER $85 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 124 | 55 | 7 | 13 | 20 | 37 | 18 | 8 | | 17 | | | |
| 9 TO 20 LAWYERS | 152 | 55 | | 5 | 3 | 32 | 11 | | | 16 | | | |
| 21 TO 24 LAWYERS | 85 | 57 | | | | 2 | 11 | | | 4 | | | |
| 41 TO 74 LAWYERS | 37 | 57 | | | | | 5 | | | 5 | | | |
| 75 OR MORE LAWYERS | 21 | 61 | 1 | 1 | | | | | | | | | |

## 2 AND 3 YEARS OF LEGAL EXPERIENCE

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE | UNDER $55 | $55- $59 | $60- $64 | $65- $69 | $70- $74 | $75- $79 | OVER $80 |
|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 124 | 63 | 38 | 14 | 31 | 21 | | | 17 |
| 9 TO 20 LAWYERS | 157 | 66 | | 31 | 20 | 20 | 16 | | 33 |
| 21 TO 24 LAWYERS | 85 | 63 | 8 | 13 | 18 | 7 | 11 | | 13 |
| 41 TO 74 LAWYERS | 37 | 63 | 1 | 2 | 4 | 7 | 5 | | 4 |
| 75 OR MORE LAWYERS | 21 | 72 | | | 2 | 4 | 4 | | |

## 4 AND 5 YEARS OF LEGAL EXPERIENCE

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE | UNDER $60 | $60- $69 | $70- $79 | $80- $89 | $90- $99 | $100- $109 | $110- $124 | $125- $149 | OVER $150 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 131 | 71 | 29 | 37 | 38 | 17 | | | | 6 | |
| 9 TO 20 LAWYERS | 158 | 74 | 21 | 41 | 32 | 28 | 13 | | 9 | | 1 |
| 21 TO 24 LAWYERS | 85 | 77 | 9 | 22 | 13 | 14 | 13 | | 6 | | 2 |
| 41 TO 74 LAWYERS | 37 | 77 | 5 | 5 | 6 | 8 | | | | 1 | |
| 75 OR MORE LAWYERS | 21 | 83 | | 1 | | | | | | | |

4 1

# TYPICAL HOURLY BILLING RATES BY SIZE OF FIRM

## 6 TO 10 YEARS OF LEGAL EXPERIENCE

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE | UNDER $60 | $60-$65 | $70-$75 | $80-$85 | $90-$95 | $100-$105 | $110-$115 | $120-$125 | OVER $140 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 168 | 82 | 8 | 40 | 41 | 35 | 24 | 7 | 2 | 2 | |
| 9 TO 20 LAWYERS | 161 | 85 | | 22 | 40 | 37 | 27 | 9 | 7 | 4 | 2 |
| 21 TO 40 LAWYERS | 83 | 92 | | 7 | 17 | 22 | 23 | 7 | 5 | 4 | 2 |
| 41 TO 74 LAWYERS | 37 | 98 | | 1 | 2 | 13 | 9 | | 1 | 2 | |
| 75 OR MORE LAWYERS | 21 | 108 | | | | | 8 | | | | |

## 11 TO 20 YEARS OF LEGAL EXPERIENCE

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE | UNDER $60 | $60-$65 | $70-$75 | $80-$85 | $90-$95 | $100-$105 | $110-$115 | $120-$125 | OVER $140 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 166 | 92 | 1 | 28 | 43 | 31 | 28 | 8 | 10 | 11 | |
| 9 TO 20 LAWYERS | 157 | 98 | | 11 | 28 | 25 | 27 | 23 | 10 | 7 | 7 |
| 21 TO 40 LAWYERS | 82 | 105 | | 2 | 1 | 13 | 14 | 9 | 4 | | 4 |
| 41 TO 74 LAWYERS | 37 | 111 | | | | 9 | 2 | | | | |
| 75 OR MORE LAWYERS | 21 | 121 | | | | 2 | | | | | |

## 21 OR MORE YEARS OF LEGAL EXPERIENCE

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE | UNDER $60 | $60-$65 | $70-$75 | $80-$85 | $90-$95 | $100-$105 | $110-$115 | $120-$125 | OVER $140 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 120 | 97 | 1 | 12 | 28 | 18 | 28 | 8 | 24 | 11 | |
| 9 TO 20 LAWYERS | 132 | 106 | | 7 | 16 | 16 | 49 | 24 | 13 | 10 | |
| 21 TO 40 LAWYERS | 73 | 110 | | 2 | 2 | 1 | 4 | 12 | 12 | | |
| 41 TO 74 LAWYERS | 36 | 119 | | | | | | | | | |
| 75 OR MORE LAWYERS | 21 | 137 | | | | | 2 | | | | |

42



## TYPICAL HOURLY BILLING RATES BY SIZE OF FIRM

### HOURLY BILLING RATES FOR PARALEGALS

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE $ | ----------NUMBER OF FIRMS REPORTING RATE OF---------- UNDER $20 | $20-$24 | $25-$29 | $30-$34 | $35-$39 | $40-$49 | OVER $49 |
|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 121 | 31 | 7 | 13 | 29 | 23 | 23 | 19 | 7 |
| 9 TO 20 LAWYERS | 137 | 34 | 2 | 3 | 22 | 37 | 33 | 33 | 7 |
| 21 TO 40 LAWYERS | 77 | 36 | | 2 | 10 | 18 | 18 | 22 | 7 |
| 41 TO 74 LAWYERS | 37 | 36 | | 1 | 1 | 12 | 12 | 10 | 1 |
| 75 OR MORE LAWYERS | 20 | 39 | | | 1 | 2 | 5 | 10 | 2 |

### HOURLY BILLING RATES FOR LAW CLERKS

| SIZE OF FIRM | NO. OF FIRMS | AVERAGE RATE $ | ----------NUMBER OF FIRMS REPORTING RATE OF---------- UNDER $20 | $20-$24 | $25-$29 | $30-$34 | $35-$39 | $40-$49 | OVER $49 |
|---|---|---|---|---|---|---|---|---|---|
| 2 TO 8 LAWYERS | 223 | 11 | 151 | 12 | 17 | 15 | 14 | 8 | 6 |
| 9 TO 20 LAWYERS | 163 | 23 | 51 | 9 | 28 | 31 | 23 | 13 | 8 |
| 21 TO 40 LAWYERS | 83 | 30 | 11 | 5 | 12 | 18 | 15 | 16 | 6 |
| 41 TO 74 LAWYERS | 37 | 36 | 1 | | 3 | 7 | 13 | 9 | 4 |
| 75 OR MORE LAWYERS | 21 | 35 | | | 3 | 5 | 6 | 6 | 1 |



## TYPICAL HOURLY BILLING RATES BY SIZE OF METROPOLITAN AREA

### UNDER 2 YEARS OF LEGAL EXPERIENCE

| POPULATION | NO. OF FIRMS | AVERAGE RATE $ | NUMBER OF FIRMS REPORTING RATE OF: UNDER $40 | $40-$44 | $45-$49 | $50-$54 | $55-$59 | $60-$64 | $65-$69 | OVER $69 |
|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 250,000 | 133 | 52 | 9 | 17 | 11 | 43 | 13 | 19 | 9 | 12 |
| 250,000 - 500,000 | 83 | 52 | 3 | 11 | 13 | 25 | 10 | 6 | 8 | 7 |
| 500,000 - 1 MILLION | 64 | 58 | 1 | 1 | 5 | 16 | 10 | 11 | 7 | 13 |
| OVER 1 MILLION | 137 | 61 | 1 | 6 | 9 | 24 | 21 | 28 | 12 | 36 |

### 2 AND 3 YEARS OF LEGAL EXPERIENCE

| POPULATION | NO. OF FIRMS | AVERAGE RATE $ | NUMBER OF FIRMS REPORTING RATE OF: UNDER $55 | $55-$59 | $60-$64 | $65-$69 | $70-$74 | $75-$79 | OVER $79 |
|---|---|---|---|---|---|---|---|---|---|
| UNDER 250,000 | 130 | 59 | 43 | 20 | 25 | 10 | 9 | 16 | 7 |
| 250,000 - 500,000 | 88 | 61 | 21 | 17 | 23 | 8 | 7 | 7 | 5 |
| 500,000 - 1 MILLION | 67 | 67 | 5 | 6 | 13 | 15 | 6 | 13 | 9 |
| OVER 1 MILLION | 137 | 71 | 13 | 12 | 16 | 20 | 12 | 24 | 30 |

### 4 AND 5 YEARS OF LEGAL EXPERIENCE

| POPULATION | NO. OF FIRMS | AVERAGE RATE $ | NUMBER OF FIRMS REPORTING RATE OF: UNDER $60 | $60-$69 | $70-$79 | $80-$89 | $90-$109 | $110-$124 | $125-$149 | OVER $149 |
|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 250,000 | 136 | 68 | 30 | 49 | 30 | 17 | 7 | 2 | 1 | |
| 250,000 - 500,000 | 89 | 71 | 13 | 29 | 24 | 12 | 10 | | 1 | |
| 500,000 - 1 MILLION | 65 | 77 | 3 | 11 | 23 | 14 | 13 | 1 | | |
| OVER 1 MILLION | 140 | 81 | 9 | 17 | 40 | 32 | 31 | 9 | 2 | |

## TYPICAL HOURLY BILLING RATES BY SIZE OF METROPOLITAN AREA

### 0 TO 10 YEARS OF LEGAL EXPERIENCE

| POPULATION | NO. OF FIRMS | AVERAGE RATE | UNDER $60 | $60- | $70- | $80- | $90- | $100- | $110- | $125- | $150- | OVER $150 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 250,000 | 144 | 76 | 9 | 49 | 47 | 29 | 26 | 11 | | | 2 |
| 250,000 - 500,000 | 75 | 82 | 2 | 12 | 23 | 21 | 23 | 3 | | | 3 |
| 500,000 - 1 MILLION | 71 | 91 | 2 | 7 | 25 | 23 | 44 | 3 | 1 | | 2 |
| OVER 1 MILLION | 162 | 97 | | | | | | 19 | | 17 | 8 |

### 11 TO 20 YEARS OF LEGAL EXPERIENCE

| POPULATION | NO. OF FIRMS | AVERAGE RATE | UNDER $60 | $60- | $70- | $80- | $90- | $100- | $110- | $125- | $150- | OVER $150 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 250,000 | 160 | 85 | 2 | 26 | 38 | 22 | 38 | 12 | | 7 | |
| 250,000 - 500,000 | 75 | 95 | 1 | 3 | 17 | 13 | 26 | 14 | | 22 | |
| 500,000 - 1 MILLION | 131 | 117 | | 3 | 2 | 2 | 23 | 13 | | 24 | |
| OVER 1 MILLION | 134 | | | | | | 20 | | | | |

### 21 OR MORE YEARS OF LEGAL EXPERIENCE

| POPULATION | NO. OF FIRMS | AVERAGE RATE | UNDER $60 | $60- | $70- | $80- | $90- | $100- | $110- | $125- | $150- | OVER $150 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 250,000 | 125 | 91 | 1 | 14 | 35 | 17 | 36 | 13 | | 10 | |
| 250,000 - 500,000 | 55 | 102 | | 2 | 10 | 10 | 27 | 15 | | 15 | |
| 500,000 - 1 MILLION | 110 | 110 | | 1 | 8 | 9 | 14 | 17 | | 13 | |
| OVER 1 MILLION | 110 | 136 | | | | | | | | | |



TYPICAL HOURLY BILLING RATES BY SIZE OF METROPOLITAN AREA

HOURLY BILLING RATES FOR PARALEGALS

HOURLY BILLING RATES FOR LAW CLERKS



117





# R E C O M M E N D A T I O N S

# O F   T H E   C O M M I T T E E

# A N D   S U M M A R Y   O F

# R A T E   S U R V E Y S

**(Including an Analysis of
Average Fees in the
Cincinnati Area)**

**Committee**

Lawrence A. Kane, Jr.
L. Clifford Craig
Paul A. Nemann
Frederick Brockmeier, IV
William R. Hardy
Louis J. Schneider, Jr.
Randall J. Newsome
John J. Getgey, Jr.

**Writing Group**

Teresa A. Wallace
Jane A. McTaggart
Andrea Dailey
Andrew R. Berger
Randall J. Newsome

## RECOMMENDATIONS

The following recommendations are drawn in large part from Professor Arthur Miller's conclusions in his comprehensive survey on attorneys' fees in class action litigation and tailored to meet the requirements established by the Sixth Circuit in the Northcross opinion.*

I.       Attorneys' Fees Should Be Calculated by Multiplying the Reasonable Number of Hours Spent on the Litigation by the Prevailing Hourly Rate for Attorneys in the Area.

This "lodestar" approach was mandated by the Sixth Circuit for civil rights cases in the Northcross decision and should be used by the courts in all class litigation. · The time/rate measure for attorneys' fees is the most prevalent method of determining fees across the country.  The advantages of this method were detailed by Professor Miller and may be summarized as follows:

A.    The time/rate method relies on objective criteria to determine the fee.  This fee calculation resembles closely the way fees are determined in the private sector and thus gives the appearance of reasonableness.  It is less likely to be perceived as a windfall to the victorious plaintiffs' attorneys if they can point to concrete numbers upon which their request for a fee is based.  Since the perception of fee abuse in class litigation is

---

*     These recommendations apply to class-actions, multi-party actions and actions in which attorneys' fees are authorized by statute. The recommendations are not intended to apply to non-class or non-multi-party litigation in which the attorneys' fees are established by a contingent fee agreement between attorney and client.

common among lay persons and in the legal community (see Miller, chapter VI, pp. 295-332), objective standards help to correct misconceptions that emanate in part from the necessarily large size of these fees.

B.   Subjective factors are less likely to influence the fee determination.  By requiring objective time/rate calculations, the court can resist the temptation to be influenced by factors like the size of the recovery for the class.  There is a tendency to think that the fee ought to be proportionate to the recovery; This tendancy can work unfairly both to increase or decrease the size of the attorneys' fee.  Where a large recovery is obtained with a minimum of effort, as in private antitrust cases following government prosecution, the actual number of hours spent might be quite small.  A fee influenced by the large recovery would over-compensate the attorneys in the case.  Likewise, the generally small monetary recovery in civil rights litigation should not persuade the court to compensate the attorneys at less than full value for their services.  Such a result was expressly forbidden by the Sixth Circuit in Kinney v. Rothchild, 678 F. 2d 658 (1982).  Using a time/rate method as the primary basis for fee determination insures that the fee will reflect the amount of actual work involved in the recovery.

C.   Subjective factors which cannot be ignored, such as the contingent nature of the litigation and the complexity of the case, will be reflected in a time/rate method.  Often the complexity of a case is most clearly reflected in the number of

-2-

hours an attorney spends on developing the case.  Time is an attorney's most valuable commodity; and the attorney is not likely, as a rule, to squander it on frivolous issues or causes. In the event that excessive time is spent on non-relevant concerns, detailed time records will allow the court to prune away the waste.  When factors like the contingent nature of the litigation are to be considered, they can be accounted for by adjusting the rate at which particular hours are compensated. While the prevailing fees in the court's locality are the base from which a court works, those rates are not to be set in stone. Where an attorney takes on a particularly difficult case and is eventually successful, the hours spent on the early stages of the case should be compensated in a way which accounts for the possibility of non-payment.  At some point, most likely during settlement, the contingency factor declines and those hours are no longer expended at a risk.  Those hours should not be compensated with the contingency premium.  The time/rate method allows for these adjustments and thus can more  accurately reflect the actual expenditures of attorney time and risks involved in a particular case.

     D.   <u>Where fee awards are made from a limited common fund, the court may wish to vary from strict application of the Northcross lodestar</u>.  In situations where a limited recovery has resulted in an accumulation of funds for the plaintiffs, the court must remember its principle obligation of protecting the class. It is conceivable that hard fought litigation may result in a

small recovery for the class.  In these cases, the number of hours spent might create a lodestar which would be equal to the entire recovery.  The lodestar calculation must yield to reason in these situations, and the court should award the most reasonable fee in light of the size of the fund.

II.     The Court Should Establish the Procedures and Standards for Attorneys' Fees at an Early Pre-Trial Conference

A.    <u>There should be a pretrial conference on fees</u>.
While consideration of attorneys' fees is certainly not the most pressing issue facing the court at the earliest stages of the litigation, it is imperative that the court establish standards for compensation early.  The issue may be moot if the plaintiffs should lose, but if there is a fee award to be made at the end of the case, the court's decision will be that much easier if the billing standards have been established from the start.  Mandating careful time records also will provide objective and tangible evidence in support of fee petitions and may lessen fee petition litigation.  Especially in mass tort class actions, where the court might override a contingent fee arrangement and impose a lodestar formula, the method to be used in awarding fees should be determined at the pre-trial stage so that counsel have adequate notice that detailed time records will be required.

B.    <u>Where there is a likelihood that more than one attorney or firm will be filing for fees at the conclusion of the litigation, the court should designate lead counsel and insist on organization and division of labor among plaintiffs' counsel</u>.

-4-

This approach will help minimize duplicative hours. Lead counsel should be instructed that they will be compensated only for time spent on class matters. Other plaintiffs' attorneys will be compensated only for time spent on class matters, presumably those functions assigned to them in the organizational plan. The court need not be involved in the actual organization of the class's counsel, but ought to insist that such a plan be devised among the attorneys involved.

       C.   At the pre-trial conference, the court should establish a standard time record to be used by counsel. The record need not be a particular form but should specifically set forth the name of the attorney doing the work, a sufficient description of the work performed and the time spent to some reasonable fraction. These time records should be submitted to the court on a regular basis to prevent the possible "padding" of hours that can occur at the end of the litigation. The court also should make clear that time that is not accounted for adequately in written records will not be compensated. Time spent on the case prior to the conference need not be held to this strict standard, but upon notification, all counsel must keep accurate records.[1]

_____

[1]     Requiring time records has been criticized because it is not a universal practice, especially with plaintiffs' attorneys. Class litigation, however, is a judicially allowed practice, and the court is entitled to place some requirements on the attorneys involved for the protection of the class.

-5-

D.  <u>If the case is sufficiently complex, the court may</u>
<u>wish to appoint a magistrate to oversee the fee process</u>.  The
magistrate could collect the time records, analyze them for
duplication, and provide a report to the court.  Professor Miller
recommends that the same magistrate be used in the district for
all fee determinations so as to develop expertise.  The magistrate
would be available to hear all evidentiary matters in connection
with the fee petition as well as to advise the class counsel on a
continuing basis should their time records be inadequate or
duplicative.  The role of the magistrate in this capacity could
also be filled by a special master, but that approval has the
disadvantage of increasing the total fee to be paid by the class
since the master will be paid by the class, while a magistrate's
position is federally funded.

III.    Time Records Should be as Specific as Possible; the Court
        Should Not Discount Hours for Any Reason other than
        Duplication and Not without Adequate Written Explanation
        for the Discount.
        A.    <u>In order to make the fee calculation process as</u>
<u>accurate as possible, the court should establish categories of</u>
<u>time expenditures so that different rates may be applied to</u>
<u>different tasks</u>.  Possible categories could include:  legal
research, writing legal memoranda, document production, trial
time, settlement negotiation, settlement administration, fee
petition preparation.  Time expenditures such as document
organization and legal research could be compensated at a lower
rate to encourage the use of paralegals and less experienced

attorneys and to minimize hours spent by more experienced litigators. Likewise, hours categorized as more demanding, such as trial work or settlement negotiation, should be segregated so that a higher hourly rate may be applied to that time. Dividing time expended into categories will enable the court to "fine-tune" the fee award. The categories should be used primarily to divide routine tasks which might be performed by paralegals from tasks which require the experience and expertise of an attorney. Obviously, a senior litigation attorney at a major law firm should be compensated at a higher rate than an inexperienced litigator. Just as obviously, paralegals can perform many of the more routine tasks, and their time should be included in the lodestar calculation at a lower hourly rate.

B. **The court should scrutinize the records for unjustified duplication of hours between lawyers and hours double-billed or otherwise inflated.** Where these excess hours exist, they should be eliminated from billing consideration. The court should explain in writing which hours have been eliminated, as required by <u>Northcross</u>. Where duplication or overbilling appears deliberate, the court should sanction such behavior. <u>Northcross</u> allowed for a small percentage deduction to account for duplicative efforts on the part of attorneys. This deduction would be unnecessary with comprehensive time records, with the possible exception of hours accumulated by counsel before the court established time records. Contemporaneous time submissions to the court would also help to eliminate duplicative hours by alerting counsel as duplication occurs.

7

C.  <u>All reasonable, non-duplicative hours should be</u> <u>compensated</u>.  If the court finds that some time was not efficiently spent, it should not eliminate the hours from the bill but compensate those hours at a lower rate.  For example, a senior partner working on routine document organization should not be compensated at the same rate as he or she would receive for trial time.  The court must be cautious in such evaluations, however, and consider the composition of an attorney's firm.  A small firm may not have the personnel to make appropriate assignments of tasks and may have to rely on a few people to do all the work.

D.  <u>In the event that the plaintiffs are only partially</u> <u>successful on the merits, time records must be segregated</u> <u>according to effort expended on issues upon which they actually</u> <u>prevailed</u>.  This allocation was required by the Supreme Court in <u>Hensley v. Eckerhart</u>, 51 U.S.L.W. 4552 (1983).  This evaluation need not be so exact as to exclude any hours not specifically spent on successful issues, but rather should focus on excluding hours specifically spent on unsuccessful issues.  The guiding principle should be evaluating time spent on developing the theories and aspects of the case that are tied to the prevailing issues.

IV.    The Scale of Rates used in Determining Attorneys' Fees
       Should Be Based in General on Local Billing Rates.
       Actual Rates used in Calculating the Fee Should Vary With
       the Expertise of the Attorney and the Nature of the Work.

-8-

A.    <u>Local billing rates should be noted by the court and used in general as the basis for the rates used in the fee award</u>. The court should appoint a committee of attorneys to apprise it of the local rates and to monitor changes in local billing practices.  These figures should be updated annually and reflect actual hourly charges by both plaintiffs' and defendants' firms. The rates should reflect variations for experience, billing senior partners at a different rate than junior partners, and recognizing differences in the experience level of associates.

B.    <u>Generally recognized premiums for particular kinds of work, such as trial time, should be accounted for in rates charged to time so spent</u>.  Other areas of time may require more specific evaluation by the court.  In many cases, settlement negotiation is by far the most difficult time, requiring the most effort by counsel.  If the facts suppport premium rates for that time, the court should adjust the rates accordingly.

C.    <u>Where out-of-town counsel are involved in the litigation, the court should compensate them at their usual hourly rates</u>.  Certain types of litigation, such as antitrust and stockholders derivative suits, have a recognized national bar.  If local rates significantly below the national average are used, experienced firms from outside the vicinity may be reluctant to join the litigation and the class may be denied top-flight representation.  Where the local rate differs significantly from the outside firm's normal billing rate, the court should use the

firm's normal hourly fee. If both national and local counsel are involved, the court should determine the normal fee charged by each firm and apply that rate respectively to the work done by each. Of course, variations in the tasks performed and the experience of the person performing the work should continue to be recognized.

D. **Time spent on class litigation by public interest groups should be compensated at the same rate as work performed by members of the private bar**. The court should not penalize public interest groups which take on class litigation by paying them a reduced rate because they are publicly funded. The system should not work against the interests of the class by encouraging only less compensated, and potentially less qualified, attorneys to represent poor plaintiffs. Once local rates have been established, they should apply to all attorneys representing the class, not just those who are in business for themselves.

One member of the committee has expressed disagreement with this recommendation, pointing to the difficulty in defining the term "public interest group," and the possibility that an award of fees to some organizations might be in the nature of a windfall rather than a reimbursement for actual legal expenses.

-10-

E.  **After rates have been established, the court may vary the actual hourly rate paid for a particular task according to various subjective factors, including the quality of the work performed and the contingent nature of the litigation**.  Authority for such variation comes from __Northcross__.  The regular hourly rate charged by an attorney is not the maximum that can or should be awarded in a particular situation.

> "An attorney's regular hourly billing rate is
> based upon an expectation of payment, win,
> lose, or draw.  If he or she will only be paid
> in the event of victory, those rates will be
> adjusted upward to compensate for the risk the
> attorney is accepting of not being paid at all."

611 F.2d. at 638.  While local rates should normally provide a floor for professional services, those rates may be adjusted to reflect the particular contingency and quality of the case at hand.  As long as time is appropriately categorized, the court can adjust upward rates applied to exceptional work, such as obtaining class certification in a particularly difficult case, and rates for routine litigation time if the case involved substantial risk.  The court might also, for example, adjust upward the hourly rate for an attorney who brought to the litigation special expertise in the technical aspects of the case or who was instrumental in retaining and working with vital expert witnesses.  The result of such an approach is appropriate adjustment without indiscriminant, across-the-board increases in rates.

F.   **When appropriate, fees should be adjusted to account for inflation and delay in payment**.  If the court elects to make these adjustments, it should consult standardized formulas or expert opinions and not just make an <u>ad hoc</u> judgment as to the discount rate or inflation rate.  The importance of adjusting for these factors should be weighed against the time involved in making such decisions.  The court should consider the number of years spent in litigation, the approximate change in the rate of inflation or change in fees charged during that time, the need for expert opinion and the corresponding cost to the class.

V.      When Necessary, the Court Should Appoint a Monitor To
        Represent the Class in Post-Trial Fee Litigation.

A.   **When the attorneys' fees are to be paid from the class fund, the court should be aware of the potential conflict of interest between the class and the class counsel**.  By establishing from the beginning a time/rate method of fee calculation and the local rates to be used, these conflicts should be held to a minimum.  In the event that there is a serious objection to the attorneys' fee petition, the court should appoint a monitor to look after the interests of the class.  This decision should be made carefully, however, as the monitor's fees also will come from the class recovery.  The monitor may be either another plaintiff's attorney, not on the lead counsel committee, an outside attorney, or a committee, made up of lead counsel, other counsel and an

-12-

outside attorney. The monitor should be in a position to evaluate all time records and recommend to the court the time to be compensated and the rate of compensation.

B. **Another potential area of conflict in fees occurs in the event of litigation over the fee award.** Professor Miller makes the following recommendations as to fees for fee litigation. Where attorney's fees are to be paid by the defendant, the defendant should pay if plaintiffs' counsel substantially prevails on the fee issue. If plaintiffs' counsel appeals the fee award and loses, they should assume their own costs. Where the fee is to be paid from the class recovery, the objector from the class should bear the class counsel's fee only if the objection is brought in bad faith. Otherwise, if class counsel is successful in defending its fee, the cost should be borne by the class.

It is hoped that by planning for the fee award from the outset of the litigation, many of the problems which have plagued the attorneys' fee question may be eliminated. Prior planning and explanation and the use of the time/rate method will certainly eliminate much of the arbitrariness that has characterized fee awards in the past.

-13-

## THE 1982 SURVEY OF LAW FIRM ECONOMICS

### By Altman & Weil, Inc.

This survey was conducted nationwide in 1982 by Altman & Weil, Inc., a management consultant firm (See Attachments).

It breaks down typical billing rates by years of legal experience, including categories of paralegal and law clerk. The analysis is by region, size of firm, size of metropolitan area and state. Page 37 lists the average hourly rate of all categories included in the survey. The average hourly billing rate of all categories of attorneys (from 0–21 or more years of legal experience) is $81.66. The average hourly billing rate for paralegals is $34.00 and for law clerks it is $20.00.

Pages 38–40 list hourly billing rates by region (Cincinnati is in the "Midwest" region). The average hourly billing rate for all categories in the Midwest region is $76.33 with the average Midwest paralegal rate being $34.00, and the average Midwest law clerk rate being $19.00.

Pages 41–43 show typical hourly billing rates on the basis of firm size. The average hourly billing rate for attorneys in firms having 2-8 lawyers (irrespective of years of experience) is $76.66. The average hourly billing rate for attorneys in firms with 9 to 20 lawyers is $80.50. For firms with 21 to 40 lawyers, the average hourly billing rate is $85.50. lawyers in firms with 41-74 lawyers bill an average of $88.50 an hour, while attorneys who practice in firms having 75 or more lawyers have an average

hourly billing rate of $96.00. The average billing rate for paralegals ranges from $31.00 in a firm of 2 to 8 lawyers, to $39.00 in a firm with 75 or more lawyers. The average hourly billing rate for law caerks is lowest in firms from 2 to 8 lawyers ($11.00) and highest in firms with 75 or more lawyers ($35.00).

Pages 44-46 of the Altman & Weil survey list typical hourly billing rates with size of metropolitan areas as the variable. (For purposes of this discussion, Cincinnati shall be considered a metropolitan area with population of over 1 million). Irrespective of years of legal experience, the average hourly billing rate for attorneys practicing in a metropolitan area whose population is in excess of 1 million is $92.83. The billing rate for paralegals in this size metropolitan area is $38.00, while that of law clerks is $26.00.

On pages 117-119, the typical hourly billing rates are listed by State. The blended average hourly billing rate for the State of Ohio (both partners and associates) is $77.33, while that of paralegals is $34.00, and that of law clerks is $23.00.

the following conclusions can be drawn from this survey. The Miwest Region has one of the lowest hourly billing rates in all categories (only the Southern Region has lower average rates). As expected, the larger the firm the higher the hourly billing rate. Those firms in the category of 75 or more lawyers had the highest hourly rate in all categories including paralegals and lawyers. The size of the metropolitan area also influences the billing rate, with the larger metropolitan areas having the highest rates.

## THE 1982 ECONOMIC STUDY OF PRIVATE LAW FIRMS
### By Daniel J. Cantor & Co., Inc.

This survey was conducted on a nationwide basis by Daniel J. Cantor & Co., Inc., Legal Professional Consultants (See Attachments).

Page B-40 lists common hourly fee rates for legal assistants (paralegals). In the East Central Category (Cincinnati's category), the average hourly fee rate for non-clerical legal assistants is $29.00. In a city the size of Cincinnati, (One Million - Two Million population), the average hourly billing rate for paralegals is $38.00. The average rate, based upon size of legal staff, ranges from $28.00 per hour for a staff of under 11 lawyers to $40.00 per hour for a staff of 71 or more attorneys.

Page B-41 gives the average hourly billing rates for associates. In the East Central category, the rates range from $57.00 for associates with less than 2 years experience to $84.00 per hour for senior associates (over 4 years in practice) The average hourly billing rate for intermediate associates (2 to 4 years experience) is $65.00 per hour. In the category of metropolitan size of One Million to Two Million, an associate with less than two years of experience has an average hourly billing rate of $61.00. Associates with 2 to 4 years experience have an average rate of $72.00, while the area for senior associates is

$84.00 per hour. The average rates for associates with less than 2 years experience based upon firm size range from $57.00 per hour in firms with less than 11 attorneys, to $63.00 per hour in firms with 71 or more attorneys.

Page B-42 deals with partner rates. In the East Central category, "younger partners" (which is not defined) have an average hourly fee of $88.00, while the figure rises to $99.00 for "intermediate partners" and $114.00 per hour for "senior partners." In a metropolitan area of One Million to Two Million, younger partners bill an average hourly rate of $97.00 per hour, intermediate partners, $115.00 per hour, and senior partners $137.00 per hour. The average rates for younger partners by firm size range form $72.00 for firms with less than 11 attorneys to $109.00 per hour in firms with 71 or more attorneys. Intermediate partners bill on the average, $84.00 per hour in firms with less than 11 lawyers and $128.00 per hour in firms with 71 or more attorneys. Finally, the average hourly rate for senior partners ranges from $100.00 in firms with less than 11 attorneys to $148.00 in firms with 71 or more attorneys.

As in the Altman & Weil survey, the conclusions are that fees for paralegals, law clerks, associates and partners are higher in areas of larger population and in large firms. Once again, Cincinati is in one of the lowest regions in the country as far as fees for paralegals, law clerks, associates and partners.

## Average Fees in the Cincinnati Area

Considering the data from both the Altman & Weil survey and the Cantor survey, some general conclusions can be drawn regarding average hourly fees in the metropolitan Cincinnati area for paralegals, law clerks, associates and partners.

Within the general region in which Cincinnati is located (Midwest or East Central), the average paralegal billing rate is $31.50, while that of law clerks is $19.00 (only reported in Altman & Weil survey). The hourly rates for associates are $55.00 with less than two years of experience, $63.00 for associates with two to four years of legal experience and $73.00 for senior associates, with four to five years of experience. The hourly rates for younger partners start at $84.00 (six to ten years legal experience), with the average rate for intermediate partners (11 to 20 years of experience) being $96.00 per hour, and the average rate for senior partners (21 or more years experience) being $107.50 per hour.

In the category of size of metropolitan area, Cincinnati is classified as "Over 1 Million" in the Altman & Weil survey and "One Million to Two Million" in the Cantor survey. The average hourly billing rate for paralegals in cities the size of Cincinnati is $38.00, while that of law clerks is $26.00 (only reported in Altman & Weil survey). Associates with less than two years of experience have an average hourly rate of $61.00 in this category. Associates with two to three years of experience have

an average rate of $71.50, while senior associates (four to five years of legal experience) have an average hourly billing rate of $82.50. Partners in a city the size of Cincinnati have average hourly billing rates ranging from $97.00 for younger partners (six to ten years of legal experience), $116.00 per hour for intermediate partners (11 to 20 years of experience), to $133.50 for senior partners (21 or more years of legal experience).

The blended average rates for 1983 for both the Midwest/East Central Region and a city with a population equal to that of Cincinnati are as follows:

| | |
|---|---|
| Paralegals – | $37.91 |
| Law Clerks – | $23.96 |
| Young Associates – | $61.77 |
| Intermediate Associates – | $71.62 |
| Senior Associates – | $82.81 |
| Young Partners – | $96.39 |
| Intermediate Partners – | $113.43 |
| Senior Partners – | $128.34 |

These figures may be considered average figures for 1983 for a city of the size of Cincinnati in the Midwest/East Central Region of the country, irrespective of firm size.[1]

---

[1]     The 1983 figures were computed by applying the 6.51% increase from July, 1982 to July, 1983 in the Consumer Price Index for all consumers in the Cincinnati metropolitan area to the 1982 blended average rates from the Altman & Weil and Cantor surveys.

# CHAPTER 5—ADMINISTRATIVE PROCEDURE

## SUBCHAPTER I—GENERAL PROVISIONS

Sec.
504. Costs and fees of parties.

1980 Amendment. Pub.L. 96—481, Title
II, § 203(a)(2), Oct. 21, 1980, 94 Stat. 2327,
added item 504.

## SUBCHAPTER I—GENERAL PROVISIONS

### § 500. Administrative practice; general provisions

#### Supplementary Index to Notes

Construction with other laws ¼

¼. Construction with other laws

Failure of Commissioner to notify, as
required by Commissioner, (f of, this section,
taxpayer of actual or alleged Alaska statute or
acquisition of consent for extension of

limitations period for assessment of tax-
es, did not affect consent for such extra-
ordinary or representative and without
knowledge of representative; and without
deception by Commissioner; such failure
was harmless, moreover answer, sec
this section does not modify, section
6601(c)(4) of Title 26 specifying manner
and procedure period of limitations. Neu-
hoff v. C.I.R., 1980, 75 T.C. 36.

※ ### § 504. Costs and fees of parties

(a)(1) An agency that conducts an adversary adjudication shall award,
to a prevailing party other than the United States, fees and other expenses
incurred by that party in connection with that proceeding, unless the ad-
judicative officer of the agency finds that the position of the agency as a
party to the proceeding was substantially justified or that special circum-
stances make an award unjust.

(2) A party seeking an award of fees and other expenses shall, within
thirty days of a final disposition in the adversary adjudication, submit to
the agency an application which shows that the party is a prevailing party
and is eligible to receive an award under this section, and the amount
sought, including an itemized statement from any attorney, agent, or ex-
pert witness representing or appearing in behalf of the party stating the
actual time expended and the rate at which fees and other expenses were
computed. The party shall also allege that the position of the agency was
not substantially justified.

(3) The adjudicative officer of the agency may reduce the amount to
be awarded, or deny an award, to the extent that the party during the
course of the proceedings engaged in conduct which unduly and unreason-
ably protracted the final resolution of the matter in controversy. The
decision of the adjudicative officer of the agency under this section shall
be made a part of the record containing the final decision of the agency and
shall include written findings and conclusions and the reason or basis
therefor.

(b)(1) For the purposes of this section—

(A) "fees and other expenses" includes the reasonable expenses
of expert witnesses, the reasonable cost of any study, analysis, en-
gineering report, test, or project which is found by the agency to be
necessary for the preparation of the party's case, and reasonable
attorney or agent fees (The amount of fees awarded under this sec-
tion shall be based upon prevailing market rates for the kind and
quality of the services furnished, except that (i) no expert witness
shall be compensated at a rate in excess of the highest rate of com-
pensation for expert witnesses paid by the agency involved, and
(ii) attorney or agent fees shall not be awarded in excess of $75 per
hour unless the agency determines by regulation that an increase
in the cost of living or a special factor, such as the limited avail-
ability of qualified attorneys or agents for the proceedings involved,
justifies a higher fee.);

---

¼d. Waiver of privilege

tied sections of its report, suggested ques-
tions of Federal Reserve System based on
nonest of the bank holding company at a
meeting with bank holding company offi-
cials. From defendant member, who noted
lack of strict confidentiality in its dealing
but also observed that Board's counsel
hesitated to reveal that Board's counsel
America, privilege refused to use it is clear
plaintiff's entitlement to report was be-
fore the court and made clear Board's in-
accesses. Board waived any right to assert
plaintiff's nonomittance which mandated
procedure. But ground for withholding
report. Denny v. Carey, D.C.Pa.1976, 78
F.R.D. 370.

¼d. In camera disclosure and production

Banking approach, necessitating close
examination of each document, interest in
nondisclosure of sections of report of
Governors of Federal Reserve
System used in connection with regulating
Pennsylvania bank holding company and
of interest of plaintiff in disclosure for
purpose of class action suit against bank
holding company, its accountants and
certain individuals had violated state tort
law and federal securities laws, so that re-
manded an in camera inspection to deter-
mine whether communicated mat-
erial from discovery. Denny v. Carey,
D.C.Pa.1976, 73 F.R.D. 370.

¼d. Contempt

The very narrow exception to the final-
ity recognized in action involving the
President of the United States did not
apply to order holding Attorney General
of the United States in civil contempt for
failure to comply with order requiring
disclosure of certain FBI informants'
identity in an action. Plaintiffs in a civil
in-suit alleged that defendants in civil
in-suit sought to protect from disclosure
official records that he held or had under
his control. In view of fact that executive
and in view of fact that executive re-
sponsibilities and constitutional status of
President were not comparable to
those of the President, the holding of
contempt of U. S. C.A.N.Y.1976, 100 F.2d
808, certiorari denied 100 S.Ct. 217, 444 U.S.
808, 62 L.Ed.2d 141.

### § 505. Systematic agency review of operations

(a) For the purpose of this section, "agency" means an Executive agen-
cy, but does not include—

[See main volume for text of (1) to (6)]

(7) the Panama Canal Commission; or

(8) the National Security Agency, Department of Defense.

(b) Under regulations prescribed and administered by the President,
each agency shall review systematically the operations of each of its
activities, functions, or organization units, on a continuing basis.

[See main volume for text of (a)]

As amended Pub.L. 96—64, § 2(a)(2), Aug. 14, 1979, 93 Stat. 381; Pub.
L. 96—70, Title III, § 3302(e)(1), Sept. 27, 1979, 93 Stat. 498.

Pub.L. 96-70 Amendments. Subsec. (a)(7).
Pub.L. 96-70 substituted "Commission"
for "Company".

Subsec. (b). Pub.L. 96-64 substituted
"Director" for "Director of the Bureau
of the Budget".

Effective Date of 1979 Amendments.
Amendment by Pub.L. 96-70 effective on
the date (Oct. 1, 1979) the United States
Treaty of 1977 enters into force, see note
under section 3601 of Title 22, For-
eign Relations and Intercourse.

Section 2(b) of Pub.L. 96-64 provided
that: "Except as otherwise expressly
provided, the amendments made by this
section, and sections 1304, 2104, 2105,
3304, 3324, 3324, 3401, 4102, 4109, 4111, 4112,

4701, 5102, 5105, 5311, 6333 to 6335, 6347,
5331, 5334, 5361, 5504, 5707, 5903, 5550a, 5522,
5362, 5365, 5507, 7325, 7327, 7701, 7703, 6331,
5332, 5347, 5701, 5704, 5705, and 8906 of this
title, section 301 of this Act, sections
301 set out as a note under section 301,
of Title 3, The President]
Historical note, For application
historical note, see note under section
1557 U.S. Code Cong. and Adm.News, p.
1654. Sec. also, Pub.L. 96-70 U.S.Code
Cong. and Adm.News, p. 1034.

8
9

(B) "party" means a party, as defined in section 551(3) of this title, which is an individual, partnership, corporation, association, or public or private organization other than an agency, that excludes (1) any individual whose net worth exceeded $1,000,000 at the time the adversary adjudication was initiated, and any sole owner of an unincorporated business, whose net worth exceeded $5,000,000 at the time the adversary adjudication was initiated, except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) exempt from taxation under section 501(a) of the Code and a cooperative association as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141j(a)), may be a party regardless of the net worth of such organization or cooperative association, and (ii) any sole owner of an unincorporated business, or any partnership, corporation, association, or organization, having more than 500 employees at the time the adversary adjudication was initiated;

(C) "adversary adjudication" means an adjudication under section 554 of this title in which the position of the United States is represented by counsel or otherwise, but excludes an adjudication for the purpose of establishing or fixing a rate or for the purpose of granting or renewing a license; and

(D) "adjudicative officer" means the deciding official, without regard to whether the official is designated as an administrative law judge, a hearing officer or examiner, or otherwise, who presided at the adversary adjudication.

(2) Except as otherwise provided in paragraph (1), the definitions provided in section 551 of this title apply to this section.

(c)(1) After consultation with the Chairman of the Administrative Conference of the United States, each agency shall by rule establish uniform procedures for the submission and consideration of applications for an award of fees and other expenses. A court reviews the underlying decision of the adversary adjudication, an award for fees and other expenses may be made only pursuant to section 2412(d)(3) of title 28, United States Code.

(2) A party dissatisfied with the fee determination made under subsection (a) may petition for leave to appeal to the court of the United States having jurisdiction to review the merits of the underlying decision of the agency adversary adjudication. If the court denies the petition for leave to appeal, no appeal may be taken from the denial. If the court grants the petition, it may modify the determination only if it finds that the failure to make an award, or the calculation of the amount of the award, was an abuse of discretion.

(d)(1) Fees and other expenses awarded under this section may be paid by any agency over which the party prevails from any funds made available to the agency, by appropriation or otherwise, for such purpose. If not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made pursuant to section 2414 of title 28, United States Code.

(2) There is authorized to be appropriated to each agency for each of the fiscal years 1982, 1983, and 1984, such sums as may be necessary to pay fees and other expenses awarded under this section in such fiscal years.

(e) The Chairman of the Administrative Conference of the United States, after consultation with the Chief Counsel for Advocacy of the Small Business Administration, shall report annually to the Congress on the amount of fees and other expenses awarded during the preceding fiscal year pursuant to this section. The report shall describe the nature, and amount of the awards, the claims involved in the controversy, and any other relevant information which may aid the Congress in evaluating the scope and impact of such awards. Each agency shall pro-

---

vide the Chairman with such information as is necessary for the Chairman to comply with the requirements of this subsection.

(Added Pub.L. 96-481, Title II, § 203(a)(1), Oct. 21, 1980, 94 Stat. 2325.

## Repeal of Section

Pub.L. 96-481, Title II, § 203(c), Oct. 21, 1980, 94 Stat. 2327, provided that: "Effective October 1, 1984, section 504 [this section], and the item relating to section 504 in the table of sections of title 5, United States Code, as added by subsection (a) of this section, are repealed, except that the provisions of such section shall continue to apply through final disposition of any adversary adjudication as defined in subsection (b)(1)(C) of such section [subsec. (b)(1)(C) of this section, initiated before the date of repeal.]"

References in Text. Section 501(c)(3) of the Internal Revenue Code of 1954, referred to in subsec. (b)(1)(B), is classified to section 501(c)(3) of Title 26, Internal Revenue Code.

Section 501(a) of the Code, referred to in subsec. (b)(1)(B), is classified to section 501(a) of Title 26.

Section 15(a) of the Agricultural Marketing Act, referred to in subsec. (b)(1) of this section, is classified to section 1141j(a) of Title 12, Banks and Banking.

Section 2412(d)(3) of title 28, United States Code, referred to in subsec. (b)(2), is classified to section 2412(d)(3) of Title 28, Judiciary and Judicial Procedure.

Section 2414 of title 28, United States Code, referred to in subsec. (d)(1), is classified to section 2414 of Title 28, Judiciary and Judicial Procedure.

Effective Date. Section 208 of Pub.L. 96-481 provided that the amendments made by this title [enacting this section, amending section 634b of Title 15, Commerce and Trade, section 621 of Title 28, Judiciary and Judicial Procedure, Rule 37 of the Federal Rules of Civil Procedure, Title 28, Appendix, and enacting provisions set out as notes under this section and section 2412 of Title 28] shall apply to any adversary adjudication, as defined in section 504(b)(1)(C) of title 5, United States Code and section 2412(d)(2)(C) of title 28, United States Code, which is pending on or commenced on or after, such date."

Short Title. Section 201 of Pub.L. 96-481 provided that: "This title [enacting this section, amending section 634b of Title 15, Commerce and Trade, section 621 of Title 28, Judiciary and Judicial Procedure, Rule 37 of the Federal Rules of Civil Procedure, set out in Title 28, Appendix, and enacting provisions set out as notes under this section and section 2412 of Title 28] may be cited as the 'Equal Access to Justice Act'."

Congressional Findings and Purposes. Section 202 of Pub.L. 96-481 provided that:

"(a) The Congress finds that certain individuals, partnerships, corporations, and labor and other organizations may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense

involved in securing the vindication of their rights in civil actions and in administrative proceedings.

"(b) The Congress further finds that because of the greater resources and expertise of the United States the standard for an award of fees against the United States should be different from the standard governing an award against a private litigant, in certain situations, and should reflect the availability of private litigant, in certain situations.

"(c) It is the purpose of this title [see Short Title note hereunder]—

"(1) to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States; and

"(2) to insure the applicability in actions by or against the United States of the common law and statutory exceptions to the 'American rule' respecting the award of attorney fees."

Limitation on Payments. Section 207 of Pub.L. 96-481 provided that: "The payment of judgments, fees and other expenses in the same manner as the payment of final judgments as provided in this Act [enacting this section and section 2412 of Title 28, Judiciary and Judicial Procedure, amending sections 634 and section 634b of Title 15, Commerce and Trade, amending sections 621, 2412, 640 and 2520 of Title 28, and section 504 of this title, and enacting provisions set out as notes under this section and sections 634, 634b, 640 and 2520 of Title 28, and section 504 of this title], shall apply only to the extent and in such amounts as are provided in advance in appropriation Acts."

Legislative History. For legislative history and purpose of Pub.L. 96-481, see 1980 U.S.Code Cong. and Adm.News, p. 4953.

## Library References

Administrative Law and Procedure ⟨1/8⟩
C.J.S. Public Administrative Bodies and Procedure § 155.

1. Retroactive effect
Where Congress decided prior to effective date of amendment to this section, condemnee was not entitled to recover court costs, attorney fees and expenses under this section. United States v. Jewel Morris, etc. Situate in Cotton and Jefferson Counties, D.C.Okl. 1981, 508 F.Supp. 288.

11

**3. Contractual or statutory basis of liability**

In the absence of specific provision in contract, or statute or express consent by Congress, interest does not run on a claim against the United States unless the same is true as to any claim against a private party. U. S. v. Louisiana, 1950, 70 S.Ct. 914, 339 U.S. 699, 94 L.Ed. 1216, rehearing denied 70 S.Ct. 1005, 339 U.S. 991, 94 L.Ed. 1391, motion denied 71 S.Ct. 95, 340 U.S. 849, 95 L.Ed. 622, rehearing denied 100 S.Ct. 3047, 447 U.S. 930, 65 L.Ed.2d 1124.

**4. Taxes**

In proceeding for tax fraud, fraud penalty imposed was proper to the extent that the government refunded or credited

any penalties taxpayer had already paid, but refusal of credit. Acker v. U. S., S. D. Ohio 1981, 519 F.Supp. 178.

Trial settlement in establishing interest rate at seven percent on judgment against United States under Federal Tort Claims Act, reversed. Oakley v. U. S., C.A. Cal. 1980, 622 F.2d 447.

District court, in nullable, on judgment under Federal Tort Claims Act, motion [310(b) and 207 et seq. of this title, for interest on award]. Oakley v. U. S., C.A. Cal. 1980, 622 F.2d 447.

**§ 2412.    Costs and fees**

(a) Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

(b) Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

(c)(1) Any judgment against the United States or any agency and any official of the United States acting in his or her official capacity for costs pursuant to subsection (a) shall be paid as provided in sections 2414 and 2517 of this title and shall be in addition to any relief provided in the judgment.

(2) Any judgment against the United States or any agency and any official of the United States acting in his or her official capacity for fees and expenses of attorneys pursuant to subsection (b) shall be paid as provided in sections 2414 and 2517 of this title, except that if the basis for the award is a finding that the United States acted in bad faith, then the award shall be paid by any agency found to have acted in bad faith and shall be in addition to any relief provided in the judgment.

(d)(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

(B) A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses

are computed. The party shall also allege that the position of the United States was not substantially justified.

(C) The court, in its discretion, may reduce the amount to be awarded pursuant to this subsection, or deny an award, to the extent that the prevailing party during the course of the proceedings engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy.

(2) For the purposes of this subsection—

(A) "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.);

(B) "party" means (i) an individual whose net worth did not exceed $1,000,000 at the time the civil action was filed, (ii) a sole owner of an unincorporated business, or a partnership, corporation, association, or organization whose net worth did not exceed $5,000,000 at the time the civil action was filed, except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) exempt from taxation under section 501(a) of the Code and a cooperative association as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141j(a)), may be a party regardless of the net worth of such organization or cooperative association, or (iii) a sole owner of an unincorporated business, or a partnership, corporation, association, or organization, having not more than 500 employees at the time the civil action was filed; and

(C) "United States" includes any agency and any official of the United States acting in his or her official capacity.

(3) In awarding fees and other expenses under this subsection to a prevailing party in any action for judicial review of an adversary adjudication, as defined in subsection (b)(1)(C) of section 504 of title 5, United States Code, or an adversary adjudication subject to the Contract Disputes Act of 1978, the court shall include in that award fees and other expenses to the same extent authorized in subsection (a) of such section, unless the court finds that during such adversary adjudication the position of the United States was substantially justified, or that special circumstances make an award unjust.

(4)(A) Fees and other expenses awarded under this subsection may be paid by any agency over which the party prevails from any funds made available to the agency, by appropriation or otherwise, for such purpose. If not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made in accordance with sections 2414 and 2517 of this title.

(B) There is authorized to be appropriated to each agency for each of the fiscal years 1982, 1983, and 1984, such sums as may be necessary to pay fees and other expenses awarded pursuant to this subsection in such fiscal years.

(5) The Director of the Administrative Office of the United States Courts shall include in the annual report prepared pursuant to section 604 of this title, the amount of fees and other expenses awarded during the preceding fiscal year pursuant to this subsection. The report shall describe the number, nature, and amount of the awards, the claims involved

Case: 1:83-mc-00056-UNA Doc #: 1 Filed: 11/16/83 Page: 134 of 136 PAGEID #: 134

in the controversy, and any other relevant information which may aid the Congress in evaluating the scope and impact of such awards.

As amended Oct. 21, 1980, Pub.L. 96–481, Title II, § 204(a), 94 Stat. 2327.

### Repeal of Subsection (d) Effective October 1, 1984

*Section 204(c) of Pub.L. 96–481 provided that: "Effective October 1, 1984, subsection (d) of section 2412, as added by subsection (a) of this section [subsec. (d) of this section], is repealed, except that the provisions of that subsection shall continue to apply through final disposition of any action commenced before the date of repeal."*

**References in Text.** Section 501(c)(3) of the Internal Revenue Code of 1954, referred to in subsec. (d)(2)(B), is classified to section 501(c)(3) of Title 26, Internal Revenue Code of 1954.

Section 501(a) of the Code, also referred to in subsec. (d)(2)(B), is classified to section 501(a) of Title 26.

Section 15(a) of the Agricultural Marketing Act, referred to in subsec. (d)(2)(B), is classified to section 1141j(a) of Title 12, Banks and Banking.

The Contract Disputes Act of 1978, referred to in subsec. (d)(3), is classified generally to section 601 et seq. of Title 41, Public Contracts. See Short Title note under section 601 of Title 41.

**1980 Amendment.** Subsec. (a). Pub.L. 96–481 designated existing provisions as subsec. (a), and as so designated, struck out provision that payment of a judgment for costs shall be as provided in section 2414 and section 2517 of this title for the payment of judgments against the United States.

Subsecs. (b) to (d). Pub.L. 96–481 added subsecs. (b) to (d).

**Effective Date of 1980 Amendment.** Amendment by Pub.L. 96–481 to take effect on Oct. 1, 1981, and applicable to adversary adjudication as defined in section 504(b)(1)(C) of Title 5, and to civil actions and adversary adjudications described in this section, which are pending on, or commenced on or after Oct. 1, 1981, see section 208 of Pub.L. 96–481, set out as a note under section 504 of Title 5, Government Organization and Employees.

**Savings Provisions.** Section 206 of Pub. L. 96–481 provided that: "Nothing in section 2412(d) of title 28, United States Code [subsec. (d) of this section], as added by section 204(a) of this title, alters, modifies, repeals, invalidates, or supersedes any other provision of Federal law which authorizes an award of such fees and other expenses to any party other than the United States that prevails in any civil action brought by or against the United States."

**Congressional Findings and Purposes.** For Congressional findings and purposes relating to 1980 amendment of this section, see section 202 of Pub.L. 96–481, set out as a note under section 504 of Title 5, Government Organization and Employees.

**Limitation on Payments.** The payment of judgments, fees and other expenses in the same manner as the payment of final judgments as provided in the 1980 Amendment effective only to the extent and in such amounts as are provided in advance in appropriation acts, see section 207 of Pub.L. 96–481, set out as a note under section 504 of Title 5, Government Organization and Employees.

**Legislative History.** For legislative history and purpose of Pub.L. 96–481, see 1980 U.S.Code Cong. and Adm.News, p. 4953.

Supplementary Index to Notes

3. **Purpose**

Purpose of this section was to correct inequities in the assessment of costs in civil actions between the United States and private litigants, so that both parties would stand on an equal footing. Com. of Puerto Rico v. SS ZOE COLOCOTRONI, D.C.Puerto Rico 1978, 456 F. Supp. 1327.

5. **Law governing**

Attorney fees may not be recovered against United States unless their allowance is specifically authorized by some statute. Howatt v. U. S., Ct.Cl.1981, 657 F.2d 1204.

6. **Power of court**

National Council of Community Mental Health Centers, Inc. v. Mathews, 546 F.2d 1003 [main volume], certiorari denied 97 S.Ct. 2674, 431 U.S. 954, 53 L.Ed.2d 270.

7. **Discretion of court**

Denial of award of attorney fees, which were requested by school district on theory that government's claim that school district threatened its employees in violation of Fair Labor Standards Act, section 201 et seq. of Title 29, was totally without merit, was not an abuse of discretion where district judge plainly regarded charge as a serious one and weighed testimony about it very carefully before finding that there was no threat of retaliation and where district court concluded that entire lawsuit was reasonable and brought in good faith. Equal Employment Opportunity Commission v. Kenosha Unified School Dist. No. 1, C.A.Wis. 1980, 620 F.2d 1220.

8. **Actions in which costs and fees allowable—Generally**

Under federal law, attorney fees may be awarded against United States or its agencies only if such an award is specifically provided by statute. Fenton v. Federal Ins. Adm'r, C.A.Fla.1981, 633 F.2d 1119.

Only exceptions specifically provided by this section will subject United States or its agencies to liability for attorney fees. Gibson v. Davis, C.A.Ohio 1978, 587 F.2d 280, certiorari denied 99 S.Ct. 1093, 441 U.S. 905, 60 L.Ed.2d 374.

10. **—— Class actions**

Larionoff v. U. S., 365 F.Supp. 140 [main volume], affirmed 97 S.Ct. 2150, 431 U.S. 864, 53 L.Ed.2d 48.

14. **—— Injunction actions**

Having permanently enjoined Postal Service from constructing addition to structure leased from plaintiffs, trial court erred in summarily denying plaintiffs' motion for costs without offering explanation. Pearlstine v. U. S., C.A.Pa. 1981, 649 F.2d 194.

15. **—— Insurance actions**

Federal Crime Insurance Act, section 1749bbb–10a, et seq., does not authorize assessment of attorney fees against United States in suit to enforce coverage under Federal Crime Insurance policy, and preempts West's F.S.A. § 627.428(1) allowing such fees. Fenton v. Federal Ins.

17. **—— Tax refund actions**

Where taxpayer paid $20 in fees for filing two petitions with Tax Court, Court found taxpayer was not entitled to award of costs absent statutory authority for reimbursing taxpayer for costs of filing petitions. Sharon v. C. I. R., 1976, 66 T.C. 515.

20. **—— Miscellaneous actions**

Since attorney travel expenses were not among listed items in section 1920 of this title listing litigation costs which could be taxed against the United States, and since amount of witness fees which could be awarded was limited to a $30 per day attendance allowance plus amount of witness' travel and board expenses, district court erred in including $4,186.36 expert witness fees and $1,808.45 attorney travel expenses in judgment for costs against the United States in suit to enforce various condemnation decrees. Commissioners of Highways of Towns of Annawan v. U. S., C.A.Ill.1981, 653 F.2d 292.

Absent statutory authority, attorneys' fees could not be awarded against Secretary of Labor on denial of enforcement of Secretary's subpoena requiring employee to appear to testify in matter being investigated under section 657 of Title 29, notwithstanding finding that lawsuit was oppressively commenced and prosecuted to harass defendant. Donovan, Secretary of Labor v. Nichols, C.A. Tex.1981, 646 F.2d 190.

In action by an association of marriage and family counselors and eight individuals eligible for benefits under Civilian Health and Medical Program of Uniformed Services against Department of Defense to prevent government termination of reimbursement benefits to users of certain marriage, family and pastoral counseling services under program, successful plaintiffs were, in court's discretion, granted litigation costs actually incurred. American Ass'n of Marriage & Family Counselors, Inc. v. Brown, D.C. D.C.1977, 440 F.Supp. 1114, affirmed 593 F.2d 1365, 193 U.S.App.D.C. 211.

21. **Prevailing parties entitled to costs and fees**

U. S. v. National Soc. of Professional Engineers, 404 F.Supp. 457 [main volume], 181 U.S.App.D.C. 41, affirmed 98 S. Ct. 1355, 435 U.S. 679, 55 L.Ed.2d 637.

Under this section and section 1920 of this title which expressly provide that party prevailing against government may be awarded costs in amount established by statute or court rule or order, and which permit award of costs or fees for exemplification and copies of papers necessarily obtained for use in case, school district was entitled to recover its costs in procuring statistical analyses that the government introduced into evidence and also computer expenses as an appropriate exercise of district court's equity powers under local rule in action alleging violations by district court of equal pay and overtime provisions of section 206 of Title 29. Equal Employment Opportunity Commission v. Kenosha Unified School Dist. No. 1, C.A.Wis.1980, 620 F.2d 1220.

Taxpayer was not entitled to award of filing costs in case before United States Tax Court where taxpayer was not the "prevailing party." Sharon v. C. I. R., C.A.9, 1978, 591 F.2d 1273, certiorari denied 99 S.Ct. 2883, 442 U.S. 941, 61 L.Ed.2d 311.

23. **Sovereign immunity—Generally**

Cuneo v. Rumsfeld, 553 F.2d 1360 [main volume], 180 U.S.App.D.C. 184.

Statutory policy against implied waivers of federal sovereign immunity with respect to awards of attorney's fees has been consistently construed as immunizing the United States against such authority to contrary. National Ass'n for Advancement of Colored People v. Civiletti, 1979, 609 F.2d 514, 197 U.S.App.D.C. 259, certiorari denied 100 S.Ct. 3012, 447 U.S. 922, 65 L.Ed.2d 1114.

Where plaintiffs' claim for damages did not seek recovery from defendant federal officials individually or from funds in agency's possession and control, as opposed to recovery from United States Treasury, claim for damages ran against United States and was barred by doctrine of sovereign immunity. Bronstein v. Philadelphia Fair Housing Commission, D.C.Pa.1980, 488 F.Supp. 1357.

Though landlords obtained ruling that authority of city fair housing commission over rents was preempted by regulations of Department of Housing and Urban Development, landlords' compensatory damage claim against federal defendants was barred by sovereign immunity. Id.

24. **—— Waiver**

As a limited waiver of sovereign immunity statute allowing award of costs against United States or its agencies if such an award is specifically provided by statute is to be strictly observed. Fenton v. Federal Ins. Adm'r., C.A.Fla.1981, 633 F.2d 1119.

Attorney fees may be assessed against the United States only when it has waived its sovereign immunity by statute. U. S. v. Dawkins, C.A.N.C.1980, 629 F.2d 972.

Direct language is required to waive assertion of federal government's sovereign immunity. Polos v. U. S., Ct.Cl.1980, 621 F.2d 385.

This section which permits a judgment for costs to be awarded to the prevailing party in a civil action brought by or against the United States or any agency or official thereof acting in his official capacity is a limited waiver of sovereign immunity and, therefore, its limitations and conditions must be strictly observed and exceptions thereto cannot be implied. Rhode Island Committee on Energy v. General Services Administration, C.A.R.I. 1977, 561 F.2d 397.

Waivers of sovereign immunity are to be strictly construed, and statutory authority to sue federal officials does not necessarily operate as complete waiver of sovereign immunity of the United States. Bronstein v. Philadelphia Fair Housing Commission, D.C.Pa.1980, 488 F.Supp. 1357.

25. **Statutory authorization for costs and fees—Generally**

Statutory authorization for an award of attorney's fees against the United States may be inferred by necessary implication from the statutory context in which a fee provision arises. National Ass'n for Advancement of Colored People v. Civiletti, 1979, 609 F.2d 514, 197 U.S.App.D.C. 259, certiorari denied 100 S.Ct. 3012, 447 U.S. 922, 65 L.Ed.2d 1114.

27. **—— Particular cases unauthorized**

National Ass'n of Regional Medical Programs, Inc. v. Mathews, 551 F.2d 340 [main volume], certiorari denied 97 S.Ct. 2674, 431 U.S. 954, 53 L.Ed.2d 270.

Because attorney fees could not be awarded against the federal government, litigants who successfully brought action against federal and state officials to halt highway project were entitled only to the fees for services rendered in their case against the state defendants. Southeast Legal Defense Group v. Adams, C.A.Or. 1981, 657 F.2d 1118.

Even assuming that Postal Service acted in bad faith, attorney fees could not be awarded plaintiff who prevailed in suit seeking to enjoin Postal Service from constructing addition to structure

Case: 1:83-mc-00556-UNA Doc #: 1 Filed: 11/16/83 Page: 135 of 136 PAGEID #: 135

## § 2411. Interest

3. Contractual or statutory basis of liability.

In the absence of specific authority provided by Congress, interest does not run on a claim against the United States, and a true federal rule follows, the same is true as to an offset of duty to invest. U. S. v. Louisiana, 1908, 100 U.S. 1035, 446 U.S. 253, 64 L.Ed.2d 230 rehearing 1981 102 S.Ct. 322, 454 U.S. 1125, 70 L.Ed.2d 447.

Interest is not recoverable against the United States except where expressly provided by statute. Oakley v. Italy, EA, Cal.1960, 622 F.2d 417.

11. Taxes
Penalty imposed was proper in fraud, fraud penalty imposed was proper in the extent that the government refunded or credited

any penalties taxpayer had already paid, and refund so awarded was entitled to interest as of the date of such payment. Akers v. U. S., D. Ohio 1981, 510 F.Supp. 178.

12. Tort actions
Interest is allowable in establishing interest rate at seven percent under judgment against United States under Federal Tort Claims Act, sections 1346(b) and 2671 et seq., rehearing denied 78 S.Ct. 100.
Cal.1959, 622 F.2d 417.
United States was liable, on judgment under this title, only for interest at 4% 1340(b) and 2071 et seq, of this title, for interest only, at rate of 4%, rather than 6%, 50, certiorari denied 100 S.Ct. 100, 439 U.S. 890, 58 L.Ed.2d 124.

## § 2412. Costs and fees

(a) Except as otherwise specifically provided for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

(b) Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

(c)(1) Any judgment against the United States or any agency and any official of the United States acting in his or her official capacity for costs pursuant to subsection (a) shall be paid as provided in sections 2414 and 2517 of this title and shall be in addition to any relief provided in the judgment.

(2) Any judgment against the United States or any agency and any official of the United States acting in his or her official capacity for fees and expenses of attorneys pursuant to subsection (b) shall be paid as provided in sections 2414 and 2517 of this title, except that if the basis for the award shall be a finding that the United States acted in bad faith, then the award shall be paid by any agency found to have acted in bad faith and shall be in addition to any relief provided in the judgment.

(d)(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

(B) A party seeking an award of fees and other expenses shall, within thirty days of a final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating

are computed. The party shall also allege that the position of the United States was not substantially justified.

(C) The court, in its discretion, may reduce the amount to be awarded pursuant to this subsection, or deny an award, to the extent that the prevailing party during the course of the proceedings engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy.

(2) For the purposes of this subsection—

(A) "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (I) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (II) attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.);

(B) "party" means (I) an individual whose net worth did not exceed $1,000,000 at the time the civil action was filed, (II) a sole owner of an unincorporated business, or a partnership, corporation, association, or organization whose net worth did not exceed $5,000,000 at the time the civil action was filed, except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) exempt from taxation under section 501(a) of the Code and a cooperative association as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141j(a)), may be a party regardless of the net worth of such organization or cooperative association, or (III) a sole owner of an unincorporated business, or a partnership, corporation, association, or organization, having net more than 500 employees at the time the civil action was filed; and

(C) "United States" includes any agency and any official of the United States acting in his or her official capacity.

(3) In awarding fees and other expenses under this subsection to a prevailing party in any action for judicial review of an adversary adjudication, as defined in subsection (b)(1)(C) of section 504 of title 5, United States Code, or an adversary adjudication subject to the Contract Disputes Act of 1978, the court shall include in that award fees and other expenses to the same extent authorized in subsection (a) of such section, unless the court finds that during such adversary adjudication the position of the United States was substantially justified, or that special circumstances make an award unjust.

(4)(A) Fees and other expenses awarded under this subsection may be paid by any agency over which the party prevails from any funds made available to the agency, by appropriation or otherwise, for such purpose. If not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made in accordance with sections 2414 and 2517 of this title.

(B) There is authorized to be appropriated to each agency for each of the fiscal years 1982, 1983, and 1984, such sums as may be necessary to pay fees and other expenses awarded pursuant to this subsection in such fiscal years.

(5) The Director of the Administrative Office of the United States Courts shall include in the annual report prepared pursuant to section 604 of this title, the amount of fees and other expenses awarded during the preceding fiscal year pursuant to this subsection. The report shall de-

Case: 1:83-mc-00056-UNA Doc #: 1 Filed: 11/16/83 Page: 136 of 136 PAGEID #: 136

## § 1988. Proceedings in vindication of civil rights; attorney's fees

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this Title, and of Title "CIVIL RIGHTS," and of Title "CRIMES," for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty. In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

R.S. § 722; Pub.L. 94–559, § 2, Oct. 19, 1976, 90 Stat. 2641; Pub.L. 96–481, Title II, § 205(c), Oct. 21, 1980, 94 Stat. 2330.

### Historical Note

References in Text. This Title, and of Title "CIVIL RIGHTS," and of Title "CRIMES," referred to in text, mean titles XIII, XXIV, and LXX of the Revised Statutes, which comprise sections 530 to 1093, 1977 to 1991, and 5323 to 5550, respectively. For complete classification of these titles to the Code, see Tables volume.

Title IX of Public Law 92–318, referred to in text, is Title IX of Pub.L. 92–318, June 23, 1972, 86 Stat. 373, popularly known as the Education Amendments of 1972, which is classified principally to chapter 38 (section 1681 et seq.) of Title 20, Education. For complete classification of this Act to the Code, see Tables volume.

The United States Internal Revenue Code, referred to in text, is classified, generally to Title 26, Internal Revenue Code.

The Civil Rights Act of 1964, referred to in text, is Pub.L. 88–352, July 2, 1964, 78 Stat. 241. Title VI of the Civil Rights Act of 1964 is classified generally to subchapter V (section 2000d et seq.) of this

chapter. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables volume.

Codification. R.S. § 722 is from Acts Apr. 9, 1866, c. 31, § 3, 14 Stat. 27; May 31, 1870, c. 114, § 18, 16 Stat. 144.

Section was formerly classified to section 729 of Title 28 prior to the general revision and enactment of Title 28, Judiciary and Judicial Procedure, by Act June 25, 1948, c. 646, § 1, 62 Stat. 869.

1980 Amendment. Pub.L. 96–481 substituted "Pub.L. 92–318, or title VI of the Civil Rights Act of 1964" for "Pub.L. 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964".

1976 Amendment. Pub.L. 94–559 authorized the court, in its discretion, to allow a reasonable attorney's fee as part of the prevailing party's costs.